IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 27 2017

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

|  |  |  |
|---|---|---|
| ONE BANK & TRUST, N.A. | ) | |
| | ) | |
| Plaintiff | ) | Case No. 5:17cv 51-BRW |
| | ) | |
| vs. | ) | (Formerly Case No. 35CV-17-48 |
| | ) | Jefferson County Circuit Court) |
| CHICAGO TITLE INSURANCE | ) | |
| COMPANY f/k/a TICOR TITLE | ) | This case ... to District Judge _Wilson_ |
| INSURANCE COMPANY | ) | and to Magistrate Judge _Kearney_ |

## DEFENDANT CHICAGO TITLE INSURANCE COMPANY'S
## NOTICE OF REMOVAL

To:    THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
ARKANSAS

Defendant Chicago Title Insurance Company f/k/a Ticor Title Insurance

Company ("Chicago"), a Nebraska corporation under 28 USCA §§ 1332, 1441, and 1446,

removes this action, Case No. 35CV-17-48, currently filed at the Circuit Court of

Jefferson County, Arkansas, to the Pine Bluff Division of the United States District

Court for the Eastern District of Arkansas, subject to the right of Defendant to move to

transfer to the Little Rock Division.  The removal of this case is based on the following

grounds.

1.    **State Court Action**

Plaintiff, One Bank & Trust, N.A. filed this action against Chicago on January 25,

2017.  Chicago was served with copies of the Summons and Complaint on January 27,

2017, by serving their registered agent, CT Corporation System via process server.  The

Summons and Complaint are attached as Exhibit "A." In addition, Plaintiff has filed an Affidavit of Service for Chicago, which is attached hereto as Exhibit "B." Defendant has filed a Motion to Dismiss for Failure to State a Claim and/or Motion for Summary Judgment and Brief in Support, which is attached hereto as Exhibit "C."

2.     **Nature of Action in Plaintiff's Complaint**

Plaintiff's Complaint alleges a breach of contract and violation of the Arkansas Deceptive Trade Practices Act by Defendant. Plaintiff has not identified a specific amount in damages in its Complaint, however, it previously made a demand for $79,339.17 prior to filing suit and seeks additional damages in the suit including additional interest, attorney's fees costs, and 12% penalty.

3.     **Removal of State Court Action**

Under 28 U.S.C. § 1441(a), "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants . . . to the district court of the United States for the district and division embracing the place where such action is pending." Because the district court has original jurisdiction under 28 U.S.C. § 1332 (diversity), and Chicago timely filed this Notice of Removal, this action is removable under 28 U. S.C. § 1441(a). However, as will be explained further, this action should be transferred to the Little Rock Division.

4.     **Diversity**

Chicago is a Nebraska corporation doing business in the state of Arkansas. Plaintiff is a national association with its principal office located in Little Rock, Pulaski

County, Arkansas. There are no other parties to this action; therefore, there is complete diversity in this action. Furthermore, the amount in controversy exceeds $75,000.00. As such, jurisdiction is proper in federal district court pursuant to 28 U.S.C. § 1332(a).

5.      **Venue and Transfer to Little Rock Division**

The United States District Court for the Easter District of Arkansas, Pine Bluff Division, embraces the county in which the state court action is now pending, and thus this Court is the proper district court to which this case should be removed. See 28 U.S.C. §§ 1441(a), 1446(a).   However, Chicago affirmatively states that venue is improper in Jefferson County because this is a breach of contract action and the Plaintiff's principal place of business is in Little Rock. The location of the real estate reformed by Plaintiff is not the issue in this case. This is a breach of contract case alleging events or omissions committed by Defendant at its offices in Florida, Defendant's claims counsel in Little Rock, and Defendant's insured in Little Rock. Consequently, Chicago reserves all rights to transfer this case to the proper federal district.

6.      **Timeliness of Notice of Removal**

As noted above, Chicago was served with copies of the Summons and Complaint on January 27, 2017. Thirty days have not elapsed since the Complaint was served, making removal timely under 28 U.S.C. § 1446(b).

7.      **State Court Pleadings**

Pursuant to 28 U.S.C. § 1446(a), Chicago is simultaneously filing with this Notice copies of all process, pleadings, order, and other papers or exhibits of every kind

existing on file in the Circuit Court of Jefferson County, Arkansas in the removed action. (See Ex. A-C) As 28 U.S.C. § 1446(d) dictates, Chicago is providing written notice to Plaintiff and is filing a true and correct copy of this Notice of Removal with the Clerk of the Circuit Court of Jefferson County, Arkansas.

In filing this Notice of Removal, Chicago does not waive, and specifically reserves all defenses, exceptions, rights, and motions. No statement herein or omission here from shall be deemed to constitute an admission by Chicago of any of the allegations or entitlement to damages sought in the Complaint.

Based on the foregoing, Chicago removes this action, Case No. 35CV-17-48, from the Circuit Court of Jefferson County, Arkansas, to the Pine Bluff Division of the United States District Court for the Eastern District of Arkansas.

Dated: February 27, 2017.

Respectfully submitted,

McMULLAN & BROWN
PO Box 2839
Little Rock, AR 72203-2839
(501) 376-9119
(501) 376-8437 (fax)

Marian M. McMullan, Bar No. 86123
mmcmullan@m-b.law
*Counsel for Chicago Title Insurance Company*

## CERTIFICATE OF SERVICE

I, Marian M. McMullan, do hereby certify that I have sent via:

- ☐ Hand-delivery
- ☐ Facsimile
- ☐ Electronic Mail
- ☒ U.S. Mail, postage pre-paid
- ☐ Court ECF System
- ☐ Federal Express

this 27th day of February, 2017, a true and complete copy of the foregoing as follows:

Wm. David Duke, Esq.
Kelly W. McNulty, Esq.
Aaron M. Heffington, Esq.
Gill Ragon Owen P.A.
425 W. Capitol, Ste. 3800
Little Rock,  AR  72201
  *Attorneys for Plaintiff*

Lafayette Woods, Sr., Clerk
Jefferson County Circuit Court
PO Box 7433
Pine Bluff, AR  71611

Marian M. McMullan

5

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS
## CIVIL DIVISION 2

ONE BANK & TRUST, N.A                                                    **PLAINTIFF**

v.                                  CASE NO. 35cv-17-48

CHICAGO TITLE INSURANCE                                                 **DEFENDANT**
COMPANY f/k/a TICOR TITLE
INSURANCE COMPANY

### COMPLAINT

Plaintiff, ONE BANK & TRUST, N.A. ("One Bank"), through its attorneys, GILL RAGON

OWEN, P.A., and for its Complaint against Chicago Title Insurance Company f/k/a Ticor Title

Insurance Company ("Chicago"), states and alleges as follows:

### INTRODUCTION

1.      This is an action for breach of contract and violation of the Arkansas Deceptive

Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq. The issues in this action arise out of

Defendant's failure to fulfill its obligations to Plaintiff pursuant to two valid title insurance

policies Plaintiff purchased from Defendant.

2.      Namely, Defendant has failed to reimburse One Bank for damages arising from

challenges to One Bank's right of access and lien priority on two properties in Jefferson County.

3.      These damages are covered by One Bank's policies and include attorneys' fees

costs, and expenses incurred in furtherance of the resolution of these access and priority issues.

### PARTIES AND JURISDICTION

4.      One Bank is a national association that operates a bank under a national charter.

Its principal place of business is in Little Rock, Pulaski County, Arkansas.

5.      Defendant Chicago is a Nebraska corporation doing business in Arkansas.



FILED IN MY OFFICE AND SUMMONS
ISSUED AT 12:49 O'CLOCK P M
1-25-17                   DATE
LAFAYETTE WOODS, SR., CLERK
Shawn Lewis      DC

EXHIBIT
A
Bumberg No. 5208

6.    The property that is the subject matter of this action is located in Jefferson County.

7.    This Court has jurisdiction over the parties and subject matter of this action pursuant to Ark. Code Ann. § 16-13-201.

8.    Venue is proper with this Court pursuant to Ark. Code Ann. § 16-60-101.

## FACTS

9.    The subject matter of this action centers on two title insurance policies purchased by One Bank from Chicago in conjunction with the issuance of two loans on two related properties located in Jefferson County, Arkansas.

10.    One loan and policy concerns a property comprised of three tracts totaling 39.45 acres (the "Roberson Property").

11.    The other loan and policy concerns an adjacent 10 acre tract (the "Barnes Property").

12.    One Bank owns the Barnes Property and has a properly perfected secured mortgage on the Roberson Property.

13.    Title to the Barnes Property and Roberson Property were once united, and together the two properties form a 49.45-acre block of land.

14.    As described below, throughout the extensive litigation regarding the Barnes Property and Roberson Property, various issues regarding access and lien-priority have arisen.

15.    These are issues covered by One Bank's insurance policies. However, Defendant has refused to fulfill its obligations thereunder.

16.    Because of Defendant's refusal, One Bank brings this action.

2

A.     **The Roberson Loan and Policy**

17.    On or about May 29, 2008, Donna Roberson executed and delivered to One Bank a promissory note (the "Roberson Note") in the initial principal amount of $170,400.00, and used part of the proceeds of the Roberson Note to pay the purchase price for 39 acres more or less, and to provide funds to enable Roberson to construct her home on the land. To secure payment thereon, Roberson acknowledged and delivered to One Bank a Mortgage dated May 29, 2008 (the "Roberson Mortgage"), which encumbered the property purchased. The Roberson Mortgage was recorded with the Jefferson County Circuit Clerk on June 25, 2008. A copy of the Roberson Mortgage is attached hereto as **Exhibit A**.

18.    In connection with this transaction, One Bank purchased from Chicago a title insurance policy numbered 74110-7623236 and dated June 25, 2008 (the "Roberson Policy"), insuring title to the land encumbered by the Roberson Mortgage. A copy of the Roberson Policy is attached hereto as **Exhibit B**.

19.    On or about September 16, 2008, Defendant or Defendant's agents discovered that the legal description of land encumbered that was initially attached to the Roberson Mortgage was incorrect. Namely, the initial description failed to include 29 acres of property that Roberson purchased with the proceeds of One Bank's loan, and was intended to be encumbered by the Roberson Mortgage.

20.    Despite the error in the Roberson Mortgage, the Roberson Policy covered 39.45 acres from its issuance.

21.    To remedy the error in the legal description, Defendant or Defendant's agents re-recorded the Roberson Mortgage with an amended legal description attached. The re-recording

3

was placed of record with the Jefferson County Circuit Clerk on September 16, 2008. A copy of the re-recording of the Roberson Mortgage is attached hereto as **Exhibit C**.

22.     The re-recording does not bear Donna Roberson's acknowledgement of the amended legal description even though it added the additional land to be encumbered by the Mortgage.

23.     On or about July 9, 2014, Defendant or Defendant's agents discovered that the legal description, as re-recorded, was still incorrect.

24.     In light of this discovery, Defendant or Defendant's agents filed or caused to be filed a Scrivener's Error Affidavit (the "Roberson Error Affidavit"), pursuant to which the erroneous legal description was once again amended—this time, to the correct legal description of the property originally encumbered by the Roberson Mortgage. The Roberson Error Affidavit was recorded with the Jefferson County Circuit Clerk on July 9, 2014. A copy of the Roberson Error Affidavit is attached hereto as **Exhibit D**.

25.     To reflect the amendment set forth in the Roberson Error Affidavit, the Roberson Mortgage was recorded a final time with the Jefferson County Circuit Clerk on July 9, 2014. A copy of this final recording is attached hereto as **Exhibit E**.

26.     In light of this final correction, Chicago executed and delivered to One Bank a Policy Correction (the "Roberson Policy Correction"), modifying the Roberson Policy's coverage to embrace the correct legal description of the Roberson Property. A copy of the Roberson Policy Correction is attached hereto as **Exhibit F**.

27.     One Bank timely paid all premiums due under the Roberson Policy.

**B.** **The Barnes Loan and Policy**

28.     On or about May 29, 2008, Michael Barnes and Johanna Barnes (collectively, "Barneses") executed and delivered to One Bank a promissory note (the "Barnes Note") in the initial principal amount of $170,400. To secure payment thereon, the Barneses acknowledged and delivered to One Bank a Mortgage dated May 29, 2008 (the "Barnes Mortgage"), which granted and conveyed to One Bank a security interest in the property purchased. A copy of the Barnes Mortgage is attached hereto as **Exhibit G**.

29.     In connection with this transaction, One Bank purchased from Chicago a title insurance policy numbered 74341-76231831 and dated June 25, 2008 (the "Barnes Policy"), insuring title to the land encumbered by the Barnes Mortgage. A copy of the Barnes Policy is attached hereto as **Exhibit H**.

30.     On or about September 16, 2008, Defendant or Defendant's agents discovered that the legal description of land encumbered that was initially attached to the Barnes Mortgage was incorrect.

31.     In light of this discovery, Defendant or Defendant's agents filed or caused to be filed a Scrivener's Error Affidavit (the "Barnes Error Affidavit"), pursuant to which the erroneous legal description was amended to the correct legal description of the property originally encumbered by the Barnes Mortgage. The Barnes Error Affidavit was recorded with the Jefferson County Circuit Clerk on July 9, 2014. A copy of the Barnes Error Affidavit is attached hereto as **Exhibit I**.

32.     To reflect the amendment set forth in the Barnes Error Affidavit, the Barnes Mortgage was recorded a final time with the Jefferson County Circuit Clerk on July 9, 2014. A copy of this final recording is attached hereto as **Exhibit J**.

5

33.     In light of this final correction, Chicago executed and delivered to One Bank a Policy Correction/Addendum (the "Barnes Policy Correction"), modifying the Barnes Policy's coverage to embrace the correct legal description of the Barnes Property. A copy of the Barnes Policy Correction is attached hereto as **Exhibit K**.

34.     One Bank timely paid all premiums due under the Barnes Policy.

**C.     Foreclosure of the Barnes Property and Prevention of Access Thereto**

35.     On February 12, 2015, One Bank filed its Complaint for Foreclosure and Judgment against the Barneses, thereby commencing Jefferson County Circuit Court Case No. 35CV-15-60 (the "Barnes Foreclosure").

36.     On July 23, 2015, One Bank acquired legal title to the Barnes Property by Commissioner's Deed executed pursuant to a Foreclosure Decree and Report of sale entered in the Barnes Foreclosure.

37.     The only method of access to the Barnes Property is a gravel road running over the Roberson Property.

38.     After One Bank acquired the Barnes Property, various individuals came forward claiming that the gravel road was a private road, and was either owned or controlled by the various individuals.

39.     In fact, there is no express easement serving the Barnes Property over the gravel road of record, even though the gravel road has been continuously used to access the Barnes Property since at least 2008, and the Barnes Property cannot be accessed otherwise.

40.     Based on these allegations, and the fact that the gravel road is private, the individuals barred One Bank's access to the Barnes Property.

6

41.     On November 9, 2015, pursuant to a writ of assistance filed in the Barnes Case, the Jefferson County Sheriff delivered possession of the Barnes Property to One Bank, whereupon One Bank's agents changed the locks.

42.     However, after the Sheriff's office had discharged its duty pursuant to the writ of assistance, the individuals continued to bar One Bank's access to the Barnes Property and to make threats of violence directed towards anyone One Bank might send to the Barnes Property.

**D.     Foreclosure of the Roberson Property**

43.     On October 8, 2015, One Bank filed its Complaint for Foreclosure and Judgment against Donna Roberson, seeking to foreclose on the Roberson Property and commencing Jefferson County Circuit Court Case No. 35cv-15-567 (the "Roberson Case").

44.     Once it became clear that other individuals were claiming ownership of portions of the Roberson Property and ownership and control over the gravel road, One Bank filed its First Amendment to its Complaint for Foreclosure and Judgment in the Roberson Case, adding additional causes of action seeking to quiet title in an access easement over the gravel road to the Barnes Property and for injunctive relief related thereto.

45.     The First Amendment named several additional defendants, mostly comprised of the individuals who had identified themselves as interested parties by claiming to have received an interest in a portion of the Roberson Property through deeds from Donna Roberson.

46.     These individuals included Jeffell Elliott, Andrew Lacey, and Rosalind Parys-Christopher.

47.     One Bank also named Vanderbilt Mortgage & Finance, Inc. ("Vanderbilt"), who claimed to have first-priority mortgages on property claimed by Elliot and Parys-Christopher.

7

48.     Upon the filing of the First Amendment, One Bank's right of access to the Barnes Property and the priority of One Bank's mortgage lien over the Roberson Property had been clearly challenged and were put in issue before the Court.

49.     If it were not for Defendant's and/or Defendant's agents' multiple errors with regard to the legal descriptions attached to the Roberson Mortgage and Barnes Mortgage, these challenges would not have been possible, as subsequent grantees of Roberson would not be able to use the error to attempt to legitimize their claims.

## E.     **Donna Roberson's Bankruptcy**

50.     On December 7, 2015, Donna Roberson filed a Chapter 13 Voluntary Petition, commencing U.S. Bankruptcy Court for the Eastern District of Arkansas Case No. 5:15-bk-16155 (the "Roberson Bankruptcy").

51.     In her petition, Donna Roberson identified One Bank as a creditor. However, Roberson indicated that her debt to One Bank was only secured by 4.6 acres of the Roberson Property and a house thereon, instead of the full 39.45 acres.

52.     One Bank objected to the Roberson Bankruptcy and moved to dismiss it based on allegations that it was filed in bad faith in an effort to stall proceedings in the Roberson Case. *See* Roberson Bankruptcy, Doc. # 13. One Bank also moved, in the alternative, that the Bankruptcy Court grant it relief from the automatic stay and abandonment so that it could pursue its foreclosure and access claims in the state-court Roberson Case. *Id.*

53.     Roberson responded to One Bank's motion with the assertion that the extent of One Bank's lien "has yet to be determined due to potential errors in the land description." Roberson Bankruptcy, Doc. # 25.

8

54.     Roberson further asserted that while "a Scrivener's Error Affidavit and

subsequent altered mortgages were filed," Roberson was without sufficient knowledge to admit

or deny the accuracy of the documents. *Id.*

55.     One Bank's motions were resolved via an Agreed Order entered by the

Bankruptcy Court on March 21, 2016. Roberson Bankruptcy, Doc. # 36.

56.     Therein, the Bankruptcy Court determined, inter alia:

      a. "One Bank holds a properly perfected secured mortgage on approximately 40
         acres [the Roberson Property."

      b. "[Roberson] grants One Bank an immediate, continuous and permanent access
         easement to the Barnes Property via the Gravel Road," and "Debtor agrees to
         direct all other property owners adjacent to the Gravel Road to allow One
         Bank access to the best of her abilities."

57.     Pursuant to the Agreed Order, One Bank agreed to dismiss its motions on the

conditions that:

      a. Roberson pay One Bank its regular monthly payment plus adequate protection
         to cure arrearages.

      b. Roberson amend her bankruptcy schedule to recognize One Bank's mortgage
         as encumbering the entire Roberson Property; and

      c. Roberson grants One Bank a permanent access easement to the Barnes
         Property via the gravel road.

58.     The Roberson Bankruptcy remains open. However, if Roberson should fail to

make her payments in a timely manner, One Bank is entitled to automatic relief from stay and

may proceed to foreclose upon the Roberson Property.

59.     If it were not for Defendant's and/or Defendant's agents' multiple errors with

regard to the legal descriptions attached to the Roberson Mortgage, Roberson and those claiming

through her would not have been able to assert these defenses.

9

**F.      Jeffell Elliott's Bankruptcy**

60.      On August 21, 2015, Jeffell Elliott filed a Chapter 13 Voluntary Petition, commencing U.S. Bankruptcy Court for the Eastern District of Arkansas Case No. 5:15-bk-14150 (the "Elliott Bankruptcy").

61.      At the time One Bank added Jeffell Elliott as a defendant in the Roberson Case, it was unaware of the Elliott Bankruptcy.

62.      After being made aware of the Elliott Bankruptcy, on January 20, 2016, One Bank filed a motion asserting that it had a first-priority lien on the portion of the Roberson Property Elliott claimed (the "Elliott Parcel"), and seeking abandonment and relief from stay so that One Bank could pursue foreclosure in the Roberson Case. In addition, One Bank's motion sought to have the Bankruptcy Court direct Jeffell Elliott to allow One Bank access to the Barnes Property. Elliott Bankruptcy, Doc. #54.

63.      On February 5, 2016, Elliott responded to One Bank's Motion by asserting that One Bank had no lien on Elliott Parcel. Elliott Bankruptcy, Doc. #65.

64.      On February 4, 2016, Vanderbilt objected to One Bank's Motion on the basis that One Bank filed its motion to foreclose on Vanderbilt's collateral and Elliott's homestead, again raising the issue of the priority of One Bank's lien. Elliott Bankruptcy, Doc. #63.

65.      On July 21, 2016, after a hearing on One Bank's Motion, the Bankruptcy Court granted One Bank's Motion in part, and denied it in part.

66.      In so doing, the Bankruptcy Court held:

   a. One Bank shall have immediate relief from the automatic stay so that the parties may litigate in the Roberson Case issues pertaining to (1) an access easement and (2) lien priority; and

   b. A survey would be performed on Roberson Property and Barnes Property.

10

67.    If it were not for Defendant's and/or Defendant's agent's multiple errors with regard to the legal descriptions attached to the Roberson Mortgage, the issue of loan priority would not have arisen, and One Bank would not have had to litigate the various issues related thereto in the Elliott Bankruptcy.

## G.    **Post-Bankruptcy Litigation in the Roberson Case**

68.    On September 26, 2016, after the automatic stay of action against Roberson and Elliott had been lifted in their respective bankruptcies, One Bank filed its Second Amended and Substituted Complaint in the Roberson Case.

69.    This most recent amendment outlined the extensive procedural history of the issues involved and consolidated all open issues with regard to the Roberson Property and Barnes Property into one complaint by requesting (1) a decree establishing an easement for access to the Barnes Property, (2) a preliminary injunction granting immediate and continuous access to the Barnes Property, (3) declaratory judgment establishing One Bank's lien on the Roberson Property as being first priority, and (4) foreclosure.

70.    On October 26, 2016, Jeffell Elliott, Andrew Lacy, Donna Roberson and Rosalind Parys-Christopher filed a joint Answer to One Bank's Second Amended Complaint.

71.    Therein, the defendants raise various defenses dealing with the priority of One Bank's lien and the extent of the Roberson Property the lien actually encumbers.

72.    In doing so, the defendants specifically attack the Roberson Error Affidavit, filed by Defendant or Defendant's agents, claiming it was "filed without consent or knowledge of Roberson to cover land that was not originally intended to be mortgaged. . . ."

11

73.     The defendants also specifically assert that the September 16, 2008, re-recording of the Roberson Mortgage recorded by Defendant or Defendant's agents "was not actually a correction, but a land grab. . . ."

74.     On October 27, 2016, Vanderbilt filed its Answer, denying the priority of One Bank's lien affirmatively requesting the Court to determine the priority of the liens involved in the case.

75.     If it were not for Defendant's and/or Defendant's agent's multiple errors with regard to the legal descriptions attached to the Roberson Mortgage, a large portion of the Roberson Case would have been unnecessary.

76.     Without these mistakes, One Bank's claim would be much less complicated, as the Roberson Case would have only been a matter of proof for foreclosure and the establishment of an easement. Instead, Defendant's and/or Defendant's agents' errors allowed Roberson, Elliott and Vanderbilt to challenge the priority of One Bank's lien, and, with these defenses, the litigation surrounding the Roberson Property and Barnes Property became significantly more complex.

## H.     Key provisions of the Barnes Policy

77.     Schedule B to the Barnes Policy specifically states that Chicago "hereby insures the insured in accordance with and subject to the terms, exclusions and conditions set forth in the American Land Title Association Loan Policy (6-17-06). . . ."

78.     A copy of the American Land Title Association Loan Policy (6-17-06) ("ALTA Policy") is included as part the Barnes Policy attached hereto as Exhibit H.

79.     The ALTA Policy, as incorporated into the Barnes Policy, specifically provides that Chicago insures against loss or damage incurred from:

a. "[A] document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered." ALTA Policy, Covered Risks § 2(a)(iii).

b. "Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land." ALTA Policy, Covered Risks § 2(c).

c. "Unmarketable Title." ALTA Policy, Covered Risks § 3.

d. "No right of access to and from the Land." ALTA Policy, Covered Risks § 4.

e. "The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title," including loss from impairments arising from "the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered. ALTA Policy, Covered Risks § 9(c).

80.    The ALTA Policy, as incorporated into the Barnes Policy, further provides that Chicago "will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions." ALTA Policy, Covered Risks § 14.

**I.    Key provisions of the Roberson Policy**

81.    The Roberson Policy provides that Chicago will insure against loss or damage incurred from:

a. "Any defect in or lien or encumbrance on the title."

b. "Unmarketability of the title."

c. "Lack of a right of access to and from the land."

d. The invalidity or unenforceability of the lien of the insured mortgage upon the title."

e. "The priority of any lien or encumbrance over the lien of the insured mortgage."

82.     The Roberson Policy further provides that Chicago "will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

**J.     One Bank's Claims and Chicago's Action in Relation Thereto**

83.     On or about January 28, 2016, One Bank submitted claims on both the Roberson Policy and the Barnes Policy via Chicago's online claim submittal portal.

84.     Through its claims, One Bank advised Chicago of the procedural background of the Roberson Case, described the issues pertaining to access, and advised Chicago of the Roberson Bankruptcy and Elliott Bankruptcy, in which the issues pertaining to priority of One Bank's lien had been raised.

85.     On March 24, 2016 Chicago accepted coverage of One Bank's claims. It confirmed acceptance and coverage through two letters (the "Roberson Confirmation" and the "Barnes Confirmation"). Copies of the Roberson Confirmation and the Barnes Confirmation are attached hereto as **Exhibit L** and **Exhibit M**, respectively.

86.     In the Barnes Confirmation, Chicago admits that the issue of access to the Barnes Property "is a covered matter subject to the terms and provision of the [Barnes] Policy."

87.     In the Roberson Confirmation, in addition to admitting that the issue of access is covered, Chicago also acknowledges a "challenge by [Roberson] to the legal description encumbered by the Insured Mortgage," and a "challenge to the priority of the Insured Mortgage on the parcels conveyed by [Roberson] to third parties. . . ."

88.     After acceptance of One Bank's claims, Chicago assigned independently-engaged attorneys to address One Bank's claims. These attorneys have taken an extremely limited role in

14

the matters described herein and have attended, but have had no participation, in the litigation pertaining to these matters.

89.     On several occasions, counsel for One Bank has offered to allow Chicago's attorneys to pursue resolution of these issues. However, on each occasion, Chicago determined that the underlying facts and filings were too complicated for a new set of attorneys to take over.

90.     Consequently, Chicago determined that its attorneys would provide assistance to One Bank's counsel, but that One Bank's counsel would maintain its primary role in litigation.

91.     Since One Bank made its claims, One Bank has paid its counsel to continue to pursue resolution of the access and priority issues.

92.     Chicago knew One Bank was paying its counsel to do so, and did not object.

93.     Since One Bank made its claims, its counsel has taken a primary role in the following:

> a.  Hearing on One Bank's Motion for Abandonment and Relief from Stay in the Elliott Bankruptcy. Chicago's attorney attended, but did not participate.
>
> b.  Hearing on One Bank's request for preliminary injunction (regarding access to the Barnes Property) in the Roberson Case.

94.     In addition, when it became clear that there was no legal description of the gravel road for the easement One Bank sought and that various new legal descriptions had become pertinent, One Bank ordered a survey of the Barnes Property and Roberson Property for $4,100 to facilitate resolution of the priority issues and to provide a legal description for the easement over the gravel road to which it is entitled. A copy of the invoice for the survey is attached hereto as **Exhibit N**.

95.     One Bank paid this invoice, but, despite demand to Chicago, has not been reimbursed for the cost of the survey.

15

96.     Every issue that has arisen with regard to the Barnes Property and/or Roberson Property has stemmed from the incorrect legal description on the initial recording of the Roberson Mortgage—a document affecting Title that was not properly created—and/or the lack of access to the Barnes Property.

97.     Both of these issues are covered under the Barnes Policy and Roberson Policy.

98.     On November 21, 2016, One Bank made demand for payment of its attorneys' fees, costs and expenses for prosecution of these issues and for reimbursement for the survey. A copy of One Bank's demand is attached hereto as **Exhibit O**.

99.     On December 7, 2016, One Bank restated these demands. A copy of One Bank's restated demand is attached hereto as **Exhibit P**.

100.    On December 20, 2016, via two separate letters, Chicago denied One Bank's demands. Copies of Chicago's denial letters are attached hereto as **Exhibit Q** and **Exhibit R**.

101.    One Bank paid all required premiums and has met conditions obligations of the Barnes Policy and Roberson Policy, including obligation to cooperate with Chicago.

102.    Nevertheless, despite owning two insurance policies that provide for payment of attorney's fees incurred as a result of the issues described herein, One Bank has not received the benefit of those provisions.

103.    Instead, Chicago has only provided minimal assistance to One Bank's attorneys in these matters, and refused to reimburse it for the damages it has incurred as a result of covered issues.

## COUNT I
## BREACH OF CONTRACT: FAILURE TO REIMBURSE FOR SURVEY

104.    One Bank re-alleges and incorporates all allegations otherwise set forth herein.

16

105.     The Barnes Policy specifically requires Chicago to reimburse One Bank for costs, damages or loss arising from "[n]o right of access to and from the Land."

106.     The Barnes Policy also requires Chicago to reimburse One Bank for costs, damages or loss arising from an unmarketable title.

107.     The survey One Bank ordered, and subsequently paid for, was and is necessary for the resolution of the access issues described herein.

108.     One Bank's title to the Barnes Property is not marketable without full resolution of the access issues describe herein.

109.     The cost of the survey constitutes a damage or loss arising from One Bank having no right of access to the Barnes Property.

110.     Therefore, Chicago is obligated to reimburse One Bank for the survey's cost.

111.     In addition, both the Barnes Policy and the Roberson Policy obligate Chicago to reimburse One Bank for costs, damages or loss arising problems with One Bank's lien.

112.     The survey was and is necessary for the resolution of the issues regarding the priority of One Bank's lien, and so the cost of the survey constitutes a damage or loss arising from problems with One Bank's lien on the Roberson Property.

113.     Therefore, Chicago is obligated to reimburse One Bank for the survey's cost.

114.     One Bank performed its obligations under both the Barnes Policy and the Roberson Policy.

115.     As described herein, Chicago has refused to reimburse One Bank for damages, costs, attorneys' fees and expenses arising from the foregoing, despite demand.

116.     Chicago's refusal constitutes breaches of both the Barnes Policy and the Roberson Policy.

117.    As a result of Chicago's breaches, One Bank has suffered damages in the amount
of $4,100.

118.    In addition to the amount of the loss, One Bank is entitled to twelve percent
(12%) damages upon the amount of the loss, together with all reasonable attorneys' fees for the
prosecution and collection of the loss pursuant to Ark. Code Ann. § 23-79-208. One Bank is also
entitled to its attorneys' fees pursuant to Ark. Code Ann. § 16-22-308

**COUNT II**
**BREACH OF CONTRACT: FAILURE TO REIMBURSE FOR DAMAGES INCURRED**
**AS A RESULT OF A LACK OF ACCESS TO THE BARNES PROPERTY**

119.    One Bank re-alleges and incorporates all allegations otherwise set forth herein.

120.    The Barnes Policy specifically requires Chicago to reimburse One Bank for
damages, costs, attorneys' fees and expenses arising from "[n]o right of access to and from the
Land."

121.    The Barnes Policy also requires Chicago to reimburse One Bank for damages,
costs, attorneys' fees and expenses arising from an unmarketable title.

122.    Because One Bank currently has no easement over which to access the Barnes
Property, One Bank cannot market the Barnes Property.

123.    One Bank performed its obligations under the Barnes Policy.

124.    As described herein, Chicago has refused to reimburse One Bank for damages,
costs, attorneys' fees and expenses arising from the foregoing, despite demand.

125.    Chicago's refusal constitutes breaches of the Barnes Policy.

126.    One Bank has been damaged and has incurred costs, attorneys' fees, and expenses
arising from an unmarketable title to the Barnes Property and arising from a lack of access to the
Barnes Property in an amount to be determined at trial.

18

127.    In addition to the amount of the loss. One Bank is entitled to twelve percent

(12%) damages upon the amount of the loss, together with all reasonable attorneys' fees for the

prosecution and collection of the loss pursuant to Ark. Code Ann. § 23-79-208. One Bank is also

entitled to its attorneys' fees pursuant to Ark. Code Ann. § 16-22-308

**COUNT III**
**BREACH OF CONTRACT: FAILURE TO REIMBURSE FOR LEGAL EXPENSES**
**INCURRED AS A RESULT OF LIEN-PRIORITY ISSUES**

128.    One Bank re-alleges and incorporates all allegations otherwise set forth herein.

129.    The Roberson Policy provides that Chicago will reimburse One Bank for

damages, costs, attorneys' fees and expenses incurred from:

     a.  "Any defect in or lien or encumbrance on the title."

     b.  The invalidity or unenforceability of the lien of the insured mortgage upon the
        title."

     c.  "The priority of any lien or encumbrance over the lien of the insured
        mortgage."

130.    One Bank performed its obligations under the Barnes Policy.

131.    As described herein. Chicago has refused to reimburse One Bank for damages,

costs, attorneys' fees and expenses arising from the foregoing, despite demand.

132.    Chicago's refusal constitutes breaches of the Roberson Policy.

133.    One Bank has been damaged and has incurred costs, attorneys' fees, and expenses

arising from potential defects in its title, potential invalidity or enforceability of its lien, and the

priority of its lien on the Roberson Property in an amount to be determined at trial.

134.    In addition to the amount of the loss. One Bank is entitled to twelve percent

(12%) damages upon the amount of the loss, together with all reasonable attorneys' fees for the

19

prosecution and collection of the loss pursuant to Ark. Code Ann. § 23-79-208. One Bank is also entitled to its attorneys' fees pursuant to Ark. Code Ann. § 16-22-308

## COUNT IV
## DECEPTIVE TRADE PRACTICES

135.    One Bank re-alleges and incorporates all allegations otherwise set forth herein.

136.    Chicago's acts and omissions constitute violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et. seq. (the "Act").

137.    As set forth above, Chicago provided only minimal attorney assistance and representation for the resolution of issues Chicago knew were covered under the Barnes Policy and Roberson Policy.

138.    Instead of taking over litigation to resolve these covered issues, Chicago allowed One Bank to pay its own attorneys to do the necessary work, even going so far as to decline One Bank's offers to Chicago's attorneys to pursue resolution the covered issues based on the contention that the underlying facts and filings were too complicated for a new set of attorneys to take over.

139.    These acts constitute unconscionable, false, or deceptive acts and practices in business in violation of Ark. Code Ann. § 4-88-107(a)(10).

140.    One Bank has suffered actual damage and injury as a result of the offenses and violations of the Act described above.  Pursuant to Ark. Code Ann. § 4-88-113(f), One Bank is entitled to a judgment against Chicago for damages arising from the Chicago's violations of the Act in an amount to be determined at trial and for One Banks attorneys' fees.

141.    One Bank reserves the right to plead further as discovery progresses and more information becomes available.

20

WHEREFORE, Plaintiff, One Bank & Trust, N. A., prays for judgment against Defendant, Chicago Title Insurance Company f/k/a Ticor Title Insurance Company, for damages in an amount to be determined at trial; for an additional twelve percent (12%) damages upon the amount of its loss; for its attorney's fees and costs; for pre- and post-judgment interest; and for all other relief to which the Plaintiff may be entitled.

Respectfully submitted,

**ONE BANK & TRUST, N.A.**

by its attorneys:

GILL RAGON OWEN, P.A.
425 West Capitol Ave., Suite 3800
Little Rock, Arkansas 72201
Telephone: (501) 376-3800
Facsimile:  (501) 372-3359
duke@gill-law.com
mcnulty@gill-law.com
heffington@gill-law.com

By: _____
    Wm. David Duke, Bar No. 79056
    Kelly W. McNulty, Bar No. 2005141
    Aaron M. Heffington, Bar No. 2013227

21

Return to:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

This instrument was prepared by:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

FILED FOR RECORD
AT 11:27 O'CLOCK a.M

JUN 26 2008
Junice Turns a.c.
FLORA O. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS
55.00

——— State of Arkansas ———   Space Above This Line For Recording Data

## MORTGAGE
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is ——————————
FEB 29 , 2008 .————————— The parties and their addresses are:

MORTGAGOR:
(Grantor)
DORIS LACY ROBINSON, UNMARRIED
4805 WEST MAIN
PINE BLUFF AR 71603

☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.

LENDER:
(Grantee)
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:
SEE ATTACHED EXHIBIT "A"

The property is located in JEFFERSON ......................... at KINGSWOOD ROAD ..................
(County)

................................ PINE BLUFF ..................... Arkansas 71603 ...........
(Address)                             (City)                        (ZIP Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

ARKANSAS - MORTGAGE (NOT FOR FNMA, FHLMC, FHA OR VA USE)                                    (page 1 of 7)
© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/20/2006          [signature]  ____

BK 663 PAGE 57


EXHIBIT
A

JUL 127 PAGE 598

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ......170,400.00........................... . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. (When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)
   NOTE #477566 DATED MAY 29, 2008 IN THE AMOUNT OF $170,400.00 MATURING FEBRUARY 28, 2009.

   B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Mortgagor in favor of Lender after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.
   C. All obligations Mortgagor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
   D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.
   This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.
   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

*(page 2 of 6)*

DZC ____

© 1994 Bankers Systems, Inc., St. Cloud, MN Form RE-MTG-AR 11/3/2004

**9. DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

**10. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor or any other owner made under any law or regulation regarding the use, ownership and occupancy of the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**11. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**12. ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default.

Upon default, Mortgagor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

**13. LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

**14. DEFAULT.** Mortgagor will be in default if any party obligated on the Secured Debt fails to make payment when due. Mortgagor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

*(page 3 of 7)*

© 1994 Bankers Systems, Inc., St. Cloud, MN Form RE-MTG-AR  11/20/2004

JUL 1 7 ... PAGE 660

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notice and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees (as determined under A.C.A. 16-22-308), court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

C. Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.

D. Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name

*(page 6 of 7)*

© 1994 Bankers Systems Financial Services - Bankers Systems™ Form RE-MTG-AR   11/10/2000

in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the loan. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include

© 1994 Bankers Systems, Inc., St. Cloud, MN Form RE-MTG-AR 11/4/2002

$\mathcal{DLR}$   *(page 6 of 3)*

VOL. 1723 PAGE 601

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

VOL. 1    PAGE 6°2

the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. NOTICE. Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

25. WAIVERS. Except to the extent prohibited by law, Mortgagor waives all rights relating to appraisement, sale, redemption and homestead under the laws of the State of Arkansas, especially under 18-49-106. To the extent applicable, Mortgagor relinquishes all rights of curtesy and dower in the Property.

26. ☒ CONSTRUCTION LOAN. This Security Instrument secures a construction loan. Mortgagor agrees that Lender is not trustee for the benefit of the contractor, subcontractor or materialmen and that such contractor, subcontractor or materialmen do not have equitable liens on the loan proceeds and that they do not have third-party beneficiary rights to any of the loan proceeds. Lender is obligated to make the construction advances. Except as indicated in the Description of Non-Construction Advances subsection, the construction advance shall be applied by Mortgagor to the payment of interest, fees, expenses and labor and material costs incurred in the construction of the improvements, and/or remodeling and repairs of the existing improvements, located on the Property. Notice is hereby given that to the full extent permitted under Ark. Stat. Ann. § 18-44-110, the lien of this Security Instrument will have priority over any statutory liens on account of labor and materials supplied for construction.

Description of Non-Construction Advances:

SEE ATTACHED EXHIBIT "A-1"

27. OTHER TERMS. If checked, the following are applicable to this Security Instrument:

☐ Line of Credit. The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☒ Fixture Filing. Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

☐ Riders. The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]

☐ Condominium Rider  ☐ Planned Unit Development Rider  ☐ Other ........................

☐ Additional Terms.

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

_Donna Lucy Cahoon 5/29/07_

(Signature) (Date) (Signature) (Date)
DONNA LUCY ROBINSON

**ACKNOWLEDGMENT:**
(Individual)   STATE OF .ARKANSAS......... COUNTY OF .Saline..............} ss.
On this .29... day of .May.... .2007...., before me, the undersigned officer, personally appeared .DONNA LUCY ROBINSON.......

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes and consideration therein contained.
My commission expires:

_Gary Sonitio_
(Notary Public)

Lender telephone no. 501-370-4400
Person to release lien (name and title)
CHRIS HUBENER, VICE PRESIDENT

$1994 Bankers Systems, Inc., Standard Systems™ Form REMTG-AR  11/4/2008 (page 7 of 7)

VOL. 1173 PAGE 603

VOL. 1 2 3 PAGE 664

## EXHIBIT A
## LEGAL DESCRIPTION

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 80 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST TO A POINT; THENCE SOUTH 68 DEGREES 01 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.54 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

EXHIBIT "A-1"

Of the principal amount of the note, Mortgagor will become indebted to _____ Mortgagee in the amount of _____ ($_____) for funds advanced this date to be used (to purchase the Real Property) (or) (to satisfy a mortgage on the Real Property) and for closing costs in connection this loan, and the balance of the loan amount is to be used in connection with construction of certain improvements on the Mortgaged Property.

*DSK*

I HEREBY CERTIFY THAT THIS INSTRUMENT
WAS FILED AND RECORDED ON THE 25
DAY OF ____ 20.01 AT 11.27
BOOK NO 0178 PAGE 597
FLORA C. OGEK, CLERK
JEFFERSON COUNTY, ARKANSAS
BY _____

VOL. 1 2 2 3 PAGE 625

# TICOR TITLE INSURANCE

**Policy No.** AR2167-48-479-062-2008.74110-76232346

## Policy of Title Insurance

**American Land Title Association Construction Loan Policy (10-17-92)**

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, TICOR TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title.

4. Lack of a right of access to and from the land;

5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;

6. The priority of any lien or encumbrance over the lien of the insured mortgage;

7. The invalidity or unenforceability of any assignment of the insured mortgage provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

This policy shall not be valid or binding until countersigned below by an authorized signatory of the Company.

AR2167.6                      479-062
Harley Enterprises, LLC

d/b/a Professional Land Title Company of Arkansas

2650 John Harden Drive, Suite O
Jacksonville, AR 72076

**TICOR TITLE INSURANCE COMPANY**

By: _____    President

ATTEST    _____    Secretary



*Authorized Signatory*

EXHIBIT
B

ALTA Construction Loan Policy (10-17-92)

## Exclusions from Coverage

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or

## Conditions and Stipulations

### 1. DEFINITION OF TERMS

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

   (i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

   (ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

   (iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, or in Schedule C if not provided for in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in the applicable Schedule, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1(a)(iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any lien or right to a lien imposed by law for services, labor or material, heretofore or hereafter furnished, except for any lien the assertion of which by a claimant is recorded in the public records at Date of Policy.

7. Any lack of priority of the lien of the insured mortgage over any lien or encumbrance because, and to the extent that, the proceeds of the loan secured thereby may not have been fully disbursed at Date of Policy.

8. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
       (a) to timely record the instrument of transfer; or
       (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor

### 2. CONTINUATION OF INSURANCE

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insured; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance: The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:
   (i) the Amount of Insurance stated in Schedule A;
   (ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or
   (iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

### 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required;

provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless Company shall be prejudiced by the failure and then only to the extent of t. .rejudice.

## 4.   DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE

(a)   Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b)   The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c)   Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

(d)   In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

## 5.   PROOF OF LOSS OR DAMAGE

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

## 6.   OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)   To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)   to pay or tender payment of the amount of insurance under this policy together with sts, attorneys' fees and expenses incurred by the insured claimant, whic. ...ere authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii)   to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefore.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all liability and obligations to the insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b)   To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i)   to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii)   to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

## 7.   DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a)   The liability of the Company under this policy shall not exceed the least of:

(i)   the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii)   the amount of the proceeds of the loan secured by the insured mortgage disbursed at Date of Policy plus the amount of each succeeding disbursement made in accordance with the terms of the insured mortgage until the aggregate of all disbursements is equal to the Amount of Insurance stated in Schedule A, plus any amount advanced to protect the lien of the insured mortgage and secured thereby, plus interest on those amounts, as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations; or

(iii)   the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b)   In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c)   The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

## 8.   LIMITATION OF LIABILITY

(a)   If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b)   In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c)   The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

## 9.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY

(a)   All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not

reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

## 10.   LIABILITY NONCUMULATIVE

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is hereafter executed by an insured and which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

## 11.   PAYMENT OF LOSS

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

## 12.   SUBROGATION UPON PAYMENT OR SETTLEMENT

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-Insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

## 13.   ARBITRATION

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

## 14.   LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

## 15.   SEVERABILITY

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

## 16.   NOTICES, WHERE SENT

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at Ticor Title Insurance Company, Claims Department, P.O. Box 2233, Los Angeles, California 90051.

FATIC 491-M
LOAN SCHEDULE A (8/93)

COMMERCIAL ☐ RESIDENTIAL X CONSTRUCT. LOAN ☐ NEW HOME SALE ☐ RESALE X 2ND MORTGAGE ☐ REFINANCE ☐ FORECLOSURE ☐
REISSUE? PRIOR POLICY #            AMOUNT $            SIMUL. POLICY # 74106-76232378            AMOUNT $43,846.00

# *TICOR TITLE INSURANCE COMPANY*
## SCHEDULE A

Issuing Agent:     **Professional Land Title Company of Arkansas.**
**2650 John Harden Drive**
**Jacksonville, AR  72076**
**Issuing Agent # 327460**

Agent's File No.: 479-062

Policy Number:  74110-7623236

Amount:  $176,400.00

1. DATE OF POLICY:  **June 25, 2008 at 11:27 AM**

2. Name of Insured:  **One Bank & Trust, N.A. and its successors and/or assigns as their interests may appear.**

3.     The estate or interest insured herein is, at Date of Policy, vested in:

    **Donna Lacy Roberson, a unmarried person**

4.     The estate or interest in the land insured herein is designated as:

    FEE SIMPLE

5.     The instruments creating the estate or the interest in the real estate which is hereby insured are described as follows:

    That certain Mortgage executed by **Donna Lacy Roberson, a unmarried person** in favor of One Bank & Trust, N.A.,
    dated May 29, 2008, in the amount of $43,846.00, having a final maturity date of June 1, 2008, filed on June 25, 2008 at
    11:27 AM in Book 1173 at Page 597 and **re-recorded on September 16, 2008 at 10:22 AM in Book 1182 at Page 141 as**
    recorded in the County of Jefferson, Arkansas.

6.     The land referred to in this Policy is in the State of Arkansas, County of Jefferson described below or, if no description
    appears below, is the land described in the instrument(s) set forth in item 4. above:

    TRACT I:
    A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART
    OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7
    SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED
    AS FOLLOWS: BEGINNING AT THE CORNER COMMON TO SECTIONS 23, 24, 25 AND 26; THENCE
    NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST 650.00 FEET TO A POINT; THENCE NORTH 00
    DEGREES 28 MINUTES 02 SECONDS WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A
    GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND
    DISTANCES: THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT; THENCE
    NORTH 82 DEGREES 12 MINUTES 58 SECONDS EAST, 21.58 FEET TO A POINT; THENCE NORTH 00
    DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE SOUTH 88 DEGREES 40 MINUTES 02
    SECONDS EAST, 605.75 FEET TO A POINT; THENCE SOUTH 89 DEGREES 52 MINUTES 02 SECONDS
    EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65;
    THENCE SOUTH 06 DEGREES 01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST
    RIGHT OF WAY LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET
    ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52
    MINUTES 02 SECONDS WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19 FEET TO THE
    POINT OF BEGINNING. CONTAINING 29.41 ACRES, MORE OR LESS.

TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88 DEGREES 01 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.64 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

August 1, 2008
Professional Land Title Company of Arkansas

Signing Agents
Michael P. Ragsdale, 323650, Brian A. Perry, 323653,
Alta Tharp, 323655

FATIC-402-M
Loan Schedule B

# TICOR TITLE INSURANCE COMPANY

## SCHEDULE B

Agent's File No.: 479-062

Policy Number FA - <u>74110-7623236</u>
LOAN

This policy does not insure against loss or damage by reason of the following:

1. All restrictive covenants affecting the above described property, but the company guarantees that any such restrictive covenants have not been violated so as to affect and that a future violation thereof will not affect the validity or priority of the mortgage hereby insured.

2. Any discrepancies, conflicts or shortages in area or boundary line, or any encroachments or any overlapping of improvements which a correct survey or a physical inspection would disclose.

3. General and taxes for 2008 and special taxes for 2009 and subsequent years not yet due and payable.

4. Covenants, Restrictions, Easements and Building Lines, other than city or county ordinances, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, or national origin to the extent such covenants, condition or restrictions violate 42 USC 3604 (c).

5. Reservations, restrictions, right-of-way, easements, dedications and setback lines as are shown on plat of surveys, dated May 22, 2008, by Arkansas Surveying & Consulting.

ALTA LOAN POLICY

# *TICOR TITLE INSURANCE COMPANY*

## SCHEDULE B-PART II

### POLICY NO.:   74110-7623236

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matter, if any be shown, but the Company insures these matters are subordinate to the lien or charge of the insured mortgage upon the estate or interest:

NONE

# ENDORSEMENT

Attached to Policy No.  74110-7623236

Issued By

### *TICOR TITLE INSURANCE COMPANY*

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

(a)   Any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matter relating to real property to purchasers for value and without knowledge of district, or filed in the records of the clerk of the United States district court for the in which the land is located, except as set forth in Schedule B; or

(b)   any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes: **None**

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

*TICOR TITLE INSURANCE COMPANY*

By: _____
      **Authorized Signatory**

CLTA Form 110.9
ALTA Form 8.1 (Environmental Protection Lien)

Effective Date: 5/1/2008

### Fidelity National Financial, Inc.
### Privacy Statement

Fidelity National Financial, Inc. and its subsidiaries ("FNF") respect the privacy and security of your non-public personal information ("Personal Information") and protecting your Personal Information is one of our top priorities. This Privacy Statement explains FNF's privacy practices, including how we use the Personal Information we receive from you and from other specified sources, and to whom it may be disclosed. FNF follows the privacy practices described in this Privacy Statement and, depending on the business performed, FNF companies may share information as described herein.

**Personal Information Collected**

We may collect Personal Information about you from the following sources:

- Information we receive from you on applications or other forms, such as your name, address, social security number, tax identification number, asset information, and income information;
- Information we receive from you through our Internet websites, such as your name, address, email address, Internet Protocol address, the website links you used to get to our websites, and your activity while using or reviewing our websites;
- Information about your transactions with or services performed by us, our affiliates, or others, such as information concerning your policy, premiums, payment history, information about your home or other real property, information from lenders and other third parties involved in such transaction, account balances, and credit card information; and
- Information we receive from consumer or other reporting agencies and publicly recorded documents.

**Disclosure of Personal Information**

We may provide your Personal Information (excluding information we receive from consumer or other credit reporting agencies) to various individuals and companies, as permitted by law, without obtaining your prior authorization. Such laws do not allow consumers to restrict these disclosures. Disclosures may include, without limitation, the following:

- To insurance agents, brokers, representatives, support organizations, or others to provide you with services you have requested, and to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure in connection with an insurance transaction;
- To third-party contractors or service providers for the purpose of determining your eligibility for an insurance benefit or payment and/or providing you with services you have requested;
- To an insurance regulatory authority, or a law enforcement or other governmental authority, in a civil action, in connection with a subpoena or a governmental investigation;
- To companies that perform marketing services on our behalf or to other financial institutions with which we have joint marketing agreements and/or
- To lenders, lien holders, judgment creditors, or other parties claiming an encumbrance or an interest in title whose claim or interest must be determined, settled, paid or released prior to a title or escrow closing.

We may also disclose your Personal Information to others when we believe, in good faith, that such disclosure is reasonably necessary to comply with the law or to protect the safety of our customers, employees, or property and/or to comply with a judicial proceeding, court order or legal process.

Effective Date: 5/1/2008

<u>Disclosure to Affiliated Companies</u> – We are permitted by law to share your name, address and facts about your transaction with other FNF companies, such as insurance companies, agents, and other real estate service providers to provide you with services you have requested, for marketing or product development research, or to market products or services to you. We do not, however, disclose information we collect from consumer or credit reporting agencies with our affiliates or others without your consent, in conformity with applicable law, unless such disclosure is otherwise permitted by law.

<u>Disclosure to Nonaffiliated Third Parties</u> – We do not disclose Personal Information about our customers or former customers to nonaffiliated third parties, except as outlined herein or as otherwise permitted by law.

**Confidentiality and Security of Personal Information**
We restrict access to Personal Information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard Personal Information.

**Access to Personal Information/**
**Requests for Correction, Amendment, or Deletion of Personal Information**
As required by applicable law, we will afford you the right to access your Personal Information, under certain circumstances to find out to whom your Personal Information has been disclosed, and request correction or deletion of your Personal Information. However, <u>FNF's current policy is to maintain customers' Personal Information for no less than your state's required record retention requirements for the purpose of handling future coverage claims.</u>

For your protection, <u>all requests made under this section must be in writing and must include your notarized signature to establish your identity.</u> Where permitted by law, we may charge a reasonable fee to cover the costs incurred in responding to such requests. Please send requests to:

Chief Privacy Officer
Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, FL 32204

**Changes to this Privacy Statement**
This Privacy Statement may be amended from time to time consistent with applicable privacy laws. When we amend this Privacy Statement, we will post a notice of such changes on our website. The effective date of this Privacy Statement, as stated above, indicates the last time this Privacy Statement was revised or materially changed.

1566

Return to:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

This instrument was prepared by
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

FILED FOR RECORD
AT 10:22 O'CLOCK a. M

SEP 16 2008

FLORA O. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS
60.00

FILED FOR RECORD
AT 11:21 O'CLOCK a. M

JUN 25 2008

FLORA O. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS
55.00

— State of Arkansas —      Space Above This Line For Recording Data

# MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is ...........................
MAY 22, 2008............................................ The parties and their addresses are:

**MORTGAGOR:**
(Grantor)
DONNA LACY ROBERSON, UNMARRIED
4806 WEST MAIN
PINE BLUFF AR 71603

RECEIVED

OCT 16 2008

COLLATERAL DEPT.

☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.

**LENDER:**
(Grantor)
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:
SEE ATTACHED EXHIBIT "A"

The property is located in JEFFERSON............................................ at PINEBERGEN ROAD........
                                 (County)
............................................ PINE BLUFF......................... Arkansas 71603........
    (Address)                       (City)                  (ZIP Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

ARKANSAS - MORTGAGE (NOT FOR FNMA, FHLMC, FHA OR VA USE)            (page 1 of 7)
© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/2/2005

VOL. 1182 PAGE 141

EXHIBIT
C

**PLEASE RE-RECORD THIS MORTGAGE TO CORRECT LEGAL**

VOL 1182 PAGE 142

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ......170,400.00...................................... . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*
   NOTE #477366 DATED MAY 29, 2008 IN THE AMOUNT OF $170,400.00 MATURING FEBRUARY 28, 2009.

   B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Mortgagor in favor of Lender after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.
   C. All obligations Mortgagor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
   D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.
   This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.
   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

*(page 2 of 7)*

DLR

© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/26/2008

9. **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor or any other owner made under any law or regulation regarding the use, ownership and occupancy of the Property.

    Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information on the Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default.

    Upon default, Mortgagor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Mortgagor will be in default if any party obligated on the Secured Debt fails to make payment when due. Mortgagor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

*d l k*

**VOL. 1182 PAGE 143**

VOL. 1     PAGE

VOL 1182 PAGE 144      VOL 147 PAGE 600

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the same interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees (as determined under A.C.A. 16-22-308), court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

    B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

    C. Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.

    D. Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name

© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/2/2006

*(page 4 of 7)*

in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the loan. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include

© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/2/2006

*(page 6 of 7)*

VOL. 1182 PAGE 146          VOL. 1    PAGE 642 

the plural and the plural the singular. The captions and headings of the sections of this Security
Instrument are for convenience only and are not to be used to interpret or define the terms of this
Security Instrument. Time is of the essence in this Security Instrument.

24. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing
it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any
other address designated in writing. Notice to one mortgagor will be deemed to be notice to all
mortgagor.

25. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all rights relating to
appraisement, sale, redemption and homestead under the laws of the State of Arkansas, especially
under 18-49-106. To the extent applicable, Mortgagor relinquishes all rights of curtesy and dower in
the Property.

26. **CONSTRUCTION LOAN.** This Security Instrument secures a construction loan. Mortgagor
agrees that Lender is not trustee for the benefit of the contractor, subcontractor or materialmen and
that such contractor, subcontractor or materialmen do not have equitable liens on the loan proceeds
and that they do not have third-party beneficiary status to any of the loan proceeds. Lender is
obligated to make the construction advances. Except as indicated in the Description of
Non-Construction Advances subsection, the construction advances shall be applied by Mortgagor to
the payment of interest, fees, expenses and labor and material costs incurred in the construction of the
improvements, and/or remodeling and repairs of the existing improvements, located on the Property.
Notice is hereby given that to the full extent permitted under Ark. Stat. Ann. § 18-44-110, the lien of
this Security Instrument will have priority over any statutory liens on account of labor and materials
supplied for construction.
Description of Non-Construction Advances.

SEE ATTACHED EXHIBIT "A-1"

27. **OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the
Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect
until released.

☒ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor
owns now or in the future and that are or will become fixtures related to the Property. This
Security Instrument suffices as a financing statement and any carbon, photographic or other
reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial
Code.

☐ **Riders.** The covenants and agreements of each of the riders checked below are incorporated
into and supplement and amend the terms of this Security Instrument. [Check all applicable
boxes]
   ☐ Condominium Rider  ☐ Planned Unit Development Rider  ☐ Other ...........................
☐ **Additional Terms.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

*Donna Lacy Calvera 5/29/*
(Signature)                                           (Date)        (Signature)                                    (Date)
DONNA LACY ROBINSON

**ACKNOWLEDGMENT:** STATE OF *ARKANSAS* ......... , COUNTY OF *Saline* ............... } ss.
(Individual)
On this *29* ...... day of *May* ............. *2008* ......, before me, the undersigned officer, personally appeared ............ *DONNA Lacy Robinson* ...........
...............................................................................................................................
...............................................................................................................................
known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes and consideration therein contained.
My commission expires:

(Notary Public)

Lender telephone no. 501-370-4400
Person to release lien (name and title)
CHRIS HUEBNER, VICE PRESIDENT

© 1996 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/2/2006
*(page 7 of 7)*

VOL. 1182 PAGE 147

VOL. 1177 PAGE 623

Agents File No. 479-062

EXHIBIT A -

VOL. 1182 PAGE 148

## LEGAL DESCRIPTION

TRACT I: A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER COMMON TO SECTIONS 23, 24, 25 AND 26; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST 650.00 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND DISTANCES: THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT; THENCE NORTH 82 DEGREES 12 MINUTES 58 SECONDS EAST, 21.58 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST, 605.75 FEET TO A POINT; THENCE SOUTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65; THENCE SOUTH 06 DEGREES 01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52 MINUTES 02 SECONDS WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19 FEET TO THE POINT OF BEGINNING. CONTAINING 29.41 ACRES, MORE OR LESS.

TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88 DEGREES 01 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.64 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

VOL. 1182 PAGE 150

## EXHIBIT "A-1"

Of the principal amount of the note, Mortgagor will become indebted to ~~86/~~
Mortgagee in the amount of _Fifty One Thousand Three Hundred_ ~~no/100~~
($ _51,300.86_ ) for funds advanced this date to be used (to
purchase the Real Property) (or) (to satisfy a mortgage on the Real Property) and for
closing costs in connection this loan, and the balance of the loan amount is to be used in
connection with construction of certain improvements on the Mortgaged Property.

DSK

I HEREBY CERTIFY THAT THIS INSTRUMENT
WAS FILED AND RECORDED ON THE _16_
DAY OF _Sept_ 20 _08_ AT _10:22_
BOOK NO _1182_ PAGE _141_
FLORA C. COOK, CLERK
JEFFERSON COUNTY, ARKANSAS
BY _Jusleen C Terrell_

I HEREBY CERTIFY THAT THIS INSTRUMENT
WAS FILED AND RECORDED ON THE _25_
DAY OF _June_ 20 _01_ AT _11:27_
BOOK NO _0118_ PAGE _597_
FLORA C. COOK, CLERK
JEFFERSON COUNTY, ARKANSAS
BY _Jeni C Turner_

VOL. 118 PAGE 605

Fed - Ex          ~~5367~~
Pro Land Title    ~~(4)~~
        7922

( )                                    ( )

AT ___ FILED FOR RECORD
AT __10:10___ O'CLOCK _X_ M

JUL ~ 9 2014

_____
LAFAYETTE WOODS, SR., CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS

$30.00

Return To:
ProLend Title Company
889 W. 3rd Street
Little Rock, AR 72201
479-082

## SCRIVENER'S ERROR AFFIDAVIT

**STATE OF ARKANSAS**
**COUNTY OF PULASKI**

**KNOW ALL PERSONS BY THESE PRESENTS THAT:**

BEFORE ME, the undersigned Notary who is authorized to administer oaths and take testimony in the aforesaid jurisdiction, personally appeared before me William P. Allison, Esq., who is well known to me and said person swore under oath and stated as follows:

1. That I prepared a Warranty Deed for recording in the public records of Jefferson County.

2. That the document described below was recorded in the public records of Jefferson County, Arkansas, but contained an error.

   Warranty Deed dated May 30, 2008 and recorded on June 25, 2008 in Book 855 at page 765, Jefferson County, Arkansas.

   **Grantor:** Ridgewood Timper Corp., an Arkansas corporation
   **Grantee:** Deana Lacy Roberson, an unmarried person

3. That the legal description in the Deed erroneously read as follows:
   TRACT I:
   A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER COMMON TO SECTIONS 23, 24, 25 AND 26; THENCE NORTH 89 DEGREES 40 MINUTES 02 SECONDS WEST 850.00 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND DISTANCES: THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT; THENCE NORTH 82 DEGREES 12 MINUTES 56 SECONDS EAST, 21.58 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE SOUTH 89 DEGREES 40 MINUTES 02 SECONDS EAST, 605.76 FEET TO A POINT; THENCE SOUTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65; THENCE SOUTH 08 DEGREES 01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52 MINUTES 02 SECONDS

EXHIBIT
D

BOOK 944 PAGE 005

BOOK 944 PAGE 006

WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19 FEET TO THE POINT OF BEGINNING. CONTAINING 29.41 ACRES, MORE OR LESS.

TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88 DEGREES 01 MINUTES 02 SECONDS EAST, 263.36 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.84 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

4      That the legal description should read as follows:

TRACT I:
A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER COMMON TO SECTIONS 23, 24, 25 AND 26; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST 650.00 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND DISTANCES: THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT; THENCE NORTH 82 DEGREES 12 MINUTES 58 SECONDS EAST, 21.58 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST, 605.75 FEET TO A POINT; THENCE SOUTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65; THENCE SOUTH 06 DEGREES 01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52 MINUTES 02 SECONDS WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19 FEET TO THE POINT OF BEGINNING. CONTAINING 29.41 ACRES, MORE OR LESS.

Less and Except:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER; THENCE NORTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 69; THENCE SOUTH 06 DEGREES 01 MINUTES 23 SECONDS EAST 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST 56.61 FEET

ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING THREE (3) COURSES AND DISTANCES; THENCE NORTH 89 DEGREES 48 MINUTES 18 SECONDS WEST 342.18 FEET TO A POINT; THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS WEST 330.00 FEET TO A POINT; THENCE SOUTH 45 DEGREES 18 MINUTES 58 SECONDS WEST 27.87 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 46 SECONDS WEST 683.94 FEET TO A POINT; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 360.18 FEET TO THE POINT OF BEGINNING, CONTAINING 10.00 ACRES, MORE OR LESS.

SUBJECT TO RIGHT OF WAY FOR THE GRAVEL ROAD, IF ANY, RUNNING THROUGH THE PROPERTY AS SHOWN ON SURVEY.

TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88 DEGREES 01 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.84 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

TRACT III:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:  BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF  THE SOUTHEAST QUARTER OF SECTION 23; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 694.25 FEET; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 774.38 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING SEVEN (7) COURSES AND DISTANCES; THENCE SOUTH 82 DEGREES 12 MINUTES 58 SECONDS WEST 21.88 FEET TO A POINT; THENCE NORTH 83 DEGREES 32 MINUTES 02 SECONDS WEST, 109.64, TO A POINT; THENCE NORTH 88 DEGREES 01 MINUTES 02 SECONDS WEST 263.35 FEET TO A POINT; THENCE NORTH 39 DEGREES 24 MINUTES 02 SECONDS WEST 113.15 FEET TO A POINT; THENCE NORTH 34 DEGREES 32 MINUTES 02 SECONDS WEST 299.50 FEET TO A POINT; THENCE NORTH 89 DEGREES 23 MINUTES 02 SECONDS WEST, 58.60 FEET TO A POINT ON THE EAST LINE OF THE SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 345.16 FEET TO THE POINT OF BEGINNING. CONTAINING 10.02 ACRES, MORE OR LESS.

BOOK 944 PAGE 007

BOOK 344 PAGE 008

5. That I know of my own personal knowledge that the correction of this Scrivener's error is consistent with the intentions of the parties and does not in any way change or alter the understanding and intentions of the parties who executed said instruments.

FURTHER AFFIANT SAYETH NAUGHT.

_____
William P. Allison, Esq.

## ACKNOWLEDGMENT

State of Arkansas
County of Pulaski

On this day came before me, the undersigned, a notary public within and for the county and state aforesaid, duly commissioned and acting and personally appeared William P. Allison, Esq., to me well known and acknowledged that he had executed the same for the uses and purposes therein mentioned and set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official seal as such notary public on this 7th day of July, 2014.

_____
Notary Public

My Commission expires:  10-16-2017
[SEAL]


OFFICIAL SEAL
LANETT M. DEYAR
No. 12362832
PULASKI COUNTY
My Commission Expires 10-16-2017

I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED AND RECORDED ON THE 9th DAY OF July 20 14 AT 11 o'clock
BOOK NO. 944 PAGE 008
LAFAYETTE WOODS, SR.
JEFFERSON COUNTY, ARKANSAS
BY _____ DC

1566   VOL. 1 3 6 4 PAGE 5 7 6

Return to:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

FILED FOR RECORD
AT 10:22 O'CLOCK A. M
SEP 16 2008
FLORA O. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS
60.00

FILED FOR RECORD
AT 11:21 O'CLOCK a. M
JUN 26 2008
FLORA O. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS
55.00
Re-Record to correct legal

This instrument was prepared by:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

FILED FOR RECORD
AT ____ O'CLOCK __ M
JUL -9 2014
_____ CIRCUIT CLERK
RECORDER ___ COUNTY, ARKANSAS
$70.00

_____ State of Arkansas _____    _____ Space Above This Line For Recording Data _____

## MORTGAGE
(With Future Advance Clause)

OCT 16 2008
COLLATERAL DEPT.

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is MAY 29, 2008. The parties and their addresses are:

   **MORTGAGOR:**
   (Grantor)
   DONNA LACY ROBERSON, UNMARRIED
   4806 WEST MAIN
   PINE BLUFF AR 71603

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.

   **LENDER:**
   (Grantee)
   ONE BANK & TRUST N.A.
   300 WEST CAPITOL AVE
   LITTLE ROCK AR 72201-4113

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:
   SEE ATTACHED EXHIBIT "A"

   The property is located in JEFFERSON .......................................... at PINEBERGER ROAD ..........................
                                              (County)
   .................................................. PINE BLUFF ................................, Arkansas 71603 .........
                (Address)                              (City)                                        (ZIP Code)

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

ARKANSAS - MORTGAGE (NOT FOR FNMA, FHLMC, FHA OR VA USE)                                    (page 1 of 7)
© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR  11/2/2006

VOL. 1182 PAGE 141        VOL. 1173

EXHIBIT
E

VOL 1182 PAGE 142        VOL 1173 PAGE 598

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ .......170,400.00......................... . This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. (When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)
NOTE #477566 DATED MAY 29, 2008 IN THE AMOUNT OF $170,400.00
- MATURING FEBRUARY 28, 2009.

B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Mortgagor in favor of Lender after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All obligations Mortgagor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, and mortgage the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
A. To make all payments when due and to perform or comply with all covenants.
B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

*(page 2 of 7)*

© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR  11/3/2006

9. **DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor or any other owner made under any law or regulation regarding the use, ownership and occupancy of the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default.

Upon default, Mortgagor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Mortgagor will be in default if any party obligated on the Secured Debt fails to make payment when due. Mortgagor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

VOL 1182 PAGE 144    VOL 1473 PAGE 600

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default.
At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the same interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees (as determined under A.C.A. 16-22-308), court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Mortgagor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.
Mortgagor represents, warrants and agrees that:

   A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

   B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

   C. Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.

   D. Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name

© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR  11/3/2006

*(page 4 of 7)*

VOL 1364 PAGE 580

in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the loan. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include

© 1994 Wisters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR 11/8/2006

*DLR*

(page 5 of 7)

VOL 1182 PAGE 145     VOL 1173 PAGE 601

VOL. 1182 PAGE 146        VOL. 1173 PAGE 602

the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

25. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all rights relating to appraisement, sale, redemption and homestead under the laws of the State of Arkansas, especially under 18-49-105. To the extent applicable, Mortgagor relinquishes all rights of curtesy and dower in the Property.

26. ☒ **CONSTRUCTION LOAN.** This Security Instrument secures a construction loan. Mortgagor agrees that Lender is not trustee for the benefit of the contractor, subcontractor or materialmen and that such contractor, subcontractor or materialmen do not have equitable liens on the loan proceeds and that they do not have third-party beneficiary status to any of the loan proceeds. Lender is obligated to make the construction advances. Except as indicated in the Description of Non-Construction Advances subsection, the construction advances shall be applied by Mortgagor to the payment of interest, fees, expenses and labor and material costs incurred in the construction of the improvements, and/or remodeling and repairs of the existing improvements, located on the Property. Notice is hereby given that to the full extent permitted under Ark. Stat. Ann. § 18-44-110, the lien of this Security Instrument will have priority over any statutory liens on account of labor and materials supplied for construction.

Description of Non-Construction Advances.

SEE ATTACHED EXHIBIT "A-1"

27. **OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☒ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

☐ **Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]

☐ Condominium Rider   ☐ Planned Unit Development Rider   ☐ Other ..........................
☐ Additional Terms.

© 1994 Wolters Kluwer Financial Services - Bankers Systems™   Form RE-MTG-AR 11/2/2006

(page 6 of 7)

VOL. 1364 PAGE 581

VOL. **1364** PAGE **582**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

.............................................................   .............................................................
(Signature)                    (Date)         (Signature)                    (Date)
DONNA, LACY ROBINSON

**ACKNOWLEDGMENT:**
(Individual)       STATE OF ..*ARKANSAS*.......... COUNTY OF ..*Smith*............ } ss.
On this ..*29*....... day of ..*May*......, *1998*....... before me, the
undersigned officer, personally appeared ..................................................................
..................................................................................................................

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to
the within Instrument and acknowledged that he/she/they executed the same for the purposes
and consideration therein contained.
My commission expires:



.............................................................
(Notary Public)

Lender telephone no. 501-370-4400
Person to release lien (name and title)
CHRIS HUBSHER, VICE PRESIDENT

© 1994 Wolters Kluwer Financial Services - Bankers Systems™ Form RE-MTG-AR  11/26/2008                    (page 7 of 7)

VOL. **1182** PAGE **147**

VOL. **1173** PAGE **603**

Agents File No. 479-062

VOL. **1182** PAGE **148**

EXHIBIT A -

## LEGAL DESCRIPTION

TRACT I: A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER COMMON TO SECTIONS 23, 24, 25 AND 26; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST 650.06 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND DISTANCES: THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT; THENCE NORTH 82 DEGREES 12 MINUTES 58 SECONDS EAST, 21.58 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST, 685.75 FEET TO A POINT; THENCE SOUTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65; THENCE SOUTH 06 DEGREES 01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52 MINUTES 02 SECONDS WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19 FEET TO THE POINT OF BEGINNING. CONTAINING 23.41 ACRES, MORE OR LESS.

TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

VOL. **1364** PAGE **583**

VOL. 1504 PAGE 502

BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF
THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28
MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A
GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5)
COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02
SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32
MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39
DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88
DEGREES 61 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE
SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.64 FEET TO A POINT;
THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A
POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST
QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 630.00
FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

VOL. 1182 PAGE 148

VOL. 1182 PAGE 150

## EXHIBIT "A-1"

Of the principal amount of the note, Mortgagor will become indebted to 8%/100
Mortgagee in the amount of Fifty One Thousand Three Hundred
($ 51,300.00 ) for funds advanced this date to be used (to purchase the Real Property) (or) (to satisfy a mortgage on the Real Property) and for closing costs in connection this loan, and the balance of the loan amount is to be used in connection with construction of certain improvements on the Mortgaged Property.

D.S.K.

I HEREBY CERTIFY THAT THIS INSTRUMENT
WAS FILED AND RECORDED ON THE 16
DAY OF _____ 20__ AT ____
BOOK NO. ____ PAGE ____
FLORA C. COOK, CLERK
JEFFERSON COUNTY, ARKANSAS
BY ____

I HEREBY CERTIFY THAT THIS INSTRUMENT
WAS FILED AND RECORDED ON THE 25
DAY OF _____ 20__ AT 11:27
BOOK NO. ____ PAGE 547
FLORA C. COOK, CLERK
JEFFERSON COUNTY, ARKANSAS
BY ____

VOL. 1364 PAGE 585

VOL. 1173 PAGE 605

Corrected

Exhibit "A"

VOL. 1364 PAGE 586

TRACT I:
A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23
AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION
24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER COMMON
TO SECTIONS 23, 24, 25 AND 26; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS
WEST 660.00 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS
WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE
ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND DISTANCES:
THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT;
THENCE NORTH 82 DEGREES 12 MINUTES 58 SECONDS EAST, 21.58 FEET TO A POINT;
THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE
SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST, 606.75 FEET TO A POINT; THENCE
SOUTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE
WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65; THENCE SOUTH 08 DEGREES
01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY
LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET ALONG
THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52
MINUTES 02 SECONDS WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19
FEET TO THE POINT OF BEGINNING, CONTAINING 29.41 ACRES, MORE OR LESS.
Less and Except:


A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF
SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST
QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST,
JEFFERSON COUNTY, ARKANSAS, BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHWEST
QUARTER OF THE SOUTHWEST QUARTER; THENCE NORTH 89 DEGREES 52
MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF
WAY LINE OF INTERSTATE NUMBER 69; THENCE SOUTH 08 DEGREES 01
MINUTES 23 SECONDS EAST 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY
LINE TO A POINT; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST
58.81 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT IN THE
CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE
FOLLOWING THREE (3) COURSES AND DISTANCES; THENCE NORTH 89
DEGREES 48 MINUTES 18 SECONDS WEST 342.18 FEET TO A POINT; THENCE
NORTH 86 DEGREES 42 MINUTES 02 SECONDS WEST 330.00 FEET TO A POINT;
THENCE SOUTH 45 DEGREES 15 MINUTES 58 SECONDS WEST 27.97 FEET TO A
POINT; THENCE NORTH 00 DEGREES 28 MINUTES 45 SECONDS WEST 683.94
FEET TO A POINT; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST
350.18 FEET TO THE POINT OF BEGINNING, CONTAINING 10.00 ACRES, MORE OR
LESS.


SUBJECT TO RIGHT OF WAY FOR THE GRAVEL ROAD, IF ANY, RUNNING
THROUGH THE PROPERTY AS SHOWN ON SURVEY.


TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23,
TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER
OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE
NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE

CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88 DEGREES 01 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.84 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.48 ACRES, MORE OR LESS.

TRACT III:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 694.25 FEET; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 774.38 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING SEVEN (7) COURSES AND DISTANCES; THENCE SOUTH 82 DEGREES 12 MINUTES 58 SECONDS WEST 21.88 FEET TO A POINT; THENCE NORTH 83 DEGREES 32 MINUTES 02 SECONDS WEST, 109.64, TO A POINT; THENCE NORTH 88 DEGREES 01 MINUTES 02 SECONDS WEST 263.35 FEET TO A POINT; THENCE NORTH 39 DEGREES 24 MINUTES 02 SECONDS WEST 113.15 FEET TO A POINT; THENCE NORTH 34 DEGREES 32 MINUTES 02 SECONDS WEST 299.50 FEET TO A POINT; THENCE NORTH 89 DEGREES 23 MINUTES 02 SECONDS WEST, 58.60 FEET TO A POINT ON THE EAST LINE OF THE SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 345.16 FEET TO THE POINT OF BEGINNING. CONTAINING 10.02 ACRES, MORE OR LESS.



479-062

I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED AND RECORDED ON THE ___ DAY OF ___ 20 __ AT __ ___ BOOK NO. 1364 PAGE 574

LAFAYETTE WOODS, SR.
JEFFERSON COUNTY, ARKANSAS

BY _____ DC

VOL 1364 PAGE 587

# Policy Correction

**Name of Insured:**   **One Bank & Trust, N.A.**

**File No.:**      **479-062**

**Policy No.:**    **74110-7623236**

**The following is hereby corrected to read as follows:**

**Schedule A, #6:**

TRACT I:
A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23
AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION
24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER COMMON
TO SECTIONS 23, 24, 25 AND 26; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS
WEST 650.00 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS
WEST, 544.23 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE
ALONG THE SAID CENTERLINE THE FOLLOWING TWO (2) COURSES AND DISTANCES:
THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST 22.90 TO A POINT;
THENCE NORTH 82 DEGREES 12 MINUTES 58 SECONDS EAST, 21.58 FEET TO A POINT;
THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 774.38 FEET; THENCE
SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST, 605.75 FEET TO A POINT; THENCE
SOUTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE
WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 65; THENCE SOUTH 06 DEGREES
01 MINUTES 23 SECONDS EAST, 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY
LINE; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST, 724.91 FEET ALONG
THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE NORTH 89 DEGREES 52
MINUTES 02 SECONDS WEST AND DEPARTING SAID WEST RIGHT OF WAY LINE, 427.19
FEET TO THE POINT OF BEGINNING. CONTAINING 29.41 ACRES, MORE OR LESS.
Less and Except:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF
SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST
QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST,
JEFFERSON COUNTY, ARKANSAS, BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHWEST
QUARTER OF THE SOUTHWEST QUARTER; THENCE NORTH 89 DEGREES 52
MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF
WAY LINE OF INTERSTATE NUMBER 69; THENCE SOUTH 06 DEGREES 01
MINUTES 23 SECONDS EAST 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY
LINE TO A POINT; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST
56.81 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT IN THE



EXHIBIT
F

CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING THREE (3) COURSES AND DISTANCES; THENCE NORTH 89 DEGREES 48 MINUTES 18 SECONDS WEST 342.18 FEET TO A POINT; THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS WEST 330.00 FEET TO A POINT; THENCE SOUTH 45 DEGREES 16 MINUTES 58 SECONDS WEST 27.97 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 45 SECONDS WEST 683.94 FEET TO A POINT; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 350.18 FEET TO THE POINT OF BEGINNING, CONTAINING 10.00 ACRES, MORE OR LESS.

SUBJECT TO RIGHT OF WAY FOR THE GRAVEL ROAD, IF ANY, RUNNING THROUGH THE PROPERTY AS SHOWN ON SURVEY.

TRACT II:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 974.84 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING FIVE (5) COURSES AND DISTANCES: THENCE SOUTH 89 DEGREES 23 MINUTES 02 SECONDS EAST, 58.60 FEET TO A POINT; THENCE SOUTH 34 DEGREES 32 MINUTES 02 SECONDS EAST 299.50 FEET TO A POINT; THENCE SOUTH 39 DEGREES 24 MINUTES 02 SECONDS EAST 113.15 TO A POINT; THENCE SOUTH 88 DEGREES 01 MINUTES 02 SECONDS EAST, 263.35 FEET TO A POINT; THENCE SOUTH 83 DEGREES 32 MINUTES 02 SECONDS EAST, 109.64 FEET TO A POINT; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 544.23 FEET TO A POINT ON THE SOUTH LINE OF SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 88 DEGREES 40 MINUTES 02 SECONDS WEST, 650.00 FEET TO THE POINT OF BEGINNING. CONTAINING 10.45 ACRES, MORE OR LESS.

TRACT III:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 694.25 FEET; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 774.38 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING SEVEN (7) COURSES AND DISTANCES; THENCE SOUTH 82 DEGREES 12 MINUTES 58 SECONDS WEST 21.88 FEET TO A POINT; THENCE NORTH 83 DEGREES 32 MINUTES 02 SECONDS WEST, 109.64, TO A POINT; THENCE NORTH 88 DEGREES 01 MINUTES 02 SECONDS WEST 263.35 FEET TO A POINT; THENCE NORTH 39 DEGREES 24 MINUTES 02 SECONDS WEST 113.15 FEET TO A POINT; THENCE NORTH 34 DEGREES 32 MINUTES 02 SECONDS WEST 299.50 FEET TO A POINT; THENCE NORTH 89 DEGREES 23 MINUTES 02 SECONDS WEST, 58.60 FEET TO A POINT ON THE EAST LINE OF THE SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 345.16 FEET TO THE POINT OF BEGINNING. CONTAINING 10.02 ACRES, MORE OR LESS.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

*Chicago Title Insurance Company*

By: _____

Signing Agent            **Alta D. Tharp, 323655**

Return to:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

This Instrument was prepared by:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

FILED FOR RECORD
AT 11:25 O'CLOCK a M

JUN 25 2008
Janice Turner, D.C.
FLORA C. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS

# 7567

70.00

————— State of Arkansas —————    ————— Space Above This Line For Recording Data —————

# REAL ESTATE MORTGAGE
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage is <u>MAY 29, 2008</u> and the parties and their addresses are as follows:

   MORTGAGOR:
   (Grantor)
   MICHAEL D BARNES, HUSBAND AND
   JOHANNA B BARNES, WIFE
   20304 OUACHITA FORD RD
   STEPHENS AR 71764

   ☒ Refer to the Addendum which is attached and incorporated herein for additional Mortgagors.

   LENDER:
   (Grantee)
   ONE BANK & TRUST N.A.
   300 WEST CAPITOL AVE
   LITTLE ROCK AR 72201-4113

2. **MORTGAGE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (hereafter defined), Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:
   SEE ATTACHED EXHIBIT "A"

The property is located in <u>JEFFERSON</u> at <u>PART OF THE SE1/4-</u>
(County)

<u>SE1/4, T-7-S, R-9-W</u>, <u>PINE BLUFF</u>, Arkansas_____
(Address)                (City)                    (Zip Code)

ARKANSAS - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT
(NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006

(page 1 of 10)

VOL. 1148

EXHIBIT
G

VOL. 1173 PAGE 586

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers which are not directly related to crop production proceeds, and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property"). The term Property also includes, but is not limited to, any and all water wells, water, ditches, reservoirs, reservoir sites and dams located on the real estate and all riparian and water rights associated with the Property, however established.

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount of the Secured Debt (hereafter defined) secured by this Mortgage at any one time shall not exceed $ _____170,400.00_____.
This limitation of amount does not include interest, loan charges, commitment fees, brokerage commissions, attorneys' fees and other charges validly made pursuant to this Mortgage and does not apply to advances (or interest accrued on such advances) made under the terms of this Mortgage to protect Lender's security and to perform any of the covenants contained in this Mortgage. Future advances are contemplated and, along with other future obligations, are secured by this Mortgage even though all or part may not yet be advanced. Nothing in this Mortgage, however, shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment would need to be agreed to in a separate writing.

4. **SECURED DEBT DEFINED.** The term "Secured Debt" includes, but is not limited to, the following:
    A. The promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all extensions, renewals, modifications or substitutions (Evidence of Debt) (e.g., borrower's name, note amount, interest rate, maturity date):

    NOTE #█7567 DATED MAY 29, 2008 IN THE AMOUNT OF $170,400.00 MATURING ON FEBRUARY 28, 2009.


    B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt, and whether or not such future advances or future obligations are incurred for any purpose that was related or unrelated to the purpose of the Evidence of Debt.
    C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
    D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the same rate provided in the Evidence of Debt.
    E. Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt.
If more than one person signs this Mortgage as Mortgagor, each Mortgagor agrees that this Mortgage will secure all future advances and future obligations described above that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. This Mortgage will not secure any other debt if Lender fails, with respect to such other debt, to make any required disclosure about this Mortgage or if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees to make all payments on the Secured Debt when due and in accordance with the terms of the Evidence of Debt or this Mortgage.
6. **WARRANTY OF TITLE.** Mortgagor covenants that Mortgagor is lawfully seized of the estate conveyed by this Mortgage and has the right to grant, bargain, convey, sell, and mortgage the Property and warrants that the Property is unencumbered, except for encumbrances of record.
7. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Mortgage. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses which Mortgagor may have against parties who supply labor or materials to improve or maintain the Property.
8. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust or security agreement that created a prior security interest or encumbrance on the Property and that may have priority over this Mortgage, Mortgagor agrees:

*MDB* _____   *JBJ.* _____

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006   (page 2 of 10)

    A. To make all payments when due and to perform or comply with all covenants.
    B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
    C. Not to make or permit any modification or extension of, and not to request or accept any future advances under any note or agreement secured by the other mortgage, deed of trust or security agreement unless Lender consents in writing.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of any lien, encumbrance, transfer, or sale, or contract for any of these on the Property. However, if the Property includes Mortgagor's residence, this section shall be subject to the restrictions imposed by federal law (12 C.F.R. 591 et seq.), as applicable. For the purposes of this paragraph, the term "Property" also includes any interest to all or any part of the Property. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Mortgage is released.

10. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if (1) a beneficial interest in Mortgagor is sold or transferred; (2) there is a change in either the identity or number of members of a partnership; or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation. However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Mortgage.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall be continuing as long as the Secured Debt remains outstanding:
    A. Mortgagor is an entity which is duly organized and validly existing in the Mortgagor's state of incorporation (or organization). Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.
    B. The execution, delivery and performance of this Mortgage by Mortgagor and the obligation evidenced by the Evidence of Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
    C. Other than disclosed in writing Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Evidence of Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will give Lender prompt notice of any loss or damage to the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor will not initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restriction limiting or defining the uses which may be made of the Property or any part of the Property, without Lender's prior written consent. Mortgagor will comply with all legal requirements and restrictions, whether public or private, with respect to the use of the Property. Mortgagor also agrees that the nature of the occupancy and use will not change without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor or any other owner made under any law or regulation regarding use, ownership and occupancy of the Property.
No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Mortgage. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent. Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

13. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any of Mortgagor's duties under this Mortgage, or any other mortgage, deed of trust, lien or other security interest that has priority over this Mortgage, Lender may, without notice, perform the duties or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may do whatever is necessary to protect Lender's security interest in the Property. This may include completing the construction.

*MPB*          *J.B.B.*

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006
                                                *(page 3 of 10)*

NUL. 117 3 PAGE 588

Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Mortgage. Any amounts paid by Lender for insuring, preserving or otherwise protecting the Property and Lender's security interest will be due on demand and will bear interest from the date of the payment until paid in full at the interest rate in effect from time to time according to the terms of the Evidence of Debt.

14. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (Property).

    A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).

    B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

15. **CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

16. **DEFAULT.** Mortgagor will be in default if any of the following occur:

    A. Any party obligated on the Secured Debt fails to make payment when due;

    B. A breach of any term or covenant in this Mortgage, any prior mortgage or any construction loan agreement, security agreement or any other document evidencing, guarantying, securing or otherwise relating to the Secured Debt;

    C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

    D. The death, dissolution, appointment of a receiver, insolvency, or application of any debtor relief law to or of Mortgagor or any person or entity obligated on the Secured Debt;

E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the Property is impaired;

F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**17. REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, mediation notices or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Mortgage in a manner provided by law if this Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the Secured Debt, this Mortgage and any related documents including without limitation, the power to sell the Property. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether expressly set forth or not. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**18. EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Mortgage. Mortgagor will also pay on demand all of Lender's expenses incurred in collecting, insuring, preserving or protecting the Property or in any inventories, audits, inspections or other examination by Lender in respect to the Property. Mortgagor agrees to pay all costs and expenses incurred by Lender in enforcing or protecting Lender's rights and remedies under this Mortgage, including but not limited to reasonable attorneys' fees (as determined under A.C.A. 18-22-308), court costs, and other legal expenses. Once the Secured Debt is fully and finally paid, Lender agrees to release this Mortgage and Mortgagor agrees to pay for any recordation costs. All such amounts are due on demand and will bear interest from the time of the advance at the same rate provided in the Evidence of Debt and as permitted by law.

**19. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) "Environmental Law" means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) "Hazardous Substance" means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law. Mortgagor represents, warrants and agrees that, except as previously disclosed and acknowledged in writing:

A. No Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

VOL. 1173 PAGE 590

E. Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. There are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Mortgage and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Mortgage without prejudice to any of Lender's rights under this Mortgage.

L. Notwithstanding any of the language contained in this Mortgage to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Mortgage regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**20. CONDEMNATION.** Mortgagor will give Lender prompt notice of any action, real or threatened, by private or public entities to purchase or take any or all of the Property, including any easements, through condemnation, eminent domain, or any other means. Mortgagor further agrees to notify Lender of any proceedings instituted for the establishment of any sewer, water, conservation, ditch, drainage, or other district relating to or binding upon the Property or any part of it. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims and to collect and receive all sums resulting from the action or claim. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Mortgage. This assignment of proceeds is subject to the terms of any prior security agreement.

**21. INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the improvements now existing or hereafter built on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. What lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Mortgage.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "lender loss payee clause." Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall promptly give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Mortgagor.

Unless Lender and Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically

feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt, whether or not then due, with any excess paid to Mortgagor. If Mortgagor abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Secured Debt whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of the payments. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B. Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C. Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

22. **NO ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

23. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem necessary. Mortgagor warrants that all financial statements and information Mortgagor provides to Lender are or will be accurate, correct, and complete. Mortgagor agrees to sign, deliver, and file as Lender may reasonably request any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Mortgage and Lender's lien status on the Property. If Mortgagor fails to do so, Lender may sign, deliver, and file such documents or certificates in Mortgagor's name and Mortgagor hereby irrevocably appoints Lender or Lender's agent as attorney in fact to do the things necessary to comply with this section.

24. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Mortgage are joint and individual. If Mortgagor signs this Mortgage but does not sign the Evidence of Debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. Mortgagor agrees that Lender and any party to this Mortgage may extend, modify or make any change in the terms of this Mortgage or the Evidence of Debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Mortgage. The duties and benefits of this Mortgage shall bind and benefit the successors and assigns of Mortgagor and Lender.

If this Mortgage secures a guaranty between Lender and Mortgagor and does not directly secure the obligation which is guarantied, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation including, but not limited to, anti-deficiency or one-action laws.

25. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Mortgage is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Mortgage is complete and fully integrated. This Mortgage may not be amended or modified by oral agreement. Any section or clause in this Mortgage, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section or clause of this Mortgage cannot be enforced according to its terms, that section or clause will be severed and will not affect the enforceability of the remainder of this Mortgage. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Mortgage are for convenience only and are not to be used to interpret or define the terms of this Mortgage. Time is of the essence in this Mortgage.

26. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to Mortgagor's address on page 1 of this Mortgage, or to any other address that Mortgagor has designated in writing. Mortgagor will give any notice to Lender by mailing it first class to Lender's address on page 1 of this Mortgage, or to any other address that Lender has designated in writing. Any notice shall be deemed to have been given to either party when given in the manner stated above.

27. **WAIVERS.** To the extent applicable, Mortgagor waives all rights relating to appraisement, sale, redemption and homestead under the laws of the State of Arkansas, especially under 18-49-106. To the extent applicable, Mortgagor relinquishes all rights of curtesy and dower in the Property.

*MDB* _____ *J.B.B.*

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006

*(page 7 of 10)*

VOL. 1 4 5 PAGE 591

VOL. 1 1 7 PAGE 582

**28. ☒ CONSTRUCTION LOAN.** This Mortgage secures a construction loan. Mortgagor agrees that Lender is not trustee for the benefit of the contractor, subcontractor or materialmen and that such contractor, subcontractor or materialmen do not have equitable liens on the loan proceeds and that they do not have third-party beneficiary status to any of the loan proceeds. Lender is obligated to make the construction advances. Except as indicated in the Description of Non-Construction Advances subsection, the construction advances shall be applied by Mortgagor to the payment of interest, fees, expenses, labor and material costs incurred in the construction of the improvements, and/or remodeling and repairs of the existing improvements, located on the Property. Notice is hereby given that to the full extent permitted under Ark. Stat. Ann. = 18-44-110, the lien of this Mortgage will have priority over any statutory liens on account of labor and materials supplied for construction.

**Description of Non-Construction Advances.**
SEE ATTACHED EXHIBIT "A-1"

**29. U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Mortgage:

    ☒ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

    ☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

    ☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property. This security interest includes all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property. The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

**30. OTHER TERMS.** If checked, the following are applicable to this Mortgage:

    ☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Mortgage will remain in effect until released.

    ☐ **Agricultural Property.** Mortgagor covenants and warrants that the Property will be used principally for agricultural or farming purposes and that Mortgagor is an individual or entity allowed to own agricultural land as specified by law.

    ☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

    ☐ **Additional Terms.**

*M.D.b.*      *J.B.B.*

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006

*(page 8 of 10)*

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Mortgage and in any attachments that Mortgagor has signed. Mortgagor also acknowledges receipt of a copy of this Mortgage on the date stated above on Page 1.

☐ Actual authority was granted to the parties signing below by resolution signed and dated
_____.

Entity Name: _____        Entity Name: _____

_Michael D Barnes_ 5/29/08        _Johann B Barnes_ 5/29/08
(Signature) MICHAEL D BARNES        (Date)        (Signature) JOHANNA B BARNES        (Date)

_____  _____        _____  _____
(Signature)        (Date)        (Signature)        (Date)

☒ Refer to the Addendum which is attached and incorporated herein for additional Mortgagors, signatures and acknowledgments.

**ACKNOWLEDGMENT:**
(Individual)  STATE OF _Arkansas_ , COUNTY OF _Saline_ } ss.
On this _29_ day of _May_ , _2008_ , before me, the undersigned officer, personally appeared _Michael D. Barnes And Johanna B. Barnes, husband And wife_
_____
_____
known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes and consideration therein contained.
My commission expires:

_Guy Scot_
(Notary Public)

VOL. 1 1 7 3 PAGE 5 5 4

(Business
or Entity
Acknowl-
edgment)

State of_____
County of _____
    On this _____ day of _____ , before me,
_____ , a Notary Public, (or before any officer within this State or
without the State now qualified under existing law to take acknowledgments), duly
commissioned qualified and acting, within and for said County and State, appeared in person
the within named _____ , (being the person or persons authorized by said
_____ to execute such instrument, stating their respective capacities in
that behalf), to me personally well known, who stated that they were the
_____ of the _____ , a _____ ,
and were duly authorized in their respective capacities to execute the foregoing instruments
for and in the name and behalf of said _____ , and further stated and
acknowledged that they had so signed, executed and delivered said foregoing instrument for
the consideration, uses and purposes therein mentioned and set forth.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this
_____ day of _____ .
My commission expires:

_____
                    (Notary Public)

Lender telephone no. 501-370-4400
Person to release lien (name and title)
CHRIS HUBENER, VICE PRESIDENT

*MDB*  _____  *J.B.B.*  _____

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006

(page 10 of 10)

Exhibit "A"

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7
SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED
AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE
SOUTHEAST QUARTER OF SECTION 23; THENCE SOUTH 88 DEGREES 49 MINUTES 02 SECONDS EAST
694.25 FEET; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 774.38 FEET TO A POINT IN
THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING SEVEN (7)
COURSES AND DISTANCES; THENCE SOUTH 82 DEGREES 12 MINUTES 00 SECONDS WEST 21.88 FEET
TO A POINT; THENCE NORTH 83 DEGREES 31 MINUTES 02 SECONDS WEST, 109.64, TO A POINT;
THENCE NORTH 83 DEGREES NORTH 68 DEGREES 01 MINUTES 02 SECONDS WEST 263.35 FEET TO A
POINT; THENCE NORTH 39 DEGREES 24 MINUTES 02 SECONDS WEST 113.15 FEET TO A POINT; THENCE
NORTH 34 DEGREES 32 MINUTES 02 SECONDS WEST 299.50 FEET TO A POINT; THENCE NORTH 89
DEGREES 23 MINUTES 02 SECONDS WEST, 56.60 FEET TO A POINT ON THE EAST LINE OF THE SAID
SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 00 DEGREES 28 MINUTES 02
SECONDS WEST 345.16 FEET TO THE POINT OF BEGINNING, CONTAINING 10.02 ACRES, MORE OR LESS.

M.D.B.
J.B.B.

VOL. 1 1 7 3 PAGE 596

**EXHIBIT "A-1"**

Of the principal amount of the note, Mortgagor will become indebted to Mortgagee in the amount of *Seventeen Thousand Three Hundred Fifty One* 73/100 ($17361.73 ) for funds advanced this date to be used (to purchase the Real Property) (or) (to satisfy a mortgage on the Real Property) and for closing costs in connection this loan, and the balance of the loan amount is to be used in connection with construction of certain improvements on the Mortgaged Property.

M.O.B.
J.B.B.

I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED AND RECORDED ON THE _25_ DAY OF _June_ 20 _08_ AT _11:25_ BOOK NO _01173_ PAGE _525_

FLORA C. COOK, CLERK
JEFFERSON COUNTY, ARKANSAS

BY _Janice Turner_ DC

**Ticor Title Insurance Company**

POLICY NO.: AR2167-48-479-063-2008.74341-76231831

**SHORT FORM RESIDENTIAL LOAN POLICY
ONE-TO-FOUR FAMILY**
Issued by
*Ticor Title Insurance Company*

477867

**SCHEDULE A**

Name and Address of Title Insurance Company:
Ticor Title Insurance Company
Attn:  Claims Department
P.O. Box 45023, Jacksonville, Florida 32232-5023.

Issuing Agent:
AR2167    479-063
Harley Enterprises, LLC
d/b/a Professional Land Title Company of Arkansas

2650 John Harden Drive, Suite O
Jacksonville, AR 72076
Tel:(501) 241-0613
Fax:(501) 241-0619

Loan No.:
Address Reference- Street Address: Kingwood Eastates, Pine Bluff, AR

County and State: Jefferson, Arkansas
Amount of Insurance:  $170,400.00
Premium: $30.00
Mortgage Amount: $170,400.00
Mortgage Date: 05/29/08
Date of Policy: 06/25/08

*RECEIVED*
*AUG 1 9 2008*
*COLLATERAL COPY*

Name of Insured: Olne Bank & Trust, N. A.,

Name of Borrower(s): Michael D. Barnes and Johanna B. Barnes

The estate or interest in the Land identified in this Schedule A and which is encumbered by the Insured Mortgage is fee simple and is, at Date of Policy, vested in the borrower(s) shown in the Insured Mortgage and named above.

The Land referred to in this policy is described as set forth in the Insured Mortgage.

This policy consists of two pages, unless an addendum is attached and indicated below:

☐    Addendum Attached

Subject to the conditions stated in the endorsement list below, the following ALTA endorsements are incorporated in this policy:

| | |
|---|---|
| ALTA ENDORSEMENT 4.1-06 | (Condominium), if the Land or estate or interest is referred to in the Insured Mortgage as a condominium. |
| ALTA ENDORSEMENT 5.1-06 | (Planned Unit Development) |
| ALTA ENDORSEMENT 6-06 | (Variable Rate), if the Insured Mortgage contains provisions which provide for an adjustable interest rate. |
| ALTA ENDORSEMENT 6.2-06 | (Variable Rate-Negative Amortization), if the Insured Mortgage contains provisions which provide for both an adjustable interest rate and negative amortization. |
| ALTA ENDORSEMENT 7-06 | (Manufactured Housing), if a manufactured housing unit is located on the Land at Date of Policy. |
| ALTA ENDORSEMENT 8.1-06 | (Environmental Protection Lien) - Paragraph b refers to the following state statute(s): |
| ALTA ENDORSEMENT 9-06 | (Restrictions, Encroachments, Minerals) |

The endorsements checked below, if any, are incorporated in this policy:

| | | |
|---|---|---|
| ☐ | ALTA ENDORSEMENT 4-06 | (Condominium) |
| ☐ | ALTA ENDORSEMENT 5-06 | (Planned Unit Development) |
| ☐ | ALTA ENDORSEMENT 7.1-06 | (Manufactured Housing - Conversion; Loan) |
| ☐ | ALTA ENDORSEMENT 14-06 | (Future Advance - Priority) |
| ☐ | ALTA ENDORSEMENT 14.1-06 | (Future Advance - Knowledge) |
| ☐ | ALTA ENDORSEMENT 14.3-06 | (Future Advance - Reverse Mortgage) |
| ☐ | ALTA ENDORSEMENT 22-06 | (Location) The type of improvement is a one-to-four family residential structure and the street address is as shown above. |

*IN WITNESS WHEREOF TICOR TITLE INSURANCE COMPANY has caused this policy to be signed and sealed by its duly authorized officers.*

Countersigned:

Authorized Signatory
Brian Perry

**EXHIBIT
H**

TICOR TITLE INSURANCE COMPANY

By: _____ President

ATTEST _____ Secretary

THIS POLICY VALID ONLY IF SCHEDULE B IS ATTACHED

74341 (5/06)

AR2167-48-479-063-2008.74341-762  31

SUBJECT TO THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B BELOW, AND ANY ADDENDUM ATTACHED HERETO, TICOR TITLE INSURANCE COMPANY, A CALIFORNIA CORPORATION, HEREIN CALLED THE "COMPANY," HEREBY INSURES THE INSURED IN ACCORDANCE WITH AND SUBJECT TO THE TERMS, EXCLUSIONS AND CONDITIONS SET FORTH IN THE AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (6-17-06), ALL OF WHICH ARE INCORPORATED HEREIN. ALL REFERENCES TO SCHEDULES A AND B SHALL REFER TO SCHEDULES A AND B OF THIS POLICY.

## SCHEDULE B

### EXCEPTIONS FROM COVERAGE AND
### AFFIRMATIVE INSURANCES

Except to the extent of the affirmative insurance set forth below, this policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) which arise by reason of:

1.  Covenants, conditions, or restrictions, if any, appearing in the Public Records; however, this policy insures against loss or damage arising from:

    (a)  the violation of those covenants, conditions, or restrictions on or prior to Date of Policy;
    (b)  a forfeiture or reversion of Title from a future violation of those covenants, conditions, or restrictions, including those relating to environmental protection; and
    (c)  provisions in those covenants, conditions, or restrictions, including those relating to environmental protection, under which the lien of the Insured Mortgage can be extinguished, subordinated, or impaired.

    As used in paragraph 1(a), the words "covenants, conditions, or restrictions" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded or filed in the Public Records at Date of Policy and is not referenced in an addendum attached to this policy.

2.  Any easements or servitudes appearing in the Public Records; however, this policy insures against loss or damage arising from (a) the encroachment, at Date of Policy, of the improvements on any easement, and (b) any interference with or damage to existing improvements, including lawns, shrubbery, and trees, resulting from the use of the easements for the purposes granted or reserved.

3.  Any lease, grant, exception, or reservation of minerals or mineral rights appearing in the Public Records; however, this policy insures against loss or damage arising from (a) any affect on or impairment of the use of the Land for residential one-to-four family dwelling purposes by reason of such lease, grant, exception or reservation of minerals or mineral rights, and (b) any damage to existing improvements, including lawns, shrubbery, and trees, resulting from the future exercise of any right to use the surface of the Land for the extraction or development of the minerals or mineral rights so leased, granted, excepted, or reserved. Nothing herein shall insure against loss or damage resulting from subsidence.

NOTICES, WHERE SENT:
Any notice of claim or other notice or statement in writing required to be given to the Company under this policy must be given to the Company at the following address: Ticor Title Insurance Company, Attn: Claims Department, Post Office Box 45023, Jacksonville, Florida 32232-5023.



**Ticor Title Insurance Company**

**Policy No.**

**ADDENDUM**
**TO**
**SHORT FORM RESIDENTIAL LOAN POLICY**

**SCHEDULE B (Continued)**

    IN ADDITION TO THE MATTERS SET FORTH ON SCHEDULE B OF THE POLICY TO WHICH THIS ADDENDUM IS ATTACHED, THIS POLICY DOES NOT INSURE AGAINST LOSS OR DAMAGE (AND THE COMPANY WILL NOT PAY COSTS, ATTORNEYS' FEES OR EXPENSES) THAT ARISE BY REASON OF THE FOLLOWING:

USE WITH FATIC-488
ALTA SHORT FORM
(10/17/92)

**Policy Number 74341-76231831**

New Home Sale ☐   Resale **X**   2nd Mortgage ☐   Refinance ☐

# SHORT FORM RESIDENTIAL LOAN POLICY ONE-TO-FOUR FAMILY
Issued By

# *TICOR TITLE INSURANCE COMPANY*

## SCHEDULE A

| | | | |
|---|---|---|---|
| Amount of Insurance: | $170,400.00 | Mortgage Amount: | $170,400.00 |
| File Number: | 479-063 | Loan Number: | |
| Mortgage Date: | **May 29, 2008** | Date of Policy:<br>(or the date of recording of the<br>insured mortgage, whichever is later.) | **June 25, 2008 at<br>11:25 AM** |

Name of Insured(s): **One Bank & Trust, N.A. and its successors and/or assigns as their interests may appear.**

Name of Borrower(s): **Michael D. Barnes and Johanna B. Barnes, husband and wife**

Property Address: **Kingwood Estates, Pine Bluff, AR 71603**

County and State: **Jefferson, Arkansas**

The estate or interest in the land identified in this Schedule A and which is encumbered by the insured mortgage is fee simple and is at Date of Policy vested in the borrower(s) shown in the insured mortgage and named above.

The land referred to in this policy is described as set forth in the insured mortgage and is identified as the property address shown above.

This policy consists of Schedule A and Schedule B, unless and addendum is attached and indicated below:

☐   Addendum attached          ☒   No Addendum attached

The ALTA endorsements indicated below are incorporated herein:

☐ ENDORSEMENT 4.1 (Condominium)

☐ ENDORSEMENT 5.1 (Planned Unit Development)

☐ ENDORSEMENT 6 (Variable Rate)

☐ ENDORSEMENT 9 (Restrictions, Encroachments, Minerals)

☐ ENDORSEMENT 6.2 (Variable Rate-Negative Amortization)

☐ ENDORSEMENT 7 (Manufactured Housing)

☒ ENDORSEMENT 8.1 (Environmental Protection Lien) referring to following state statute(s): **NONE**

*TICOR TITLE INSURANCE COMPANY*

*By its Authorized Agent*

**Professional Land Title Company of Arkansas
Issuing Agent # 327460
2650 John Harden Drive
Jacksonville, AR 72076**

By:

Issue Date: August 1, 2008

**Signing Agents**
**Michael P. Ragsdale, 323650, Brian A. Perry, 323653, Alta Tharp, 323655**

Note: The Arkansas Insurance Department address and contact information is: Arkansas Insurance Department,

( )

Consumer Serv'..'s Division, 1200 W. 3rd Street, Little
Rock, AR. 722... /1940, (800) 852-5494 or (501) 371-
2640

**ENDORSEMENT**

**Attached to Policy No. 74341-76231831**

**Issued By**

*TICOR TITLE INSURANCE COMPANY*

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

(a)     Any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matter relating to real property to purchasers for value and without knowledge of district, or filed in the records of the clerk of the United States district court for the in which the land is located, except as set forth in Schedule B; or

(b)     any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes: **None**

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

*TICOR TITLE INSURANCE COMPANY*

By: _____
          **Authorized Signatory**

CLTA Form 110.9
ALTA Form 8.1 (Environmental Protection Lien)

Short.frm (Arkansas)11/2/00

Effective Date: 5/1/2008

Fidelity National Financial, Inc.
**Privacy Statement**

Fidelity National Financial, Inc. and its subsidiaries ("FNF") respect the privacy and security of your non-public personal information ("Personal Information") and protecting your Personal Information is one of our top priorities. This Privacy Statement explains FNF's privacy practices, including how we use the Personal Information we receive from you and from other specified sources, and to whom it may be disclosed. FNF follows the privacy practices described in this Privacy Statement and, depending on the business performed, FNF companies may share information as described herein.

**Personal Information Collected**
We may collect Personal Information about you from the following sources:
- Information we receive from you on applications or other forms, such as your name, address, social security number, tax identification number, asset information, and income information;
- Information we receive from you through our Internet websites, such as your name, address, email address, Internet Protocol address, the website links you used to get to our websites, and your activity while using or reviewing our websites;
- Information about your transactions with or services performed by us, our affiliates, or others, such as information concerning your policy, premiums, payment history, information about your home or other real property, information from lenders and other third parties involved in such transaction, account balances, and credit card information; and
- Information we receive from consumer or other reporting agencies and publicly recorded documents.

**Disclosure of Personal Information**
We may provide your Personal Information (excluding information we receive from consumer or other credit reporting agencies) to various individuals and companies, as permitted by law, without obtaining your prior authorization. Such laws do not allow consumers to restrict these disclosures. Disclosures may include, without limitation, the following:
- To insurance agents, brokers, representatives, support organizations, or others to provide you with services you have requested, and to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure in connection with an insurance transaction;
- To third-party contractors or service providers for the purpose of determining your eligibility for an insurance benefit or payment and/or providing you with services you have requested;
- To an insurance regulatory authority, or a law enforcement or other governmental authority, in a civil action, in connection with a subpoena or a governmental investigation;
- To companies that perform marketing services on our behalf or to other financial institutions with which we have joint marketing agreements and/or
- To lenders, lien holders, judgment creditors, or other parties claiming an encumbrance or an interest in title whose claim or interest must be determined, settled, paid or released prior to a title or escrow closing.

We may also disclose your Personal Information to others when we believe, in good faith, that such disclosure is reasonably necessary to comply with the law or to protect the safety of our customers, employees, or property and/or to comply with a judicial proceeding, court order or legal process.

Effective Date: 5/1/2008

<u>Disclosure to Affiliated Companies</u> – We are permitted by law to share your name, address and facts about your transaction with other FNF companies, such as insurance companies, agents, and other real estate service providers to provide you with services you have requested, for marketing or product development research, or to market products or services to you. We do not, however, disclose information we collect from consumer or credit reporting agencies with our affiliates or others without your consent, in conformity with applicable law, unless such disclosure is otherwise permitted by law.

<u>Disclosure to Nonaffiliated Third Parties</u> – We do not disclose Personal Information about our customers or former customers to nonaffiliated third parties, except as outlined herein or as otherwise permitted by law.

**Confidentiality and Security of Personal Information**
We restrict access to Personal Information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard Personal Information.

**Access to Personal Information/**
**Requests for Correction, Amendment, or Deletion of Personal Information**
As required by applicable law, we will afford you the right to access your Personal Information, under certain circumstances to find out to whom your Personal Information has been disclosed, and request correction or deletion of your Personal Information. However, <u>FNF's current policy is to maintain customers' Personal Information for no less than your state's required record retention requirements for the purpose of handling future coverage claims</u>.

For your protection, <u>all requests made under this section must be in writing and must include your notarized signature to establish your identity</u>. Where permitted by law, we may charge a reasonable fee to cover the costs incurred in responding to such requests. Please send requests to:

Chief Privacy Officer
Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, FL 32204

**Changes to this Privacy Statement**
This Privacy Statement may be amended from time to time consistent with applicable privacy laws. When we amend this Privacy Statement, we will post a notice of such changes on our website. The effective date of this Privacy Statement, as stated above, indicates the last time this Privacy Statement was revised or materially changed.

**EXHIBIT 2**

American Land Title Association

Loan Policy
(6-17-06)

### LOAN POLICY OF TITLE INSURANCE
Issued by
*Blank Title Insurance Company*

Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, BLANK TITLE INSURANCE COMPANY, a Blank corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1.  Title being vested other than as stated in Schedule A.

2.  Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from

    (a)   A defect in the Title caused by

          (i)    forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

          (ii)   failure of any person or Entity to have authorized a transfer or conveyance;

          (iii)  a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

          (iv)   failure to perform those acts necessary to create a document by electronic means authorized by law;

          (v)    a document executed under a falsified, expired, or otherwise invalid power of attorney;

          (vi)   a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

          (vii)  a defective judicial or administrative proceeding.

    (b)   The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.

    (c)   Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.

3.  Unmarketable Title.

4.  No right of access to and from the Land.

5.  The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (a)   the occupancy, use, or enjoyment of the Land;

    (b)   the character, dimensions, or location of any improvement erected on the Land;

    (c)   the subdivision of land; or

    (d)   environmental protection

if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6.  An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7.  The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8.  Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9.    The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage

      (a)    forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;

      (b)    failure of any person or Entity to have authorized a transfer or conveyance;

      (c)    the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;

      (d)    failure to perform those acts necessary to create a document by electronic means authorized by law;

      (e)    a document executed under a falsified, expired, or otherwise invalid power of attorney;

      (f)    a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or

      (g)    a defective judicial or administrative proceeding.

10.    The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11.    The lack of priority of the lien of the Insured Mortgage upon the Title

      (a)    as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either

            (i)    contracted for or commenced on or before Date of Policy; or

            (ii)    contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and

      (b)    over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12.    The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13.    The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title

      (a)    resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or

      (b)    because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records

            (i)    to be timely, or

            (ii)    to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14.    Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

[Witness clause optional]

**BLANK TITLE INSURANCE COMPANY**

BY: _____ PRESIDENT

BY: _____ SECRETARY

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.       (a)       Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

               (i)       the occupancy, use, or enjoyment of the Land;

               (ii)       the character, dimensions, or location of any improvement erected on the Land;

               (iii)       the subdivision of land; or

               (iv)       environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

       (b)       Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.       Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.       Defects, liens, encumbrances, adverse claims, or other matters

       (a)       created, suffered, assumed, or agreed to by the Insured Claimant;

       (b)       not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

       (c)       resulting in no loss or damage to the Insured Claimant;

       (d)       attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

       (e)       resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.       Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.       Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.       Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

       (a)       a fraudulent conveyance or fraudulent transfer, or

       (b)       a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.       Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

1. **DEFINITION OF TERMS**

The following terms when used in this policy mean:

(a)    "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.

(b)    "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c)    "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.

(d)    "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of

    (i)    the amount of the principal disbursed as of Date of Policy;

    (ii)    the amount of the principal disbursed subsequent to Date of Policy;

    (iii)    the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;

    (iv)    interest on the loan;

    (v)    the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;

    (vi)    the expenses of foreclosure and any other costs of enforcement;

    (vii)    the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;

    (viii)    the amounts to pay taxes and insurance; and

    (ix)    the reasonable amounts expended to prevent deterioration of improvements;

but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.

(e)    "Insured": The Insured named in Schedule A.

    (i)    The term "Insured" also includes

        (A)    the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;

        (B)    the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;

        (C)    successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;

        (D)    successors to an Insured by its conversion to another kind of Entity;

        (E)    a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title

            (1)    if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

            (2)    if the grantee wholly owns the named Insured, or

            (3)    if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;

        (F)    any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;

    (ii)    With regard to (A), (B), (C), (D) , and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.

(f)    "Insured Claimant": An Insured claiming loss or damage.

(g)    "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.

(h)    "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(i)    "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or

easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(j)     "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(k)     "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(l)     "Title": The estate or interest described in Schedule A.

(m)    "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or land if there is a contractual condition requiring the delivery of marketable title.

**2.      CONTINUATION OF INSURANCE**

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3.      NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**4.      PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5.      DEFENSE AND PROSECUTION OF ACTIONS**

(a)     Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)     The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it should be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)     Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

**6.      DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)     In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured

under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)     The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7.     OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY

In case of a claim under this policy, the Company shall have the following additional options:

(a)     To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)     To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii)     To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)     To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)     to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii)     to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

8.     DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a)     The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)     the Amount of Insurance,

(ii)     the Indebtedness,

(iii)     the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)     if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)     If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

(i)     the Amount of Insurance shall be increased by 10%, and

(ii)     the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c)     In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d)     In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9.     LIMITATION OF LIABILITY**

(a)     If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b)     In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c)     The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10.     REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)     All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b)     The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11.     PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12.     RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a)     The Company's Right to Recover

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b)     The Insured's Rights and Limitations

(i)     The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

(ii)     If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c)     The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13.   ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**14.   LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT**

(a)      This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)      Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c)      Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d)      Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15.   SEVERABILITY**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16.   CHOICE OF LAW; FORUM**

(a)      Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)      Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**17.   NOTICES, WHERE SENT**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at [fill in].

NOTE: Bracketed [ ] material optional

**SCHEDULE A**

Name and Address of Title Insurance Company:

[File No.:  ]   Policy No.:
Loan No.:
Address Reference:
Amount of Insurance: $ [Premium: $    ]
Date of Policy:      [at a.m./p.m.]

1.          Name of Insured:

2.          The estate or interest in the Land that is encumbered by the Insured Mortgage is:

3.          Title is vested in:

4.          The Insured Mortgage and its assignments, if any, are described as follows:

5.          The Land referred to in this policy is described as follows:

[6.          This policy incorporates by reference those ALTA endorsements selected below:

❑   4-06          (Condominium)
❑   4.1-06
❑   5-06          (Planned Unit Development)
❑   5.1-06
❑   6-06          (Variable Rate)
❑   6.2-06          (Variable Rate–Negative Amortization)
❑   8.1-06          (Environmental Protection Lien) Paragraph b refers to the following state statute(s):
❑   9-06          (Restrictions, Encroachments, Minerals)
❑   13.1-06          (Leasehold Loan)
❑   14-06          (Future Advance-Priority)
❑   14.1-06          (Future Advance-Knowledge)
❑   14.3-06          (Future Advance-Reverse Mortgage)
❑   22-06          (Location) The type of improvement is a _____, and the street address is as shown above.]

**SCHEDULE B**

[File No.   ]                                      Policy No.

**EXCEPTIONS FROM COVERAGE**

[Except as provided in Schedule B - Part II,] t[or T]his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

[PART I

PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]

Return To:
ProLand Title Company
909 W. 3rd Street
Little Rock, AR 72201
479-063

FILED FOR RECORD
AT _11:14_ O'CLOCK _A_ M

JUL - 9 2014

~Degma White~
LAFAYETTE WOODS, SR., CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS
$20.00

SCRIVENER'S AFFIDAVIT

**STATE OF ARKANSAS**
**COUNTY OF PULASKI**

## KNOW ALL PERSONS BY THESE PRESENTS THAT:

BEFORE ME, the undersigned Notary who is authorized to administer oaths and take testimony in the aforesaid jurisdiction, personally appeared before me **William P. Allison, Esq.**, who is well known to me and said person swore under oath and stated as follows:

1.    That I prepared a Warranty Deed for recording in the public records of Jefferson County.

2.    That the document described below was recorded in the public records of Jefferson County, Arkansas, but that said documents contained an error:

Warranty Deed dated May 30, 2008, and recorded on June 25, 2008 in Book 855 at page 763, Jefferson County, Arkansas.
**Grantor:  Ridgewood Timber Corp., an Arkansas corporation**
**Grantee:  Michael D. Barnes and Johanna B. Barnes, husband and wife**

3.    That the above referenced documents all contain an incorrect description of the property known as 1081 RBL Estate RD, Pine Bluff, AR 71603.

4.    That the legal description in the Deed erroneously reads as follows:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:  BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 694.25 FEET; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 774.38 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING SEVEN (7) COURSES AND DISTANCES; THENCE SOUTH 82 DEGREES 12 MINUTES 58 SECONDS WEST 21.88 FEET TO A POINT; THENCE NORTH 83 DEGREES 32 MINUTES 02 SECONDS WEST, 109.64, TO A POINT; THENCE NORTH 88 DEGREES 01 MINUTES 02 SECONDS WEST 263.35 FEET TO A POINT; THENCE NORTH 39 DEGREES 24 MINUTES 02 SECONDS WEST 113.15 FEET TO A POINT; THENCE NORTH 34 DEGREES 32 MINUTES 02 SECONDS WEST 299.50 FEET TO A POINT; THENCE NORTH 89 DEGREES 23 MINUTES 02 SECONDS WEST, 58.60 FEET TO A POINT ON THE EAST LINE OF THE SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 345.16 FEET TO THE POINT OF BEGINNING. CONTAINING 10.02 ACRES, MORE OR LESS.


EXHIBIT
I

BOOK **944** PAGE **004**



I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED AND RECORDED ON THE 9th DAY OF July 2014 AT 11:14 AM BOOK NO 944 PAGE 003
LAFAYETTE WOODS, SR.
JEFFERSON COUNTY, ARKANSAS
BY _____ DC

5.   That the legal description should read as follows:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER; THENCE NORTH 89 DEGREES 52 MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF INTERSTATE NUMBER 69; THENCE SOUTH 06 DEGREES 01 MINUTES 23 SECONDS EAST 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST 56.81 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE THE FOLLOWING THREE (3) COURSES AND DISTANCES; THENCE NORTH 89 DEGREES 48 MINUTES 18 SECONDS WEST 342.18 FEET TO A POINT; THENCE NORTH 89 DEGREES 42 MINUTES 02 SECONDS WEST 330.00 FEET TO A POINT; THENCE SOUTH 45 DEGREES 16 MINUTES 58 SECONDS WEST 27.97 FEET TO A POINT; THENCE NORTH 00 DEGREES 28 MINUTES 45 SECONDS WEST 683.94 FEET TO A POINT; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 350.18 FEET TO THE POINT OF BEGINNING, CONTAINING 10.00 ACRES, MORE OR LESS. SUBJECT TO RIGHT OF WAY FOR THE GRAVEL ROAD, IF ANY, RUNNING THROUGH THE PROPERTY AS SHOWN ON SURVEY.

6.   That I know of my own personal knowledge that the correction of this Scrivener's error is consistent with the intentions of the parties and does not in any way change or alter the understanding and intentions of the parties who executed said instruments.

FURTHER AFFIANT SAYETH NAUGHT.

William P. Allison, Esq.

ACKNOWLEDGMENT

State of Arkansas
County of Pulaski

On this day came before me, the undersigned, a notary public within and for the county and state aforesaid, duly commissioned and acting and personally appeared William P. Allison, Esq., to me well known and acknowledged that he had executed the same for the uses and purposes therein mentioned and set forth.

IN WITNESS WHEREOF, I hereunto set my hand and official seal as such notary public on this 26th day of June, 2014.

Notary Public

My Commission expires:   *10-16-2017*
                        [SEAL]

OFFICIAL SEAL
LANETT M. DETAR
No. 12362822
PULASKI COUNTY
My Commission Expires 10-16-2017

Return to:
ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

FILED FOR RECORD
AT 11:25 O'CLOCK __ M

FILED FOR RECORD
AT 11:25 O'CLOCK __ M

JUN 25 2008

This Instrument was prepared by: JUL - 9 2014

FLORA C. COOK, CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS

ONE BANK & TRUST N.A.
300 WEST CAPITOL AVE
LITTLE ROCK AR 72201-4113

LAFAYELIN WOODS, SR., CIRCUIT CLERK
JEFFERSON COUNTY, ARKANSAS

477507 ✓

70.00

$75.00

——— State of Arkansas ———        ——— Space Above This Line For Recording Data ———

Re-Record to correct legal

## REAL ESTATE MORTGAGE
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage is MAY 29, 2008 _____ and the parties and their addresses are as follows:

   MORTGAGOR:
   (Grantor)
   MICHAEL D BARNES, HUSBAND AND
   JOHANNA B BARNES, WIFE
   20304 OUACHITA FORD RD
   STEPHENS AR 71764

   XX Refer to the Addendum which is attached and incorporated herein for additional Mortgagors.

   LENDER:
   (Grantee)
   ONE BANK & TRUST N.A.
   300 WEST CAPITOL AVE
   LITTLE ROCK AR 72201-4113

2. **MORTGAGE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (hereafter defined), Mortgagor grants, bargains, conveys and mortgages to Lender the following described property:
   SEE ATTACHED EXHIBIT "A"

The property is located in JEFFERSON _____ at PART OF THE SE1/4-
(County)
SE1/4, T-7-S, R-9-W _____, PINE BLUFF _____, Arkansas _____
(Address)                      (City)                      (Zip Code)

ARKANSAS - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT
(NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2008        (page 1 of 10)

**EXHIBIT 5**

VOL. 1364 PAGE 0563



VOL. 1364 PAGE 564

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers which are not directly related to crop production proceeds, and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property"). The term Property also includes, but is not limited to, any and all water wells, water, ditches, reservoirs, reservoir sites and dams located on the real estate and all riparian and water rights associated with the Property, however established.

3.  **MAXIMUM OBLIGATION LIMIT.** The total principal amount of the Secured Debt (hereafter defined) secured by this Mortgage at any one time shall not exceed $ _____170,400.00_____ .
    This limitation of amount does not include interest, loan charges, commitment fees, brokerage commissions, attorneys' fees and other charges validly made pursuant to this Mortgage and does not apply to advances (or interest accrued on such advances) made under the terms of this Mortgage to protect Lender's security and to perform any of the covenants contained in this Mortgage. Future advances are contemplated and, along with other future obligations, are secured by this Mortgage even though all or part may not yet be advanced. Nothing in this Mortgage, however, shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment would need to be agreed to in a separate writing.

4.  **SECURED DEBT DEFINED.** The term "Secured Debt" includes, but is not limited to, the following:
    A.  The promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all extensions, renewals, modifications or substitutions (Evidence of Debt) (e.g., borrower's name, note amount, interest rate, maturity date):

    NOTE #■■7567 DATED MAY 29, 2008 IN THE AMOUNT OF $170,400.00
    MATURING ON FEBRUARY 28, 2009.


    B.  All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt, and whether or not such future advances or future obligations are incurred for any purpose that was related or unrelated to the purpose of the Evidence of Debt.
    C.  All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
    D.  All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the same rate provided in the Evidence of Debt.
    E.  Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt.
    If more than one person signs this Mortgage as Mortgagor, each Mortgagor agrees that this Mortgage will secure all future advances and future obligations described above that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. This Mortgage will not secure any other debt if Lender fails, with respect to such other debt, to make any required disclosure about this Mortgage or if Lender fails to give any required notice of the right of rescission.

5.  **PAYMENTS.** Mortgagor agrees to make all payments on the Secured Debt when due and in accordance with the terms of the Evidence of Debt or this Mortgage.

6.  **WARRANTY OF TITLE.** Mortgagor covenants that Mortgagor is lawfully seized of the estate conveyed by this Mortgage and has the right to grant, bargain, convey, sell, and mortgage the Property and warrants that the Property is unencumbered, except for encumbrances of record.

7.  **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Mortgage. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses which Mortgagor may have against parties who supply labor or materials to improve or maintain the Property.

8.  **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust or security agreement that created a prior security interest or encumbrance on the Property and that may have priority over this Mortgage, Mortgagor agrees:

MDB _____ JBB. _____

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2005

*(page 2 of 10)*

A. To make all payments when due and to perform or comply with all covenants.
B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
C. Not to make or permit any modification or extension of, and not to request or accept any future advances under any note or agreement secured by, the other mortgage, deed of trust or security agreement unless Lender consents in writing.

**9. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately-due and payable upon the creation of any lien, encumbrance, transfer, or sale, or contract for any of these on the Property. However, if the Property includes Mortgagor's residence, this section shall be subject to the restrictions imposed by federal law (12 C.F.R. 591 et seq.), as applicable. For the purposes of this paragraph, the term "Property" also includes any interest to all or any part of the Property. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Mortgage is released.

**10. TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if (1) a beneficial interest in Mortgagor is sold or transferred; (2) there is a change in either the identity or number of members of a partnership; or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation. However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Mortgage.

**11. ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall be continuing as long as the Secured Debt remains outstanding:

A. Mortgagor is an entity which is duly organized and validly existing in the Mortgagor's state of incorporation (or organization). Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.
B. The execution, delivery and performance of this Mortgage by Mortgagor and the obligation evidenced by the Evidence of Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
C. Other than disclosed in writing Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Evidence of Debt is satisfied.

**12. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will give Lender prompt notice of any loss or damage to the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor will not initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restriction limiting or defining the uses which may be made of the Property or any part of the Property, without Lender's prior written consent. Mortgagor will comply with all legal requirements and restrictions, whether public or private, with respect to the use of the Property. Mortgagor also agrees that the nature of the occupancy and use will not change without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor or any other owner made under any law or regulation regarding use, ownership and occupancy of the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Mortgage. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent. Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**13. AUTHORITY TO PERFORM.** If Mortgagor fails to perform any of Mortgagor's duties under this Mortgage, or any other mortgage, deed of trust, lien or other security interest that has priority over this Mortgage, Lender may, without notice, perform the duties or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may do whatever is necessary to protect Lender's security interest in the Property. This may include completing the construction.

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RES-AR 11/8/2006

*(page 3 of 10)*

VOL. 1364 PAGE 565

VOL. **1364**PAGE **566**

Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Mortgage. Any amounts paid by Lender for insuring, preserving or otherwise protecting the Property and Lender's security interest will be due on demand and will bear interest from the date of the payment until paid in full at the interest rate in effect from time to time according to the terms of the Evidence of Debt.

14. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, conveys and mortgages to Lender as additional security all the right, title and interest in the following (Property).

   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).

   B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

15. **CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

16. **DEFAULT.** Mortgagor will be in default if any of the following occur:

   A. Any party obligated on the Secured Debt fails to make payment when due;

   B. A breach of any term or covenant in this Mortgage, any prior mortgage or any construction loan agreement, security agreement or any other document evidencing, guarantying, securing or otherwise relating to the Secured Debt;

   C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

   D. The death, dissolution, appointment of a receiver, insolvency, or application of any debtor relief law to or of Mortgagor or any person or entity obligated on the Secured Debt;

*MQB.*          *JBB*

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006                    *(page 4 of 10)*

E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the Property is impaired;

F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

17. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, mediation notices or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Mortgage in a manner provided by law if this Mortgagor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the Secured Debt, this Mortgage and any related documents including without limitation, the power to sell the Property. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether expressly set forth or not. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

18. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Mortgage. Mortgagor will also pay on demand all of Lender's expenses incurred in collecting, insuring, preserving or protecting the Property or in any inventories, audits, inspections or other examination by Lender in respect to the Property. Mortgagor agrees to pay all costs and expenses incurred by Lender in enforcing or protecting Lender's rights and remedies under this Mortgage, including but not limited to reasonable attorneys' fees (as determined under A.C.A. 16-22-308), court costs, and other legal expenses. Once the Secured Debt is fully and finally paid, Lender agrees to release this Mortgage and Mortgagor agrees to pay for any recordation costs. All such amounts are due on demand and will bear interest from the time of the advance at the same rate provided in the Evidence of Debt and as permitted by law.

19. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) "Environmental Law" means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) "Hazardous Substance" means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law. Mortgagor represents, warrants and agrees that, except as previously disclosed and acknowledged in writing:

A. No Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of a Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006          *(page 5 of 10)*

VOL. 1364 PAGE 568

E. Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. There are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Mortgage and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Mortgage without prejudice to any of Lender's rights under this Mortgage.

L. Notwithstanding any of the language contained in this Mortgage to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Mortgage regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**20. CONDEMNATION.** Mortgagor will give Lender prompt notice of any action, real or threatened, by private or public entities to purchase or take any or all of the Property, including any easements, through condemnation, eminent domain, or any other means. Mortgagor further agrees to notify Lender of any proceedings instituted for the establishment of any sewer, water, conservation, ditch, drainage, or other district relating to or binding upon the Property or any part of it. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims and to collect and receive all sums resulting from the action or claim. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Mortgage. This assignment of proceeds is subject to the terms of any prior security agreement.

**21. INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the improvements now existing or hereafter built on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. What lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Mortgage.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "lender loss payee clause." Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall promptly give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Mortgagor.

Unless Lender and Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically

*MDB*   *J.B.B.*

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006   *(page 6 of 10)*

feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt, whether or not then due, with any excess paid to Mortgagor. If Mortgagor abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Secured Debt whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of the payments. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

  B. Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

  C. Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

22. **NO ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

23. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem necessary. Mortgagor warrants that all financial statements and information Mortgagor provides to Lender are or will be accurate, correct, and complete. Mortgagor agrees to sign, deliver, and file as Lender may reasonably request any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Mortgage and Lender's lien status on the Property. If Mortgagor fails to do so, Lender may sign, deliver, and file such documents or certificates in Mortgagor's name and Mortgagor hereby irrevocably appoints Lender or Lender's agent as attorney in fact to do the things necessary to comply with this section.

24. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Mortgage are joint and individual. If Mortgagor signs this Mortgage but does not sign the Evidence of Debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. Mortgagor agrees that Lender and any party to this Mortgage may extend, modify or make any change in the terms of this Mortgage or the Evidence of Debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Mortgage. The duties and benefits of this Mortgage shall bind and benefit the successors and assigns of Mortgagor and Lender.

If this Mortgage secures a guaranty between Lender and Mortgagor and does not directly secure the obligation which is guarantied, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation including, but not limited to, anti-deficiency or one-action laws.

25. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Mortgage is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Mortgage is complete and fully integrated. This Mortgage may not be amended or modified by oral agreement. Any section or clause in this Mortgage, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section or clause of this Mortgage cannot be enforced according to its terms, that section or clause will be severed and will not affect the enforceability of the remainder of this Mortgage. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Mortgage are for convenience only and are not to be used to interpret or define the terms of this Mortgage. Time is of the essence in this Mortgage.

26. **NOTICE.** Unless otherwise required by law, any notice to Mortgagor shall be given by delivering it or by mailing it by first class mail to Mortgagor's address on page 1 of this Mortgage, or to any other address that Mortgagor has designated in writing. Mortgagor will give any notice to Lender by mailing it first class to Lender's address on page 1 of this Mortgage, or to any other address that Lender has designated in writing. Any notice shall be deemed to have been given to either party when given in the manner stated above.

27. **WAIVERS.** To the extent applicable, Mortgagor waives all rights relating to appraisement, sale, redemption and homestead under the laws of the State of Arkansas, especially under 18-49-106. To the extent applicable, Mortgagor relinquishes all rights of curtesy and dower in the Property.

*MDB*          *J.B.B.*

©1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/6/2006          (page 7 of 10)

VOL. **1364** PAGE **570**

**28. ☒ CONSTRUCTION LOAN.** This Mortgage secures a construction loan. Mortgagor agrees that Lender is not trustee for the benefit of the contractor, subcontractor or materialmen and that such contractor, subcontractor or materialmen do not have equitable liens on the loan proceeds and that they do not have third-party beneficiary status to any of the loan proceeds. Lender is obligated to make the construction advances. Except as indicated in the Description of Non-Construction Advances subsection, the construction advances shall be applied by Mortgagor to the payment of interest, fees, expenses, labor and material costs incurred in the construction of the improvements, and/or remodeling and repairs of the existing improvements, located on the Property. Notice is hereby given that to the full extent permitted under Ark. Stat. Ann. = 18-44-110, the lien of this Mortgage will have priority over any statutory liens on account of labor and materials supplied for construction.
**Description of Non-Construction Advances.**
SEE ATTACHED EXHIBIT "A-1"

**29. U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Mortgage:

   ☒ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

   ☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

   ☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property. This security interest includes all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property. The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

**30. OTHER TERMS.** If checked, the following are applicable to this Mortgage:

   ☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Mortgage will remain in effect until released.

   ☐ **Agricultural Property.** Mortgagor covenants and warrants that the Property will be used principally for agricultural or farming purposes and that Mortgagor is an individual or entity allowed to own agricultural land as specified by law.

   ☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

   ☐ **Additional Terms.**

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006

*(page 8 of 10)*

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Mortgage and in any attachments that Mortgagor has signed. Mortgagor also acknowledges receipt of a copy of this Mortgage on the date stated above on Page 1.

☐ Actual authority was granted to the parties signing below by resolution signed and dated _____.

Entity Name: _____    Entity Name: _____

(Signature) MICHAEL D BARNES      5/29/08 (Date)    (Signature) JOHNNIA B BARNES    5/24/08 (Date)

(Signature) _____ (Date) _____    (Signature) _____ (Date) _____

☒ Refer to the Addendum which is attached and incorporated herein for additional Mortgagors, signatures and acknowledgments.

**ACKNOWLEDGMENT:**
(Individual)
STATE OF __Arkansas__ , COUNTY OF __Saline__ } ss.
On this __29__ day of __May__ , __2008__ , before me, the undersigned officer, personally appeared __Michael D. Barnes And Johanna B. Barnes, husband And wife__

_____

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes and consideration therein contained.
My commission expires:

_____ (Notary Public)

VOL. 1364 PAGE 572

**(Business or Entity Acknowledgment)**

State of _____

County of _____

On this _____ day of _____, before me, _____, a Notary Public, (or before any officer within this State or without the State now qualified under existing law to take acknowledgments), duly commissioned qualified and acting, within and for said County and State, appeared in person the within named _____, (being the person or persons authorized by said _____ to execute such instrument, stating their respective capacities in that behalf), to me personally well known, who stated that they were the _____ of the _____, a _____, and ware duly authorized in their respective capacities to execute the foregoing instruments for and in the name and behalf of said _____, and further stated and acknowledged that they had so signed, executed and delivered said foregoing instrument for the consideration, uses and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _____ day of _____.

My commission expires:

_____
(Notary Public)

Lender telephone no. 501-370-4400
Person to release lien (name and title)
CHRIS HUBENER, VICE PRESIDENT

*MDB.* _____   *J.B.B.* _____

© 1993, 2001 Wolters Kluwer Financial Services - Bankers Systems™ Form AGCO-RESI-AR 11/8/2006   *(page 10 of 10)*

Exhibit "A"

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 7 SOUTH, RANGE 9 WEST, JEFFERSON COUNTY, ARKANSAS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 23; THENCE SOUTH 00 DEGREES 40 MINUTES 02 SECONDS EAST 694.15 FEET; THENCE SOUTH 00 DEGREES 28 MINUTES 02 SECONDS EAST, 774.38 FEET TO A POINT IN THE CENTERLINE OF A GRAVEL ROAD; THENCE ALONG SAID CENTERLINE THE FOLLOWING SEVEN (7) COURSES AND DISTANCES; THENCE SOUTH 82 DEGREES 52 MINUTES 02 SECONDS WEST 21.00 FEET TO A POINT; THENCE NORTH 83 DEGREES 32 MINUTES 02 SECONDS WEST, 109.64, TO A POINT; THENCE NORTH 83 DEGREES NORTH 68 DEGREES 01 MINUTES 02 SECONDS WEST 263.35 FEET TO A POINT; THENCE NORTH 39 DEGREES 24 MINUTES 02 SECONDS WEST 113.15 FEET TO A POINT; THENCE NORTH 34 DEGREES 32 MINUTES 02 SECONDS WEST 299.50 FEET TO A POINT; THENCE NORTH 89 DEGREES 23 MINUTES 02 SECONDS WEST, 56.60 FEET TO A POINT ON THE EAST LINE OF THE SAID SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER; THENCE NORTH 00 DEGREES 28 MINUTES 02 SECONDS WEST 345.16 FEET TO THE POINT OF BEGINNING. CONTAINING 10.02 ACRES, MORE OR LESS.

M.D.B.
J.B.B.

VOL. 1364 PAGE 573

EXHIBIT "A-1"          VOL. 1 3 6 4 PAGE   5 7 4

Of the principal amount of the note, Mortgagor will become indebted to Mortgagee in the amount of _Seventeen Thousand Three Hundred Sixty One_ ___23/100___ ($ _17361.73_ )for funds advanced this date to be used (to purchase the Real Property) (or) (to satisfy a mortgage on the Real Property) and for closing costs in connection this loan, and the balance of the loan amount is to be used in connection with construction of certain improvements on the Mortgaged Property.

H.O.B.
J.B.B.

I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED AND RECORDED ON THE _25_ DAY OF _June_ 20 _02_ AT _11:35_ BOOK NO _01173_ PAGE _575_ FLORA C. COOK, CLERK JEFFERSON COUNTY ARKANSAS BY _Janice Turner_ DC

## Policy Correction/Addendum

**Name of Insured:**   One Bank & Trust, N.A.

**File No.:**   479-063

**Policy No.:**   74341-76231831

**The land referred to in this Policy:**

PROPERTY DESCRIPTION:

A PART OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF
SECTION 23 AND PART OF THE SOUTHWEST QUARTER OF THE SOUTHWEST
QUARTER OF SECTION 24 ALL IN TOWNSHIP 7 SOUTH, RANGE 9 WEST,
JEFFERSON COUNTY, ARKANSAS, BEING MORE PARTICULARLY DESCRIBED AS
FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF THE SOUTHWEST
QUARTER OF THE SOUTHWEST QUARTER; THENCE NORTH 89 DEGREES 52
MINUTES 02 SECONDS EAST 276.49 FEET TO A POINT ON THE WEST RIGHT OF
WAY LINE OF INTERSTATE NUMBER 69; THENCE SOUTH 06 DEGREES 01
MINUTES 23 SECONDS EAST 605.39 FEET ALONG THE SAID WEST RIGHT OF WAY
LINE TO A POINT; THENCE SOUTH 07 DEGREES 45 MINUTES 56 SECONDS EAST
56.81 FEET ALONG THE SAID WEST RIGHT OF WAY LINE TO A POINT IN THE
CENTERLINE OF A GRAVEL ROAD; THENCE ALONG THE SAID CENTERLINE
THE FOLLOWING THREE (3) COURSES AND DISTANCES; THENCE NORTH 89
DEGREES 48 MINUTES 18 SECONDS WEST 342.18 FEET TO A POINT; THENCE
NORTH 89 DEGREES 42 MINUTES 02 SECONDS WEST 330.00 FEET TO A POINT;
THENCE SOUTH 45 DEGREES 16 MINUTES 58 SECONDS WEST 27.97 FEET TO A
POINT; THENCE NORTH 00 DEGREES 28 MINUTES 45 SECONDS WEST 683.94 FEET
TO A POINT; THENCE SOUTH 88 DEGREES 40 MINUTES 02 SECONDS EAST 350.18
FEET TO THE POINT OF BEGINNING, CONTAINING 10.00 ACRES, MORE OR LESS.

SUBJECT TO RIGHT OF WAY FOR THE GRAVEL ROAD, IF ANY, RUNNING
THROUGH THE PROPERTY AS SHOWN ON SURVEY.

This endorsement is made a part of the policy and is subject to all of the terms and
provisions thereof and of any prior endorsements thereto. Except to the extent expressly
stated, it neither modifies any of the terms and provisions of the policy and any prior
endorsements, nor does it extend the effective date of the policy and any prior
endorsements, nor does it increase the face amount thereof.


EXHIBIT
K

*Chicago Title Insurance Company*

By: _____

Signing Agent                    **Alta D. Tharp, 323655**

# Chicago Title Insurance Company

March 24, 2016

Gill Ragon Owen, PA                                     *Via email: Heffington@gill-law.com*
Attn: Aaron Heffington
425 West Capitol Avenue, Ste. 3800
Little Rock, AR 72201

|   |   |   |
|---|---|---|
| RE: | Claim Number: | 536106 |
|     | Policy No: | 74110-7623236 |
|     | Insured: | One Bank &Trust, NA |
|     | Borrower: | Donna Lacy Roberson |
|     | Property: | 1370 RBL Estate Road, Pine Bluff, AR 71603 |

Dear Mr. Heffington:

As you are aware, I am the claims attorney assigned to administer your claim on behalf of Chicago Title Insurance Company (the "Company"). I have had the opportunity to review the information you presented on this claim and can now provide a coverage determination. The Company accepts coverage of your claim subject to the reservations set forth below.

The facts surrounding the claim, as I understand them, are as follows:

On or about May 29, 2008, One Bank & Trust, NA (the "Insured") obtained a mortgage (the "Insured Mortgage") executed by Donna Lacy Roberson (the "Borrower") secured against the property located at 1370 RBL Estate Road, Pine Bluff, Arkansas (the "Property"). On June 25, 2008, the Company Issued ALTA Short Form Residential Loan Policy (10/17/92) number 74110-7623236 in the amount of $176,400.00 ("Policy").

On October 8, 2015, the Insured filed its Complaint for Foreclosure and Judgment against the Borrower in Jefferson County Circuit Court Case Number 35CV-15-567. Subsequently, it was discovered there is not an easement over RBL Estate Road and portions of the Property had been conveyed to third parties subject to the Insured Mortgage.

On or about December 11, 2015, the Insured filed its First Amendment to Complaint for Foreclosure and Judgment (including Request to Quiet Title to an Access Easement to Adjacent Property, and for Injunctive Relief requiring Access while this action is pending) in Case Number 35CV-15-567 in the Jefferson County Circuit Court against Donna Lacy Roberson; Central Arkansas Foundation Homes; Jeffell Elliott; Andrew Lacy; Vanderbilt Mortgage & Finance, Inc.; Rosalind Parys-Christopher; Motors Finance Co. LLC;

601 Riverside Avenue · Building Five, Fourth Floor · Jacksonville, FL 32204· (904) 854-8900 · (877) 862-9111 · Fax: (904) 357-1261


EXHIBIT
L

*Claim No 536106*
*March 24, 2016*
*Pg. 2*

Americredit Financial Services, Inc. dba GM Financial; the State of Arkansas Department of Finance and Administration; and Unknown Occupants of Any Part of the Real Property (the "Amended Complaint"). The Amended Complaint seeks to foreclose on the Insured Mortgage and alleges there is no access to both 1370 and 1375 RBL Estate Road. In addition to foreclosing on the Insured Mortgage, the Amended Complaint seeks an order quieting title to an easement by implication and/or necessity.

Subsequently, it was discovered Jeffell Elliott, neighboring property owner, and the Borrower had filed for Chapter 13 Bankruptcy protection. You tendered a claim to the Company.

A review of the pleadings in both Bankruptcy cases reveals there may be a challenge by the Borrower to the legal description encumbered by the Insured Mortgage. It is not yet clear what the basis is for the Borrower's statement that there may be a legal description error in the Insured Mortgage. It further appears there may be a future challenge to the priority of the Insured Mortgage on the parcels conveyed by the Borrower to third parties in the foreclosure action upon the granting of relief from the Bankruptcy stay.

From the information that the Company has been provided, there may be a lack of a right of access to and from the land. Accordingly, this is a covered matter subject to the terms and provisions of the Policy. The Company will retain counsel to associate into the pending litigation to confirm access to the Property with a full reservation of rights. Contact information for litigation counsel will be provided under separate cover.

The above-referenced cause is taken pursuant to the following Policy provision[s]:

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

*(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.*

Accordingly, the Company reserves its right to continue its independent investigation of this matter and reserves the right to assert any defense, which though not apparent at this time, becomes apparent at a later date. If at some point in the future the Company concludes that it has no actual or potential obligation under the policy to indemnify or provide legal representation to the Insured in this matter, the Company expressly

*Claim No 536106*
*March 24, 2016*
*Pg. 3*

reserves the right to decide, after giving reasonable notice, to discontinue indemnification and/or discontinue the above-referenced action. The Company also reserves the right to seek a judicial declaration determining that it has no obligation to indemnify or take action.

Once retained, litigation counsel will be in contact with you to discuss this matter and its representation of your client's interests.   Please give him or her your full cooperation in this matter. I will ask him or her to send me all correspondence, pleadings, documents, and other writings, created or received, except those which are confidential communications between attorney and client.

The Company does not consent to pay attorney's fees in representing the Insured except as stated in this letter or in the Policy. The Company will not retain counsel to represent the Insured regarding questions or issues concerning coverage under the Policy. Any questions concerning coverage should be directed to my attention.

This letter shall confirm that you are the point of contact for counsel assigned to this matter regarding execution of the forthcoming retention letter, any pleadings requiring review or verification, and all other matters required by retained counsel to work towards resolution of this claim. If you will not be the point of contact, please provide the contact information for the person assigned this responsibility immediately. Failure to provide this information may result in the Company rendering the claim to the Insured due to non-cooperation under the Policy.

Although certain provisions of the Policy are cited herein, additional terms and conditions of the Policy may be applicable based upon the facts as presented and the Company reserves the right to rely upon any applicable term or condition of the Policy to limit or deny coverage.  Reference to any particular provision of the Policy in this letter, therefore, shall not be construed as a waiver of any other term or provision.   The Company retains the right to supplement this letter.

The Company reserves the right to resolve this claim in any manner permitted by the terms and provisions of the Policy and applicable law. The Company further reserves its right to determine the amount of any covered loss or damage pursuant to and in accordance with the terms and provisions of the Policy and applicable law.

*Claim No 536106*
*March 24, 2016*
*Pg. 4*

You may contact me at (904) 854-8945 or Charissa.McIntosh@fnf.com with any questions or concerns. **Please reference the above claim number in all communications with this office.** Thank you for your courtesy and cooperation in this matter.

Sincerely,

Charissa M. McIntosh
Claims Counsel, AVP

# Chicago Title Insurance Company

March 24, 2016

Gill Ragon Owen, PA                          *Via email: Heffington@gill-law.com*
Attn: Aaron Heffington
425 West Capitol Avenue, Ste. 3800
Little Rock, AR 72201

RE:    **Claim Number:**    **536077**
        **Policy No:**    **74341-76231831**
        **Insured:**    **One Bank &Trust, NA**
        **Borrower:**    **Michael & Johanna Barnes**
        **Property:**    **1375 RBL Estate Road, Pine Bluff, AR 71603**

Dear Mr. Heffington:

As you are aware, I am the claims attorney assigned to administer your claim on behalf of Chicago Title Insurance Company (the "Company"). I have had the opportunity to review the information you presented on this claim and can now provide a coverage determination. The Company accepts coverage of your claim subject to the reservations set forth below.

The facts surrounding the claim, as I understand them, are as follows:

On or about May 29, 2008, One Bank & Trust, NA (the "Insured") obtained a mortgage (the "Insured Mortgage") executed by Michael and Johanna Barnes (the "Borrowers") secured against the property located at 1375 RBL Estate Road, Pine Bluff, Arkansas (the "Property"). On June 25, 2008, the Company issued ALTA Short Form Residential Loan Policy (10/17/92) number 74341-76231831 in the amount of $170,400.00 ("Policy"). On or about July 21, 2015, a Commissioner's Deed conveyed the Property to the Insured following foreclosure sale.

Following foreclosure, it was discovered there is not an easement over RBL Estate Road to access the Property. On or about December 11, 2015, the Insured filed its First Amendment to Complaint for Foreclosure and Judgment (including Request to Quiet Title to an Access Easement to Adjacent Property, and for Injunctive Relief requiring Access while this action is pending) in Case Number 35CV-15-567 in the Jefferson County Circuit Court against Donna Lacy Roberson; Central Arkansas Foundation Homes; Jeffell Elliott; Andrew Lacy; Vanderbilt Mortgage & Finance, Inc.; Rosalind Parys-Christopher; Motors Finance Co. LLC; Americredit Financial Services, Inc. dba GM Financial; the State of Arkansas Department of Finance and Administration; and Unknown Occupants of Any Part of the Real Property (the "Amended Complaint"). The Amended Complaint seeks to

601 Riverside Avenue · Building Five, Fourth Floor · Jacksonville, FL 32204 (904) 854-8900 · (877) 862-9111 · Fax: (904) 357-1261



*Claim No 536077*
*March 24, 2016*
*Pg. 2*

foreclose on certain property interests in 1370 RBL Estate Road, which are addressed in separate correspondence for Claim 536106 and not addressed here, and alleges there is no access to both 1370 and 1375 RBL Estate Road. The Amended Complaint seeks an order quieting title to an easement by implication and/or necessity.

Subsequently, it was discovered Jeffell Elliott and Donna Roberson, neighboring property owners, had filed for Chapter 13 Bankruptcy protection. You tendered a claim to the Company.

From the information that the Company has been provided, the lack of an easement may result in the lack of a right of access to and from the land. Accordingly, this is a covered matter subject to the terms and provisions of the Policy. The Company will retain counsel to associate into the pending litigation only for the limited purposes of obtaining a right of access. Contact information for litigation counsel will be provided under separate cover.

The above-referenced cause is taken pursuant to the following Policy provision[s]:

**4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.**

*(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.*

Accordingly, the Company reserves its right to continue its independent investigation of this matter and reserves the right to assert any defense, which though not apparent at this time, becomes apparent at a later date. If at some point in the future the Company concludes that it has no actual or potential obligation under the policy to indemnify or provide legal representation to the insured in this matter, the Company expressly reserves the right to decide, after giving reasonable notice, to discontinue indemnification and/or discontinue the above-referenced action. The Company also reserves the right to seek a judicial declaration determining that it has no obligation to indemnify or take action.

Once retained, litigation counsel will be in contact with you to discuss this matter and its representation of your client's interests. Please give him or her your full cooperation in this matter. I will ask him or her to send me all correspondence, pleadings,

*Claim No 536077*
*March 24, 2016*
*Pg. 3*

documents, and other writings, created or received, except those which are confidential communications between attorney and client.

The Company does not consent to pay attorney's fees in representing the Insured except as stated in this letter or in the Policy. The Company will not retain counsel to represent the Insured regarding questions or issues concerning coverage under the Policy. Any questions concerning coverage should be directed to my attention.

This letter shall confirm that you are the point of contact for counsel assigned to this matter regarding execution of the forthcoming retention letter, any pleadings requiring review or verification, and all other matters required by retained counsel to work towards resolution of this claim. If you will not be the point of contact, please provide the contact information for the person assigned this responsibility immediately. Failure to provide this information may result in the Company retendering the claim to the Insured due to non-cooperation under the Policy.

Although certain provisions of the Policy are cited herein, additional terms and conditions of the Policy may be applicable based upon the facts as presented and the Company reserves the right to rely upon any applicable term or condition of the Policy to limit or deny coverage. Reference to any particular provision of the Policy in this letter, therefore, shall not be construed as a waiver of any other term or provision. The Company retains the right to supplement this letter.

The Company reserves the right to resolve this claim in any manner permitted by the terms and provisions of the Policy and applicable law. The Company further reserves its right to determine the amount of any covered loss or damage pursuant to and in accordance with the terms and provisions of the Policy and applicable law.

You may contact me at (904) 854-8945 or Charissa.McIntosh@fnf.com with any questions or concerns. **Please reference the above claim number in all communications with this office.** Thank you for your courtesy and cooperation in this matter.

Sincerely,

Charissa M. McIntosh
Claims Counsel, AVP



# Invoice

*Foshee Brothers Land Surveying*

P.O. Box 1217
Hot Springs
AR 71901

| Date | Invoice # |
|------|-----------|
| 9/21/2016 | 4880 |

**Bill To:**

One Bank

| **Total** | $4,100.00 |
|-----------|-----------|
| Amount paid: $ | |
| Check number: | |

---

Cut along line, return the upper portion with your payment and keep lower portion for you records

*Foshee Brothers Land Surveying*

| Date | Invoice # |
|------|-----------|
| 9/21/2016 | 4880 |

| Description | Qty | Work Date | Amount |
|-------------|-----|-----------|--------|
| Survey 50 in Pine Bluff | 1 | 9/20/2016 | 4,100.00 |
| | | **Total** | **$4,100.00** |

Kevin Foshee    (501) 762-7215    kevinofoshee@gmail.com    Mike Foshee    (501) 617-1032    mwfoshee@gmail.com



EXHIBIT
N

**Aaron Heffington**

**Subject:**                    FW: claims 536077 & 536106/ 1370 & 1375 RBL Estate Road

**From:** Kelly McNulty [mailto:McNulty@gill-law.com]
**Sent:** Monday, November 21, 2016 12:00 PM
**To:** McIntosh, Charissa <Charissa.McIntosh@fnf.com>
**Subject:** RE: claims 536077 & 536106/ 1370 & 1375 RBL Estate Road
**Importance:** High

Charissa,

Good morning. I am working with One Bank & Trust on these claims (you have previously corresponded with Aaron Heffington at my office). Today I am meeting with Diana Snyder—the attorney hired by Fidelity to represent One Bank. The purpose of the meeting is to hand over the majority of the legal work on these files to her as she is being compensated under the title policies. The purpose of my email to you today is to make a formal claim on behalf of One Bank for compensation for attorney's fees and costs incurred in the defense and prosecution of these claims.

As you know, One Bank made claims under its title policies (referenced above) in January 2016. Since that time, we have had 2 hearings in these matters [one in the Jeffell Elliott bankruptcy and one in the Donna Roberson state court litigation]. At both of those hearings, attorneys hired by Fidelity were present but did not participate in the hearings. On several prior occasions we have offered to give these files to the attorneys at Wright, Lindsey and Jennings so that One Bank would not have to incur attorney's fees, but every time we were told that this matter was too complicated for a new set of attorneys to take over and that the Fidelity-hired attorneys would just provide assistance. The result was that while One Bank has a policy which provides for the payment of attorney's fees, it was not getting the benefit of those provisions. Every issue that has arisen involving this property stems from the incorrect legal description on the initial mortgage [a document affecting Title not property created] and/or the lack of access [no right of access to and from the Land]. Both of those are covered under the policies and Fidelity should pay for the costs, attorney's fees and expenses incurred in these matters.

Accordingly, please consider this a formal demand by One Bank for the payment of our firm's attorney's fees, costs and expenses in the defense and prosecution of these matters which have been incurred. If Fidelity will not cover these losses, One Bank requests a written explanation for the denial. We will provide any documentation requested or needed to process this claim.

Additionally, One Bank is seeking reimbursement for the survey it obtained. If you do not already have the documentation needed to process this, please let me know.

If you would like to discuss this matter, please give me a call.

Kelly W. McNulty
Attorney at Law
GILL RAGON OWEN, P.A.
425 West Capitol Ave., Suite 3800
Little Rock, AR 72201
(p)  (501) 376-3800
(f)  (501) 372-3359
gill-law.com

This communications is subject to the attorney-client privilege and is intended only for the use of the addressee. If you, the reader, are not the intended addressee, you are hereby notified that any further dissemination, distribution or copying of this communications is strictly prohibited. If you have received this communications in error, please notify this firm by telephone and return this communications to us via regular mail at the address noted herein.

1

**EXHIBIT**
**O**



# GILL
# RAGON
# OWEN
A T T O R N E Y S

GILL RAGON OWEN, P.A.
ATTORNEYS AT LAW
425 WEST CAPITOL AVENUE, SUITE 3800
LITTLE ROCK, ARKANSAS 72201
TELEPHONE 501.376.3800
FACSIMILE 501.372.3359
www.gill-law.com

KELLY W. McNULTY | ATTORNEY
EMAIL: mcnulty@gill-law.com

December 7, 2016

Charissa McIntosh
Claims Counsel                          *Via Email: charissa.mcintosh@fnf.com*
Fidelity National Title Group
601 Riverside Avenue, Bldg. 5, 4th Floor
Jacksonville, FL 32204
Direct: (904) 854-8945

| Claim Number: | 536106 | Claim Number: | 536077 |
|---|---|---|---|
| Policy Number: | 74110-7623236 | Policy Number: | 74341-76231831 |
| Insured: | One Bank & Trust, NA | Insured: | One Bank & Trust, NA |
| Borrower: | Donna Lacy Roberson | Borrower: | Michael & Johanna Barnes |
| Property: | 1370 RBL Estate Road, Pine Bluff, AR 71603 | Property: | 1375 RBL Estate Road, Pine Bluff, AR 71603 |

Dear Ms. McIntosh:

On March 24, 2016, Chicago Title Insurance Company and Fidelity National Title Group (the "Title Company") accepted coverage on the claims made on behalf of One Bank related to the above-referenced Properties. Since that date, I have made demand on the Title Company to pay the expenses and attorney's fees incurred by One Bank in defending and prosecuting the litigation concerning the Properties and the Borrowers. To date, the Title Company has failed to reimburse One Bank for those costs.

As outlined in my email demanding payment on November 21, 2016, One Bank made claims under its title policies in January 2016. Since that time, we have had two hearings in these matters (one in the Jeffell Elliott bankruptcy and one in the Donna Roberson state court litigation). At both of those hearings, attorneys hired by Fidelity were present but did not participate in the hearings. On several prior occasions we have offered to give these files to the attorneys at Wright, Lindsey and Jennings so that One Bank would not have to incur attorney's fees, but every time we were told that this matter was too complicated for a new set of attorneys to take over and that the Fidelity-hired attorneys would just provide assistance. The result was that while One Bank has a policy which provides for the payment of attorney's fees, it was not getting the benefit of those provisions. Every issue that has arisen involving this property stems



EXHIBIT
**P**

from the incorrect legal description on the initial mortgage (a document affecting Title not property created] and/or the lack of access [no right of access to and from the Land). Both of those are covered under the policies and the Title Company should pay for the costs, attorney's fees and expenses incurred in these matters.

By email dated December 7, 2016, you requested copies of invoices for our legal services. Those are attached. You should have all of the information that you need at this point.

If no payment has been made within ten (10) business days of your receipt of this demand, I have been instructed to file suit.

If you'd like to discuss, please contact me.

Cordially,

*Kelly W. McNulty*

Kelly W. McNulty

KWM/ddg
Enclosures

cc:     Rocco Kuhn

# CHICAGO TITLE INSURANCE COMPANY


601 Riverside Avenue • Building 5, Fourth Floor • Jacksonville, FL 32204 • (888) 453-4095

December 20, 2016

Gill Ragon Owen, PA
Attn: Kelly W. McNulty
425 West Capitol Avenue, Ste. 3800
Little Rock, AR 72201

*Via email: mcnulty@gill-law.com*

| RE: | | |
|---|---|---|
| | **Claim Number:** | **536106** |
| | **Policy No:** | **74110-7623236** |
| | **Insured:** | **One Bank &Trust, NA (the "Insured")** |
| | **Borrower:** | **Donna Lacy Roberson** |
| | **Property:** | **1370 RBL Estate Road, Pine Bluff, AR 71603 (the "Property")** |

Dear Mr. McNulty:

This letter is in response to your December 7, 2016 correspondence to Chicago Title Insurance Company (the "Company") wherein you request the Company pay attorneys' fees incurred by the Insured. The Company has had the opportunity to review the information presented and can now provide the Company's response. For the reasons set forth below, the Company must respectfully deny your request for payment of attorneys' fees.

The Company previously accepted coverage with respect to the lack of a legal right of access to and from the Property by letter dated March 24, 2016 (the "Coverage Letter"). The facts surrounding the claim are set forth in the Coverage Letter and are incorporated herein by reference; capitalized terms not otherwise defined shall have the meanings ascribed in the Coverage Letter. As set forth in the Coverage Letter, the Company retained counsel to associate into the pending litigation only for the limited purposes of obtaining a right of access to the Property. Counsel was not retained to prosecute the foreclosure action or to obtain relief from stay from the Bankruptcy Court to continue the foreclosure action. Further, the Coverage Letter specifically stated the Company would not pay attorney's fees in representing the Insured except as stated in that letter or in the Policy. Finally, the Coverage Letter stated the Company would not retain counsel to represent the Insured regarding questions or issues concerning coverage under the Policy.

You have now submitted this demand for reimbursement of your fees from January 2016 through the present, comprised of 320.0 hours of work for a grand total of $68,325.17. You allege these fees were incurred solely due to the subject matter of the title claim.

The Policy's Conditions and Stipulations state in relevant part:

*7. Determination and Extent of Liability.*
*(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.*


EXHIBIT
Q

Claim No. 536106
December 20, 2016
Pg. 2

Condition 4 states in part:

> 4. *Defense and Prosecution of Actions; Duty of insured Claimant to Cooperate.*
> *(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured,* **but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy.** *The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured* **as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.**
>
> *(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.* (Emphasis added)

The Company specifically stated in the Coverage Letter that it was accepting coverage only with respect to the lack of an access easement. Further, the Coverage Letter specifically stated the Company was only retaining counsel to associate into the pending foreclosure litigation, as co-counsel, for the limited purpose of obtaining a right of access. Counsel was, in fact, retained to obtain the grant of easement. Counsel was not retained for any other purpose with respect to this claim. At the time of the Coverage Letter, the foreclosure action was subject to an automatic stay due to the Borrower filing for Chapter 13 Bankruptcy protection. The Coverage Letter did acknowledge that, upon the granting of relief from the Bankruptcy stay, there may be a future challenge by the Borrower to the legal description encumbered by the Insured Mortgage and a challenge to the priority of the Insured Mortgage on the parcels conveyed by the Borrower to third parties. However, no such challenges had yet been presented, and, therefore, no coverage decision was made regarding the same.

On March 21, 2016, an Agreed Order of Strict Compliance was entered by the Bankruptcy Court whereby the Court ordered Ms. Roberson must comply by granting an immediate, continuous and permanent access easement to the Barnes Property over the existing gravel road in exchange for the withdrawal of the Insured's Motion to Dismiss and Objection to Confirmation of Plan, both of which were filed in the Roberson Bankruptcy. The Court further ordered that the Borrower must make timely payments or the Insured would be entitled to file an *ex parte* motion for automatic relief from stay, which would be granted without hearing if the default was not cured within a seven day notice period. Per the Bankruptcy docket, no such *ex parte* motion was filed and no order granting relief from stay was entered.

*Claim No. 536106*
*December 20, 2016*
*Pg. 3*

Next, pursuant to the Policy, the Company is not responsible for any fees, costs, or expenses incurred by the Insured in defending matters not insured against by the Policy. The invoices provided with the December 7, 2016 correspondence in significant part relate to litigating the Bankruptcies and researching coverage under the Policy. These are not matters insured against under the Policy. Further, the Coverage Letter specifically states the Company will not retain counsel to assist the Insured with questions regarding coverage. As a result, the Company is not responsible for fees incurred in these unrelated matters.

Finally, pursuant to the Policy, the Company is not responsible for the fees of any counsel not specifically retained by the Company. The invoices also identify a substantial amount of work that appears to have been taken in the state court litigation which was not approved by the Company and which might have been in violation of the Bankruptcy stay. The Company did not retain the claimant firm in any capacity on this claim. Further, the Company did not agree to pay the fees of the claimant firm. Accordingly, the Company is not responsible for payment of claimant counsel's invoices *in toto*.

Based on the foregoing, the Company respectfully denies this request for payment of fees. Please note that any reference to any particular provision of the Policy in this letter shall not be construed as a waiver of any other term or provision. The Company retains the right to supplement this letter. Also, please be advised that the Company retains the right to deny this claim based on additional grounds.

If there are any facts which were unknown to the Company upon making this coverage determination, and which may alter such determination, please provide this information or documentation in writing as soon as possible and your claim will be reevaluated. If I do not receive additional information or documentation, your claim file will be closed in 30 days from the date of this letter. Please contact me at (904) 854-8945 or Charissa.Mcintosh@fnf.com should you have any questions or concerns regarding this matter. **Please reference the above claim number in all communications with my office.** Thank you.

Sincerely,

Charissa M. McIntosh
Claims Counsel, AVP

# CHICAGO TITLE INSURANCE COMPANY



601 Riverside Avenue • Building 5, Fourth Floor • Jacksonville, FL 32204 • (888) 453-4095

December 20, 2016

Gill Ragon Owen, PA
Attn: Kelly W. McNulty
425 West Capitol Avenue, Ste. 3800
Little Rock, AR 72201

*Via email: mcnulty@gill-law.com*

|  |  |  |
|---|---|---|
| RE: | **Claim Number:** | **536077** |
|  | **Policy No:** | **74341-76231831** |
|  | **Insured:** | **One Bank &Trust, NA (the "Insured")** |
|  | **Borrower:** | **Michael & Johanna Barnes** |
|  | **Property:** | **1375 RBL Estate Road, Pine Bluff, AR 71603 (the "Property")** |

Dear Mr. McNulty:

This letter is in response to your December 7, 2016 correspondence to Chicago Title Insurance Company (the "Company") wherein you request the Company pay attorneys' fees incurred by the Insured. The Company has had the opportunity to review the information presented and can now provide the Company's response. For the reasons set forth below, the Company must respectfully deny your request for payment of attorneys' fees.

The Company previously accepted coverage with respect to the lack of a legal right of access to and from the Property by letter dated March 24, 2016 (the "Coverage Letter"). The facts surrounding the claim are set forth in the Coverage Letter and are incorporated herein by reference; capitalized terms not otherwise defined shall have the meanings ascribed in the Coverage Letter. As set forth in the Coverage Letter, the Company retained counsel to associate into the pending litigation only for the limited purposes of obtaining a right of access to the Property. Counsel was not retained to prosecute the foreclosure action or to obtain relief from stay from the Bankruptcy Court to continue the foreclosure action. Further, the Coverage Letter specifically stated the Company would not pay attorney's fees in representing the Insured except as stated in that letter or in the Policy. Finally, the Coverage Letter stated the Company would not retain counsel to represent the Insured regarding questions or issues concerning coverage under the Policy.

You have now submitted this demand for reimbursement of your fees from January 2016 through the present, comprised of 52.9 hours of work for a grand total of $11,014.00. You allege these fees were incurred solely due to the subject matter of the title claim.

The Policy's Conditions and Stipulations state in relevant part:

*7. Determination and Extent of Liability.*
*(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.*



EXHIBIT

R

Condition 4 states in part:

> *4. Defense and Prosecution of Actions; Duty of Insured Claimant to Cooperate.*
> *(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, **but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy.** The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and **shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.***
>
> *(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.* (Emphasis added)

The Company specifically stated in the Coverage Letter that it was accepting coverage only with respect to the lack of an access easement. Further, the Coverage Letter specifically stated the Company was only retaining counsel to associate into the pending foreclosure litigation, as co-counsel, for the limited purpose of obtaining a right of access. Counsel was, in fact, retained to obtain the grant of easement. Counsel was not retained for any other purpose with respect to this claim.

At the time of the Coverage Letter, the foreclosure action was subject to an automatic stay due to the borrower of that foreclosure, Ms. Donna Roberson, filing for Chapter 13 Bankruptcy protection. On March 21, 2016, an Agreed Order of Strict Compliance was entered by the Court in the Donna Roberson Bankruptcy whereby the Court ordered Ms. Roberson must comply by granting an immediate, continuous and permanent access easement to the insured Property over the existing gravel road in exchange for the withdrawal of the Insured's Motion to Dismiss and Objection to Confirmation of Plan, both of which were filed in the Roberson Bankruptcy.

Next, pursuant to the Policy, the Company is not responsible for any fees, costs, or expenses incurred by the Insured in defending matters not insured against by the Policy. The invoices provided with the December 7, 2016 correspondence primarily relate to the physical possession of the Property, coordinating with the sheriff's office to take possession of the Property, litigating the Bankruptcies, and researching coverage under the Policy. These are not matters insured against under the Policy. Further, the Coverage Letter specifically states the Company

*Claim No. 536077*
*December 20, 2016*
*Pg. 3*

will not retain counsel to assist the Insured with questions regarding coverage. As a result, the Company is not responsible for fees incurred in these unrelated matters.

Finally, pursuant to the Policy, the Company is not responsible for the fees of any counsel not specifically retained by the Company. The Company did not retain the claimant firm in any capacity on this claim. Further, the Company did not agree to pay the fees of the claimant firm. Accordingly, the Company is not responsible for payment of claimant counsel's invoices *in toto*.

Based on the foregoing, the Company respectfully denies this request for payment of fees. Please note that any reference to any particular provision of the Policy in this letter shall not be construed as a waiver of any other term or provision. The Company retains the right to supplement this letter. Also, please be advised that the Company retains the right to deny this claim based on additional grounds.

If there are any facts which were unknown to the Company upon making this coverage determination, and which may alter such determination, please provide this information or documentation in writing as soon as possible and your claim will be reevaluated. If I do not receive additional information or documentation, your claim file will be closed in 30 days from the date of this letter. Please contact me at (904) 854-8945 or Charissa.Mcintosh@fnf.com should you have any questions or concerns regarding this matter. **Please reference the above claim number in all communications with my office.** Thank you.

Sincerely,

Charissa M. McIntosh
Claims Counsel, AVP

35CV-17-48

No. _____ **This summons is for** _Chicago Title Insurance Company f/k/a_ _Ticor Title Insurance Company_ **(name of Defendant).**

## PROOF OF SERVICE

☐ I personally delivered the summons and complaint to the individual at _____ _____[place] on _____ [date]; or

☐ I left the summons and complaint in the proximity of the individual by _____ _____ after he/she refused to receive it when I offered it to him/her; or

☐ I left the summons and complaint at the individual's dwelling house or usual place of abode at _____[address] with _____[name], a person at least 14 years of age who resides there, on _____[date]; or

☒ I delivered the summons and complaint to _The Corporation Company_[name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _Chicago Title Insurance Company f/k/a_[name of defendant] on __1-27-17__ [date]; or _Ticor Title Insurance Company_

☐ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

☐ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

☐ Other [specify]: _____

☐ I was unable to execute service because: _____

_____

My fee is $ _____.

FILED

FEB 2 2017

LAFAYETTE WOODS, SR.
Circuit Clerk
JEFFERSON COUNTY, ARKANSAS



EXHIBIT
B

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____        SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: 1-30-17                By: _____
[Signature of server]

_____
Jeff Barnett
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: 1/31/2017

_____
Notary Public

My commission expires: 1/28/2025

Additional information regarding service or attempted service:

_____

_____

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

ONE BANK & TRUST N.A.                                             PLAINTIFF

V.                          CASE NO. 35CV-17-48

CHICAGO TITLE INSURANCE COMPANY
f/k/a TICOR TITLE INSURANCE COMPANY                    DEFENDANT

### CHICAGO TITLE'S MOTION TO DISMISS
### FOR FAILURE TO STATE A CLAIM AND/OR
### MOTION FOR SUMMARY JUDGMENT

Comes now Defendant Chicago Title Insurance Company f/k/a Ticor Title Insurance Company ("Chicago"), by and through counsel, and, for its Motion to Dismiss for Failure to State a Claim and/or Motion for Summary Judgment pursuant to Arkansas Rules of Civil Procedure 12(b)(6), Federal Rules of Civil Procedure 12(b)(6), Arkansas Rules of Civil Procedure 8(a), and Arkansas and Federal Rules of Civil Procedure 56, states:

1.      This Motion is brought pursuant to Rule 12(b)(6) of the Arkansas Rules of Civil Procedure.  In the event this case is removed, this Motion is also brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.      Because the state and federal rules are somewhat different, both standards will be addressed in the accompanying brief.



FILED

FEB 2 4 2017

LAFAYETTE WOODS, SR.
Circuit Clerk
JEFFERSON COUNTY, ARKANSAS

EXHIBIT

C.

Bumberg No. 5308

3.      Alternatively, if either the state or federal court in making its ruling considers matters outside of the pleadings, these courts may convert this Motion to one for summary judgment. Ark. R. Civ. P. 56 and Fed. R. Civ. P. 56.

4.      As stated by Plaintiff, this case also relates to several other cases that are a matter of public record and are referenced to and embody Plaintiff's complaint. These cases are: the Barnes Foreclosure (Jefferson County Circuit Case No. 35CV-15-60); the Roberson Foreclosure (Jefferson County Circuit Case No. 35CV-15-567); the Elliott Bankruptcy (U.S. Bankruptcy Court, E.D. of Arkansas, No. 5:15-bk-14150); and the Roberson Bankruptcy (U.S. Bankruptcy Court, E.D. of Arkansas, No. 5:15-bk-16155). This court is allowed to take judicial notice of same.

5.      Additionally, Plaintiff references and alleges its title insurance claims, but failed to attach a copy.  Therefore, attached here as Exhibit 1 is the Roberson title insurance claim and as Exhibit 2, the Barnes title insurance claim.

6.      Further, Plaintiff did not attach copies of its later request for Defendant to reconsider its position.  Therefore, attached as Exhibit 3 and 4 is the reconsideration by Defendant as to the Roberson and Barnes claims, respectively.

7.      For the reasons stated in the accompanying brief, Defendant moves for dismissal.

2

Respectfully submitted,

McMULLAN & BROWN
PO Box 2839
Little Rock, AR  72203-2839
(501) 376-9119
(501) 376-8437 (fax)

_____
Marian M. McMullan, Bar No. 86123
mmcmullan@m-b.law
*Counsel for Chicago Title Ins. Co.*

## CERTIFICATE OF SERVICE

I, Marian M. McMullan, do hereby certify that I have sent via:

- ☐ Hand-delivery
- ☐ Facsimile
- ☑ Electronic Mail
- ☐ U.S. Mail, postage pre-paid
- ☐ Court ECF System
- ☐ Federal Express

this **23** day of **February**, 2017, a true and complete copy of the foregoing as follows:

Wm. David Duke, Esq.
Kelly W. McNulty, Esq.
Aaron M. Heffington, Esq.
Gill Ragon Owen P.A.
425 W. Capitol, Ste. 3800
Little Rock,  AR 72201
    *Attorneys for Plaintiff*

_____
Marian M. McMullan

3

**Herman, Gamble**

| | |
|---|---|
| **From:** | Cornish, Danielle |
| **Sent:** | Friday, January 29, 2016 10:52 AM |
| **To:** | McIntosh, Charissa |
| **Cc:** | Wilson, Kimberly |
| **Subject:** | New claim 536106 - Rush |
| **Attachments:** | Policy 536106.pdf |

Good Morning Charissa,

Please see attached for new claim. This claim has been associated with 536077, the associated claim code is: SE005281.

Thank you,

Danielle Cornish
Intake Assistant
Fidelity National Title|Omaha Claims Center
2533 North 117th Avenue, Omaha, NE 68164

**From:** doNotReply@fnf.com [mailto:doNotReply@fnf.com]
**Sent:** Thursday, January 28, 2016 10:29 AM
**To:** Claims Website Notifications <ClaimsWebsiteNotifications@fnf.com>
**Subject:** Chicago Title - Contact

## Claims - CTI

### Question / Comment

Hello, I represent One Bank and Trust, N.A. The applicable policy number
is 74110-7623236. One Bank holds a secured interest 39.45 acres owned
or previously owned by Borrower. Borrower has filed chapter 13
bankruptcy in the United States Bankruptcy Court for the Eastern District
of Arkansas, Pine Bluff Division, Case No. 5:15-bk-16155. While
Borrower has identified One Bank as a secured creditor in her bankruptcy
filings, Borrower states that One Bank's secured interest is limited only to
a house and 4.6 acres of land located at 1370 RBL Estate Road. One Bank
has filed a foreclosure action against Borrower seeking to foreclose on all
39.45 acres securing Borrower's debt. The foreclosure action also seeks to
establish access to the insured property, as well as an adjacent property
One Bank previously obtained through foreclosure. The sole access to both
properties is available over an existing gravel roadway crossing the insured
property known as RBL Estate Road. Various members of the Borrowers'
family, including but not limited to Borrower, Michael Barnes, Johanna
Barnes, Andrew Lacy, Jeffell Elliott and Rosalynd Parys-Christopher, have
refused to allow One Bank to use RBL Estate Road to access the insured
property, claiming that the road is private and crosses over property owned



by Jeffell Elliott. As a result, One Bank has no way to exercise its right to access the insured property. One Bank has brought action against the individuals named above in attempt to establish an access easement over RBL Estate Road. Donna Lacy Roberson and Jeffell Elliott have both filed for chapter 13 bankruptcy, and One Bank has moved for relief of stay in both cases, with a hearing on 9/11/16 at 9am.

## Contact Info

| | |
|---|---|
| **Sent on behalf of:** | Company |
| **Name:** | Mr. Aaron Heffington |
| **E-Mail:** | Heffington@gill-law.com |
| **Regarding:** | General Question |
| **Transaction / Escrow #:** *(if applicable)* | |

## Subject Property *(if applicable)*

| | |
|---|---|
| **Address:** | 1370 RBL Estate Road |
| | Pine Bluff, AR 71603 |

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

## Herman, Gamble

| | |
|---|---|
| **From:** | Cornish, Danielle |
| **Sent:** | Friday, January 29, 2016 10:05 AM |
| **To:** | McIntosh, Charissa |
| **Cc:** | Wilson, Kimberly |
| **Subject:** | New claim 536077 - Rush |
| **Attachments:** | Loan Policy 536077.pdf |

Good Morning Charissa,

Please see attached for new claim.

Thank you,

Danielle Cornish
Intake Assistant
Fidelity National Title|Omaha Claims Center
2533 North 117th Avenue, Omaha, NE 68164

**From:** doNotReply@fnf.com [mailto:doNotReply@fnf.com]
**Sent:** Thursday, January 28, 2016 10:26 AM
**To:** Claims Website Notifications <ClaimsWebsiteNotifications@fnf.com>
**Subject:** Chicago Title - Contact

### Claims - CTI

#### Question / Comment

Hello, I represent One Bank and Trust, N.A. The applicable policy number
is 74341-76231831. On July 21, 2015, One Bank acquired title to the
insured property pursuant to a Commissioner's Deed recorded on July 23,
2015 with the Jefferson County Circuit Clerk in Book 961 at Page 294. At
the time the policy was issued, access to the insured property was available
solely by an existing gravel roadway known as RBL Estate Road. After
gaining title to the property, with the assistance of the Jefferson County
Sheriff, One bank took possession of the insured property from the
Borrowers. Since One Bank took possession, Borrowers and various
members of the Borrowers' family, including but not limited to, Donna
Lacy Roberson, Andrew Lacy, Jeffell Elliott, Eligha Lacy and Rosalynd
Parys-Christopher, have refused to allow One Bank to use RBL Estate
Road to access the insured property, claiming that the road is private and
crosses over property owned by Jeffell Elliott. As a result, One Bank has
no way to exercise its right to access the insured property. One Bank has
brought action against the individuals named above in attempt to establish
an access easement over RBL Estate Road. Donna Lacy Roberson and
Jeffell Elliott have both filed for chapter 13 bankruptcy, and One Bank has



EXHIBIT

2

moved for relief of stay in both cases. A hearing on these motions is
scheduled for February 11, 2016 at 9:00 a.m.

| Contact Info | |
|---|---|
| Sent on behalf of: | Company |
| Name: | Mr. Aaron Heffington |
| E-Mail: | Heffington@gill-law.com |
| Regarding: | Specific Transaction |
| Transaction / Escrow #: (if applicable) | |

| Subject Property (if applicable) | |
|---|---|
| Address: | 1375 RBL Estate Road Pine Bluff, AR 71603 |

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If
you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and
all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender
immediately.

# CHICAGO TITLE INSURANCE COMPANY

601 Riverside Avenue • Building 5, Fourth Floor • Jacksonville, FL 32204 • (888) 453-4095

February 6, 2017

Gill Ragon Owen, PA                          *Via email: mcnulty@gill-law.com*
Attn: Kelly W. McNulty
425 West Capitol Avenue, Ste. 3800
Little Rock, AR 72201

> **RE:**  **Claim Number:**  **536106**
> **Policy No:**  **74110-7623236**
> **Insured:**  **One Bank &Trust, NA (the "Insured")**
> **Borrower:**  **Donna Lacy Roberson**
> **Property:**  **1370 RBL Estate Road, Pine Bluff, AR 71603 (the "Property")**

Dear Mr. McNulty:

This letter is in response to your January 3, 2017 correspondence to Chicago Title Insurance Company (the "Company") wherein you request the Company reconsider its position set forth in its December 20, 2016 letter (the "Fee Coverage Letter"). For the reasons set forth below, the Company must respectfully stand by its previous denial of reimbursement of attorneys' fees incurred by the Insured.

The facts surrounding this matter are set forth in the coverage letter dated March 24, 2016 (the "Coverage Letter") and the Fee Coverage Letter are incorporated herein by reference; capitalized terms not otherwise defined shall have the meanings ascribed in the Coverage Letter and Fee Coverage Letter.

The Company previously accepted coverage with regard to the potential for lack of access to the Property which was to be addressed in Case No. 35CV-15-567 filed in Circuit Court of Jefferson County, Arkansas (the "Litigation"). The Company also acknowledged the possibility of a future challenge to the priority of the Insured Mortgage, but, as of the date of the Coverage Letter, no formal challenge to the priority of the Insured Mortgage existed. Counsel was retained to associate into the Litigation for the limited purpose of obtaining a right of access to the Property. Counsel was not retained under the Policy to prosecute or defend against those portions of the Litigation related to the foreclosure of the Insured Mortgage or the establishment of access to property not described in the Policy.

The Insured has requested reimbursement of expenses in the amount of $4,100 for a survey obtained in relation to the claim. The Company has agreed to reimburse this sum and a check in the amount of $4,100 has already been tendered to the Insured. Any claims for additional sums incidental to the actual cost of the survey are hereby denied.



EXHIBIT

3

The Insured has also requested reimbursement for attorney fees. The Company previously denied this request pursuant to Conditions 4 and 7 of the Policy because the Company retained counsel to associate into the pending litigation only for the limited purposes of confirming access to the Property, reserving all rights under the Policy unto the Company. Counsel was not retained to prosecute the foreclosure action or to obtain relief from stay from the Bankruptcy Court to continue the foreclosure action. Further, the Coverage Letter specifically stated the Company would not pay attorney's fees in representing the Insured except as stated in that letter or in the Policy and that the Company would not retain counsel to represent the Insured regarding questions or issues concerning coverage under the Policy.

You have now requested reconsideration alleging a "significant portion of the work done in relation to Donna Roberson and Jeffell Elliott's respective Bankruptcy proceedings is directly related to the resolution of the access, priority, and legal description issues." The Company contends that all actions taken in the bankruptcy proceedings relate to the Insured's attempts to obtain a relief from stay and objection to the confirmation of a Chapter 13 Plan, which the Company specifically stated were not covered. The Company's duty to defend has not been triggered by any of these proceedings. In Arkansas, an insurer's duty to defend is determined by the pleadings. If the pleadings state a claim within the policy coverage, an insurer must defend. *See Mattson v. St. Paul Title Co. of the South*, 277 Ark. 290, 292 (1982). The Insured's access to the Property has not been challenged in either the Roberson or Elliott bankruptcies. Likewise, the priority of the Insured Mortgage has not been challenged. Your claim that Vanderbilt Mortgage and Finance raised priority issues in the Elliott bankruptcy is a mischaracterization of the pleadings filed. Vanderbilt did not assert priority over the Insured Mortgage; rather Vanderbilt merely objected to the Insured's motion and demanded strict proof on all allegations. Such a denial does not trigger the Company's duty to defend. Finally, the legal description attached to the Insured Mortgage has not been challenged. You claim that the Borrower has "raised issues regarding the legal description." By this you are presumably referring to the Borrower's averments that, "[the Borrower] admits that [the Insured] holds a secured lien against some of [the Borrower's] real estate, the extent of which has yet to be determined due to potential errors in the legal description" and "[d]ue to lack of knowledge as to [the Insured's] definition of 'the Property', [the Borrower] denies the remainder of the allegation (sic) in Paragraph 18." These averments do not state a claim that would be entitled to coverage under the Policy. Accordingly, the Company has no duty to defend. The Insured therefore is not entitled to reimbursement of any fees incurred in connection with any bankruptcy proceedings.

The Company also denies any obligation to reimburse the Insured to the extent any of the fees are associated with the work related to the filing of the Second Amended Complaint in the Litigation. The Second Amended Complaint was filed by the Insured without the knowledge or approval of the Company. Additionally, the Company did not retain your firm in any capacity. As a result, the Company is not responsible for fees incurred by the Insured in unilaterally deciding to authorize your firm to file additional pleadings. Moreover, the Second Amended Complaint alleges matters not insured against by the Policy, which requires the continued involvement of the Insured's personal counsel. Pursuant to the Policy, the Company is not responsible for any fees, costs, or expenses incurred by the Insured in defending matters not insured against by the Policy.

Based on the foregoing, the Company respectfully stands by its previous denial of payment of fees. Please note that any reference to any particular provision of the Policy in this letter shall

not be construed as a waiver of any other term or provision. The Company retains the right to supplement this letter. Also, please be advised that the Company retains the right to deny this claim based on additional grounds.

If there are any facts which were unknown to the Company upon making this coverage determination, and which may alter such determination, please provide this information or documentation in writing as soon as possible and your claim will be reevaluated. Please contact me at (904) 854-8945 or Charissa.Mcintosh@fnf.com should you have any questions or concerns regarding this matter. **Please reference the above claim number in all communications with my office.** Thank you.

Sincerely,

Charissa M. McIntosh
Claims Counsel, AVP

# CHICAGO TITLE INSURANCE COMPANY

601 Riverside Avenue • Building 5, Fourth Floor • Jacksonville, FL 32204 • (888) 453-4095

February 6, 2017

Gill Ragon Owen, PA
Attn: Kelly W. McNulty                          *Via email: mcnulty@gill-law.com*
425 West Capitol Avenue, Ste. 3800
Little Rock, AR 72201

RE:   **Claim Number:**   **536077**
      **Policy No:**      **74341-76231831**
      **Insured:**        **One Bank &Trust, NA (the "Insured")**
      **Borrower:**       **Michael & Johanna Barnes**
      **Property:**       **1375 RBL Estate Road, Pine Bluff, AR 71603 (the "Property")**

Dear Mr. McNulty:

This letter is in response to your January 3, 2017 correspondence to Chicago Title Insurance Company (the "Company") wherein you request the Company reconsider its position set forth in its December 20, 2016 letter (the "Fee Coverage Letter"). For the reasons set forth below, the Company must respectfully stand by its previous denial of reimbursement of attorneys' fees incurred by the Insured.

The facts surrounding this matter are set forth in the coverage letter dated March 24, 2016 (the "Coverage Letter") and the Fee Coverage Letter are incorporated herein by reference; capitalized terms not otherwise defined shall have the meanings ascribed in the Coverage Letter and Fee Coverage Letter.

The Insured has requested reimbursement of expenses in the amount of $4,100 for a survey obtained in relation to the claim. The Company has agreed to reimburse this sum and a check in the amount of $4,100 has already been tendered to the Insured. Any claims for additional sums incidental to the actual cost of the survey are hereby denied.

The Insured has also requested reimbursement for attorney fees. The Company previously agreed to defend the Insured against certain challenges to title arising out of Case No. 35CV-15-567 filed in Circuit Court of Jefferson County, Arkansas (the "Litigation"). Specifically, counsel was retained to associate into the Litigation for the limited purposes of obtaining a right of access to the Property. Counsel was not retained to prosecute or defend against those portions of the Litigation related to the foreclosure of another mortgage held by the Insured against property not covered by the Policy. Similarly, counsel was not retained to obtain a relief from stay in any pending bankruptcy actions preventing the Insured's foreclosure of the other mortgage. The invoices provided in support of the Insured's request for reimbursement correspond to your efforts related to the physical possession of the Property, coordinating with the sheriff's office to take possession of the Property, litigating within the pending bankruptcy actions, and researching coverage under the Policy. None of these fees were incurred in furtherance of establishing the



EXHIBIT

4

Insured's right of access to the Property. The Company therefore denied any obligation to reimburse the Insured.

You have now requested reconsideration alleging a "significant portion of the work done in relation to Donna Roberson and Jeffell Elliott's respective Bankruptcy proceedings is directly related to the resolution of the access, priority, and legal description issues." The Company disagrees as there was no adversary proceeding filed in the Bankruptcy challenging the Insured's right of access or even bringing the issue within the jurisdiction of the Bankruptcy Court for adjudication. The actions taken in the bankruptcy proceedings were in furtherance of the Insured's relief from stay to foreclose a mortgage that is not covered under the Policy and objecting to confirmation of the Chapter 13 Plan, which the Company specifically stated were not covered in the Coverage Letter.

The Company also denies any obligation to reimburse the Insured to the extent any of the fees are associated with the work related to the filing of the Second Amended Complaint in the Litigation. The Second Amended Complaint was filed by the Insured without the knowledge or approval of the Company. Additionally, the Company did not retain your firm in any capacity. As a result, the Company is not responsible for fees incurred by the Insured in unilaterally deciding to authorize your firm to file additional pleadings. Moreover, the Second Amended Complaint alleges matters not insured against by the Policy, which requires the continued involvement of the Insured's personal counsel. Pursuant to the Policy, the Company is not responsible for any fees, costs, or expenses incurred by the Insured in defending matters not insured against by the Policy.

Based on the foregoing, the Company respectfully stands by its previous denial of payment of fees. Please note that any reference to any particular provision of the Policy in this letter shall not be construed as a waiver of any other term or provision. The Company retains the right to supplement this letter. Also, please be advised that the Company retains the right to deny this claim based on additional grounds.

If there are any facts which were unknown to the Company upon making this coverage determination, and which may alter such determination, please provide this information or documentation in writing as soon as possible and your claim will be reevaluated. Please contact me at (904) 854-8945 or Charissa.Mcintosh@fnf.com should you have any questions or concerns regarding this matter. **Please reference the above claim number in all communications with my office.** Thank you.

Sincerely,

Charissa M. McIntosh
Claims Counsel, AVP

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS

ONE BANK & TRUST N.A.                                                    PLAINTIFF

V.                                      CASE NO. 35CV-17-48

CHICAGO TITLE INSURANCE COMPANY
f/k/a TICOR TITLE INSURANCE COMPANY                         DEFENDANT

## CHICAGO TITLE'S BRIEF IN SUPPORT OF MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND/OR MOTION FOR SUMMARY JUDGMENT

I.      **Applicable Legal Standards**

   A.      *Arkansas and Federal Rules of Civil Procedure 12(b)(6)*

*State Rules*

A complaint must state facts, not mere conclusions, in order to entitle the pleader to relief.  Ark. Rules Civ. Proc. 8(a).  In Arkansas state courts, Rule 12(b)(6) and Rule 8(a)(1) must be read together to test the sufficiency of the complaint.  *Id.*  Courts look to the underlying facts supporting an alleged cause of action to determine whether the matter has been sufficiently pled.  *Ballard Group, Inc. v. BP Lubricants USA, Inc. 2014 Ark. 276, 436 S.W.3d 445.*  In a breach of contract action, the courts can look to the contract attached to the complaint to determine whether there was a valid contract in force or whether the allegations clearly articulate the breach of a provision.  *Id.*

*Federal Rules*

On a motion to dismiss for failure to state a claim upon which relief can be granted, the court must review the complaint in a light most favorably to the non-

FILED

FEB 2 4 2017

LAFAYETTE WOODS, SR.
Circuit Clerk
JEFFERSON COUNTY, ARKANSAS

moving party, and may dismiss only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations. Fed. Rules Civ. Proc. Rule 12(b)(6). Matters outside the pleadings which are considered in a ruling on a motion to dismiss for failure to state a claim will require conversion of the motion to one for summary judgment and would include any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for the court's ruling and does not merely reiterate what is said in the pleadings. *Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.* 187 F.3d 941 (8th Cir. 1999). A district court does not convert a motion to dismiss for failure to state a claim into a motion for summary judgment when it does not rely upon matters outside the pleadings in granting the motion. Fed. Rules Civ. Proc. Rules 12(b)(6), 56., *Gorog v. Best Buy Co., Inc.* 760 F.3d 787, (US Ct. Appeals, 8th Cir. 2014).

## II. Subject Matter of the Lawsuit and Facts

1. Plaintiff brings this action against Chicago Title Insurance Company f/k/a Ticor Title Insurance Company ("Chicago") because of two mortgagee's title insurance policies issued by Chicago insuring the validity and priority of the relevant mortgages resulting from two separate loans by One Bank & Trust, N.A. ("One Bank"). Comp. ¶¶ 9, 10, 11

2. Policy Number 74341-76231831 insured a mortgage from Michael and Johanna Barnes on what has been referred to as the Barnes Property. Comp. ¶ 12, 29; Barnes Mortgage, Ex. G; Barnes Mtgee Policy Ex. H .

3.      Policy Number 7410-7623236 insured One Bank's mortgage executed by Donna Roberson to secure 39 acres, more or less. Comp. ¶ 17, 18; Ex. A – Roberson Mortgage; Comp. Ex. B – Roberson Mtgee Policy.

4.      Right of legal access is insured.

*Barnes Foreclosure*

5.      On February 12, 2015, One Bank filed its complaint for foreclosure against the Barneses (Jefferson County Circuit Court, Case No. 35CV-15-60) ("Barnes Foreclosure").[1]

6.      On July 23, 2015, One Bank acquired legal title to the Barnes' property by Commissioner Deed dated July 23, 2015. Comp. ¶¶ 35, 36.

7.      Access to the Barnes property was by way of a gravel road running across the Roberson Property and, after One Bank acquired title, various individuals objected to One Bank's use and asserted the gravel road was not an express easement serving the Barnes' property. Comp. ¶¶ 37, 38, 39, 40.

8.      On November 9, 2015, pursuant to a Writ of Assistance filed in the Barnes Case, the Jefferson County Sheriff delivered possession of the Barnes Property to One Bank, whereupon One Bank's agents changed the locks. Comp. ¶ 41.

9.      However, after the Sheriff's office had discharged its duty pursuant to the Writ of Assistance, the individuals continued to bar One Bank's access to the Barnes Property. Comp. ¶ 42.

---

[1] There are several cases involving parties to the Roberson state court action cited throughout this brief for which this court is allowed to take judicial notice.

*Roberson Foreclosure*

10.     On October 8, 2015, One Bank filed its foreclosure complaint against Donna Roberson seeking to foreclose on the Roberson property (Jefferson County Circuit Court, Case No. 35CV-15-567) ("Roberson Foreclosure").

11.     On December 7, 2015, Donna Roberson filed a Chapter 13 Voluntary Petition (U.S. Bkrptc'y Ct. Eastern Dist. of AR, Case No. 5:15-bk-16155) ("Roberson Bankruptcy").  Comp. ¶ 50.

12.     On December 11, 2015, apparently unaware Roberson had filed for bankruptcy, One Bank filed its first amendment to its complaint for foreclosure adding parties due to a claim of ownership to part of the Roberson mortgaged property by Jeffell Elliott, Andrew Lacy, and Rosalind Parys-Christopher. Comp. ¶¶ 44, 46.

13.     One Bank also named Vanderbilt Mortgage & Finance, Inc. ("Vanderbilt") who had a mortgage from Elliott and Parys-Christopher.  Comp. ¶ 47.

14.     On January 14, 2016, in the Roberson Bankruptcy, One Bank filed its Motion  to Dismiss Case or in the Alternative, Motion for Relief from Stay and Abandonment to pursue the access issue and foreclosure in the state court action. Comp. ¶¶ 52, 53, 54;  Roberson Bankruptcy, Docket #13.

15.     On February 2, 2016, Roberson filed its Response to One Bank's Motion. Roberson Bankruptcy, Docket #25.

16.     The Roberson bankruptcy court scheduled a hearing on One Bank's Motion for February 11, 2016, which was continued to March 16, 2016.   Roberson Bankruptcy, Docket ##27, 28, 30.

17.     On March 21, 2016, an Agreed Order of Strict Compliance was entered in the Roberson Bankruptcy where the bankruptcy court determined, *inter alia*:

   a.     "One Bank holds a properly perfected secured mortgage on approximately 40 acres [the Roberson Property]."

   b.     "[Roberson] grants One Bank an immediate, continuous and permanent easement to the Barnes Property via the Gravel Road," and "Debtor agrees to direct all other property owners adjacent to the Gravel Road to allow One Bank access to the best of her abilities."

Comp. ¶¶ 55, 56; Roberson Bankruptcy, Docket #36.

18.     In addition, pursuant to the Agreed Order,  One Bank agreed to dismiss its motions on the conditions that:

   a.     Roberson pay One Bank its regular monthly payment plus adequate protection to cure arrearages.

   b.     Roberson amend her bankruptcy schedule to recognize One Bank's mortgage as encumbering the entire Roberson Property; and

   c.     Roberson grants One Bank a permanent access easement to the Barnes property via the gravel road.

Comp. ¶ 57; Roberson Bankruptcy, Docket #36.

*Elliott Bankruptcy*

5

19.     On August 21, 2015, prior to One Bank's filing of its First Amended Complaint naming Elliott and Vanderbilt,  Elliott filed a Chapter 13 Voluntary Petition ("Elliott Bankruptcy"). Elliott Bankruptcy, Docket #1; Comp. ¶60.

20.     On January 20, 2016, One Bank filed a  Motion for Abandonment and Relief from Stay in the Elliott Bankruptcy to pursue the access issue seeking to direct Elliott to allow One Bank access to the Barnes Property.  Comp. ¶ 62; Elliott Bankruptcy, Docket #54.

21.     Elliott challenged One Bank's motion by asserting One Bank had no lien on the Elliott Parcel. Comp. ¶ 63; Elliott Bankruptcy, Docket #65.

22.     On February 4, 2016, Vanderbilt objected to One Bank's motion.  Comp. ¶4; Elliott Bankruptcy, Docket #63.[2]

23.     On July 21, 2016, the court entered its Order on the Motion for Abandonment by One Bank, granting One Bank relief from the stay so that the access issue in the state court Roberson case could be litigated.  Comp.¶66

*The Title Insurance Claims*

24.     On or about January 28, 2016, One Bank submitted title insurance claims to Chicago on both the Roberson policy and the Barnes Policy.  Comp. ¶ 83.

25.     The Barnes claim submittal states in part:

> . . . One Bank acquired title to the insured property pursuant to a Commissioner's Deed recorded on July 23, 2015. . . . At the time the policy was issued, access to the insured property was available solely by an existing gravel roadway known as RBL Estate Road.

---

[2] Defendant has not used the exact language from Plaintiff's complaint.  Defendant disagrees with Plaintiff's interpretation of Vanderbilt's pleadings as will be noted later in the documents.

After gaining title to the property, with the assistance of the Jefferson County Sheriff, One Bank took possession of the insured property from the Borrowers.  Since One Bank took possession, Borrowers and various members of the Borrowers' family, including but not limited to, Donna Lacy Roberson, Andrew Lacey, Jeffell Elliott, Eligha Lacy and Rosalynd Parys-Christopher, have refused to allow One Bank to use RBL Estate Road to access the insured property, claiming that the road is private and crosses over property owned by Jeffell Elliott.  As a result, One Bank has no way to exercise its right to access the insured property.  One Bank has brought action against the individuals named above in [an] attempt to establish an access easement over RBL Estate Road.  Donna Lacy Roberson and Jeffell Elliott have both filed for chapter 13 bankruptcy, and One Bank has  moved for relief of stay in both cases.  A hearing on these motions is scheduled for February 11, 2016 at 9:00 am.  Ex. 2, Barnes Claim Submission

26.   The Roberson claim submittal states in part:

. . . One Bank holds a secured interest [on] 39.45 acres owned or previously owned by Borrower.  Borrower has filed chapter 13 bankruptcy . . . .While Borrower has identified One Bank as a secured creditor in her bankruptcy filings, Borrower states that One Bank's secured interest is limited only to a house and 4.6 acres of land located at 1370 RBL Estate Road.  One Bank has filed a foreclosure action against Borrower seeking to foreclose on all 39.45 acres securing Borrower's debt.  The foreclosure action also seeks to establish access to the insured property, as well as an adjacent property One Bank previously obtained through foreclosure [the Barnes property]. . . Various members of the Borrowers' family, including but not limited to Borrower, Michael Barnes, Johanna Barnes, Andrew Lacy, Jeffell Elliott and Rosalynd Parys-Christopher, have refused to allow One Bank to use RBL Estate Road to access the insured property, claiming that the road is private and crosses over property owned by Jeffell Elliott. . . . One Bank has brought action against the individuals named above in [an] attempt to establish an access easement over RBL Estate Road. Donna Lacy Roberson and Jeffell Elliott have both filed for chapter 13 bankruptcies, and One Bank has moved for relief of stay in both cases, with a hearing on 9/11/16 at 9am. Ex.1,   Roberson   Claim Submission.

27.    On March 24, 2016, Chicago issued its coverage determination and accepted coverage on the access issue on both claims under a reservation of rights. Comp. ¶ 85; Ex.'s L and M.

28.    The Barnes claim was assigned Chicago Claim No. 536077 and the Roberson claim was assigned Chicago Claim No. 536106. Comp., Ex.'s L and M.

29.    Chicago assigned Wright, Lindsey & Jennings ("WLJ") as claims counsel for its insured, One Bank, on both the Roberson and Barnes policies. Comp. ¶ 88; Ex.'s L and M.

30.    In the Coverage Letter on the Roberson claim, Chicago restates the facts, the case status, noting the First Amended Complaint seeks access by implication or necessity, and the subsequently discovered bankruptcy of Elliott, the neighboring property owner. Comp., Ex. L.

31.    Specifically, Chicago states:

> A review of the pleadings in both Bankruptcy cases reveals there may be a challenge by the Borrower to the legal description encumbered by the Insured Mortgage. It is not yet clear what the basis is for the Borrower's statement that there may be a legal description error in the Insured Mortgage. It further appears there may be a future challenge to the priority of the Insured Mortgage on the parcels conveyed by the Borrower to third parties in the foreclosure action upon the granting of relief from the Bankruptcy stay.
>
> From the information that the Company has been provided, there may be a lack of right of access to and from the land. Accordingly, this is a covered matter subject to the terms and provisions of the Policy. The Company will retain counsel to associate into the pending litigation to confirm access to the Property with a full reservation of rights. Contact information for litigation counsel will be provided under separate cover.

8

Comp. Ex. L, p.2.

32.    The Barnes Coverage Letter is virtually identical in coverage substance, but there is no mention of a priority issue arising.  Comp., Ex. M.

33.    On both Coverage Letters, Chicago states, "[T]he Company will retain counsel to associate into the pending litigation to confirm access with a full reservation of rights." . . . "The Company does not consent to pay attorney's fees in representing the Insured except as stated in this letter or in the Policy." Comp. Ex.'s L and M.

34.    Chicago also quotes certain provisions of the policy under Terms and Conditions, including paragraph 4, Defense and Prosecution of Actions – Duty of Insured Claimant to Cooperate. *Id.*

35.    On November 21, 2016, One Bank made demand(via email)  for payment of its attorney's fees, costs and expenses for prosecution of the Roberson and Barnes issues.  Comp. ¶ 98, Ex. O.

36.    The demand states in part:

> The purpose of my email to you today is to make a formal claim on behalf of One Bank for compensation for attorney's fees and costs incurred in the defense and prosecution of these claims. . . . As you know, One Bank made claims under its title policies (referenced above) in January 2016.  Since that time, we have had 2 hearings in these matters [one in the Jeffell Elliott bankruptcy and one in the Donna Roberson state court litigation].  At both of those hearings, attorneys hired by Fidelity were present but did not participate in the hearings.  On several prior occasions we have offered to give these files to the attorneys at Wright, Lindsey and Jennings, so that One Bank would not have to incur attorney's fees, but every time we were told that this matter was too complicated for a new set of attorneys to take over and that the Fidelity-hired attorneys would

just provide assistance.  The result was that while One Bank has a policy which provides for the payment of attorney's fees, it was not getting the benefit of those provisions.  Every issue that has arisen involving this property stems from the incorrect legal description on the initial mortgage [a document affecting Title not properly created] and/or the lack of access [no right of access to and from the Land].  Both of those are covered under the policies and Fidelity should pay for the costs, attorney's fees and expenses incurred in these matters.[3]

37.     One Bank then sent their demand by letter dated December 7, 2016, restating its demands.  Comp., Ex. P.

38.     Chicago responded on December 20, 2016, refusing to pay One Bank's attorney's fees as to the Roberson claim (536106) which, at that time, was $68,325.17 stating:

The Company previously accepted coverage with respect to the lack of a legal right of access to and from the property by letter dated March 24, 2016. . .  As set forth in the Coverage Letter, the Company retained counsel to associate into the pending litigation only for the limited purposes of obtaining a right of access to the Property.  Counsel was not retained to prosecute the foreclosure action or to obtain relief from stay from the Bankruptcy Court to continue the foreclosure action.  Further, the Coverage Letter  specifically stated the Company would not pay attorney's fees in representing the Insured except as stated in that letter or in the Policy.

Comp, Ex. Q.

39.     Chicago then directed One Bank to the policy's conditions and stipulations in relevant part:

7. Determination and Extent of Liability.

---

[3] The subject of the state court hearing is not known.

*(c) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.*

Condition 4 states in part:

*4. Defense and Prosecution of Actions:   Duty of insured Claimant to Cooperate.*
*(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured,* **but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy.** *The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured* **as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.**

*(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgaged, as insured, or to prevent or reduce loss or damage to the insured.   The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy.   If the Company shall exercise its rights under this paragraph, it shall do so diligently.*   (Emphasis added by Chicago)

Comp., Ex. Q

40.   Chicago noted that "[o]n March 21, 2016, [before the Coverage Letter] an Agreed Order of Strict Compliance was entered in the Roberson Bankruptcy ordering Ms. Roberson to grant an immediate, continuous, and permanent access easement to the Barnes Property over the existing gravel road and finding that One Bank's mortgage

covered the 39 acres." *Id.* . . .Finally, pursuant to the Policy, the Company is not responsible for the fees of any counsel not specifically retained by the Company." *Id.*

41.     As to the Barnes claim, Chicago notes, "the demand is for 52.9 hours representing $11,014.00 in attorney's fees." Chicago also stated:

> The Company specifically stated in the Coverage Letter that it was accepting coverage only with respect to the lack of an access easement.   Further, the Coverage Letter specifically stated the Company was only retaining counsel to associate into the pending foreclosure litigation, as co-counsel, for the limited purpose of obtaining a right of access.  Counsel was, in fact, retained to obtain the grant of easement.  Counsel was not retained for any other purpose with respect to this claim.
>
> At the time of the Coverage Letter, the foreclosure action was subject to an automatic stay due to the borrower of that foreclosure, Ms. Donna Roberson, filing for Chapter 13 Bankruptcy protection. On March 21, 2016, an Agreed Order of Strict Compliance was entered by the Court in the Donna Roberson Bankruptcy whereby the Court ordered Ms. Roberson must comply by granting an immediate, continuous and permanent access easement to the insured Property over the existing gravel road in exchange for the withdrawal of the Insured's Motion to Dismiss and Objection to Confirmation of Plan, both of which were filed in the Roberson Bankruptcy.
>
> Finally, pursuant to the Policy, the Company is not responsible for the fees of any counsel not specifically retained by the Company. The Company did not retain the claimant firm in any capacity on this claim.  Further, the Company did not agree to pay the fees of the claimant firm.  Accordingly, the Company is not responsible for payment of claimant counsel's invoice *in toto.*

Comp. Ex. R.

42.     On February 6, 2017, Chicago again responded to One Bank at One Bank's request for reconsideration.  Roberson Ex.3,  Barnes Ex.4 - Chicago letter to One Bank's counsel dated 2/6/17.

43.    More specifically, Chicago explained:

You have now requested reconsideration alleging a "significant portion of the work done in relation to Donna Roberson and Jeffell Elliott's respective Bankruptcy proceedings is directly related to the resolution of the access, priority, and legal description issue." The Company contends that all actions taken in the bankruptcy proceedings relate to the Insured's attempts to obtain a relief from stay and objection to the confirmation of a Chapter 13 Plan, which the Company specifically stated were not covered. The Company's duty to defend has not been triggered by any of these proceedings. In Arkansas, an insurer's duty to defend is determined by the pleadings. If the pleadings state a claim within the policy coverage, an insurer must defend. *See Mattson v. St. Paul Title Co. of the South*, 277 Ark. 290, 292 (1982). The Insured's access to the Property has not been challenged in either the Roberson or Elliott bankruptcies. Likewise, the priority of the Insured Mortgage has not been challenged. *Your claim that Vanderbilt Mortgage and Finance raised priority issues in the Elliott bankruptcy is a mischaracterization of the pleadings filed. Vanderbilt did not assert priority over the Insured Mortgage; rather, Vanderbilt merely objected to the Insured's motion and demanded strict proof* . . . (Emphasis added, see ¶22 and footnote 2)

The Company also denies any obligations to reimburse the Insured to the extent any of the fees are associated with the work related to the filing of the Second Amended Complaint in the Litigation. The Second Amended Complaint was filed by the Insured without the knowledge or approval of the Company. Additionally, the Company did not retain your firm in any capacity. As a result, the Company is not responsible for fees incurred by the Insured in unilaterally deciding to authorize your firm to file additional pleadings. Moreover, the Second Amended Complaint alleges matters not insured against by the Policy, which requires the continued involvement of the Insured's personal counsel. Pursuant to the Policy, the Company is not responsible for any fees, costs, or expenses incurred by the Insured in defending matters not insured against by the Policy.

44.    Plaintiff filed this action on January 25, 2017.

## III.    Abbreviated Timeline

For the convenience of the court, an abbreviated timeline follows pertaining to the Elliott and Roberson bankruptcies, the Roberson and Barnes state court actions, and the title insurance issues.

## ABBREVIATED TIMELINE

| DATE | CASE NO. | DESCRIPTION |
|------|----------|-------------|
| 2/12/2015 | 35CV-15-60 (Barnes) | One Bank files it complaint for foreclosure |
| 7/23/2015 | 35CV-15-60 (Barnes) | One Bank acquires title to the Barnes property by Commissioner's Deed. |
| 8/21/2015 | 5:15-bk-14150 (Elliott) | Chapter 13 Petition |
| 10/8/2015 | 35CV-15-567 Roberson) | One Bank files its Complaint for Foreclosure |
| 11/9/2015 | 35CV-15-60 (Barnes) | Sheriff executes on a Writ of Assistance |
| 12/7/2015 | 5:15-bk-16155 (Roberson) | Roberson filed Chapter 13 |
| 12/11/2015 | 35CV-15-567 (Roberson) | First Amended Complaint for Foreclosure by One Bank adding parties and action for access |
| 1/14/2016 | 5:15-bk-16155 (Roberson) | One Bank filed MTD Bankruptcy or, alternatively, for abandonment and relief from stay |
| 1/20/2016 | 5:15-bk-14150 (Elliott | One Bank's Motion for Abandonment and Relief from Stay filed |
| 1/28/2016 | | Title Insurance Claims submitted |
| 2/2/2016 | 5:15-bk-16155 (Roberson) | Roberson filed Response to One Bank's MTD Bankruptcy or alternatively for abandonment and relief from stay |
| 2/4/2016 | 5:15-bk-14150 (Elliott) | Vanderbilt files Objection to One Bank's motion for abandonment and relief from stay |
| 3/21/2016 | 5:15-bk-16155 (Roberson) | Agreed Order of Strict Compliance |
| 7/21/2016 | 5:15-bk-14150 (Elliott) | Order on Motion to Abandonment by One Bank (lifting stay for access issue) |
| 9/26/2016 | 35CV-15-567 (Roberson) | One Bank's 2nd Amended Complaint |
| 11/2/2016 | 35CV-15-567 | Notice of Appearance –WLJ for One Bank |

| DATE | CASE NO. | DESCRIPTION |
|------|----------|-------------|
|      | (Roberson) |           |
| 11/21/2016 |    | One Bank made demand for payment |
| 12/7/2016 |     | One Bank restated demand |

## IV.    Plaintiff's Causes of Action

Plaintiff brings four causes of action:    (1) Breach of Contract: Failure to Reimburse for Survey; (2) Breach of Contract:    Failure to Reimburse for Damages Incurred as a result of lack of access to the Barnes property; (3) Breach of Contract: Failure to Reimburse for Legal Expenses Incurred as a result of lien priority issues; and (4) Violation of Deceptive Trade Practices Act.

*1.   Plaintiff's breach of contract actions 1, 2, and 3 should be dismissed.*

At issue in this case is whether or not Chicago breached its obligations as contained in the two title insurance policies.  As such, the court must interpret the title insurance contract like any other contract according to general contract principles to determine the mutual intent of the parties. *Foster v. Farm Bureau Mutual Ins. Co.,* 71 Ark. App 132, 27 S.W.3d 464, (2000).  Like other contracts, the different clauses and provisions are to harmonize the entirety of the contractual agreement. *Bates v. Security Ben. Life Ins. Co.* 146 F.3d 600 (8th Cir. 1998).  It is unnecessary to resort to rules of construction if policy terms are unambiguous; in such cases, policy will not be interpreted to bind an insurer to a risk which it plainly excluded and for which it was not paid. *Fulton v. Beacon Nat. Ins. Co.,* 2012 Ark. App. 320, 416 S.W.3d (2012).

In the present case, the Plaintiff asserts that Chicago breached its contract by refusing to reimburse its insured's attorneys fees because, as One Bank alleges, all actions of the insured's attorneys pertained to the defective legal description in the initial mortgage causing the status of its priority to become an issue. As demonstrated by the claims submission and acknowledged by Chicago in its coverage determination letter, the claim made by insured's counsel did not raise a lien priority issue; only a lack of access issue. Ex. 1, 2, 3, & 4.   It was Chicago that, after reviewing pleadings in connection with the claim, observed that a priority issue *might be raised* in the state court proceeding given the pleadings filed in the bankruptcies.

One Bank does not allege it voiced any objection to Chicago's coverage letter.  As to claims counsel's participation the only allegation made supporting Chicago had breached the contract is the suspect allegation that the attorneys at WLJ considered the case "too complicated" to take over.   Even if WLJ made this statement, One Bank's failure to object constitutes its acceptance to these terms and, therefore, a waiver of Chicago's alleged breach.

The consent to the legal work arrangement is exemplified by the Second Amended Complaint in which WLJ was not named as co-counsel. As Chicago noted in its response of February 6, 2017, it had no knowledge of this pleading and did not authorize One Bank's attorneys to prepare this pleading. Ex. 3 & 4. A comparison of the Second Amended Complaint to the First Amended Complaint shows that it restates the same cause of action for access.

As to the lien priority issue, it was not until the latter part of October that Vanderbilt and the other individuals formally raised it. Immediately thereafter, an Entry of Appearance was made by claims counsel, WLJ, in the state court action. Approximately three weeks later, One Bank made formal demand for prior attorney's fees it had incurred as well as the expense for a survey its attorneys had ordered. (The survey has now been paid by Chicago.)

One Bank is responsible for its legal fees incurred in the relevant proceedings because it consented to the arrangement of work distribution with WLJ and the matters were not covered or ripe under the policy. If One Bank did not consent, it was required to do something rather than remain silent and wait eleven months to send an invoice. One Bank should be estopped from raising this issue now.

Evidently One Bank is displeased with WLJ's management of the case. One Bank asserts, [t]hese attorneys have taken an extremely limited role in the matters described [in this complaint] and have attended, but have had no participation, in the litigation pertaining to these matters. Comp. ¶88. One Bank contradicts itself. It recognizes WLJ attending hearings in the bankruptcy though neither the access or priority issues were proper for that venue. Consequently, there was no need for WLJ to participate. One Bank acknowledges WLJ attended some unidentified state court hearing. One can reasonably assume One Bank knew WLJ had not yet entered an appearance. One Bank does not allege it requested WLJ to conduct the hearing and WLJ refused.

These allegations, at best, assert a lack of diligence in performance as opposed to non-performance. Interpreting these allegations to an extreme degree, one might say it

17

rises to the level of negligence. This type of assertion was made in *Central Flying Service, Inc. v. StarNet Ins. Co.*, 150 F. Supp 3d 1038 (U.S.D.C. E.D. Ark. West. Div. 2015). There, the plaintiff's allegation was that the insurer had failed to explain, failed to investigate, and failed to contact the plaintiff. The *StarNe*t court concluded these types of allegations raised a negligence in the performance of duties under the insurance contract and observed the Supreme Court of Arkansas has held that negligence performance of an insurance contract is not a tort in Arkansas. See also *Farm Bureau Ins. Co. of Ark, Inc. v. Running M Farms, Inc.*, 366 Ark. 480, 237 S.W.3d 32 (2006).

Moreover, the terms of the title policy provides, "the Company shall  have the right at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured." Ex. B, Conditions and Stipulations,¶4(b). This provision in the policy gives the insurer complete management over the action. *McChristian v. State Farm Mutual Automobile Ins. Co.*, 304 F.Supp 748 (U.S.D.C. W.D. Ark., Fayetteville Div.)

Based upon One Bank's allegations in its Complaint, the court must dismiss the breach of contract actions for failure to state a claim upon which relief can be granted. Or, if the court believes it is necessary to consider matters outside of the pleadings and its own exhibits, the court should grant summary judgment in favor of Chicago.

2.    *Plaintiff has failed to state a claim under Arkansas Deceptive Trade Practices Act.*

Deceptive and unconscionable trade practices are defined in Ark. Code Ann. § 4-88-107.  One Bank asserts that the pertinent provision is 10(a) which states, "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."   The factual allegations that One Bank claims constitutes this deceptive practice is:

> Chicago provided only minimal attorney assistance and representation for the resolution of issues Chicago knew were covered under the Barnes Policy and the Roberson Policy; Comp. ¶137.

> Instead of taking over litigation to resolve these covered issues, Chicago allowed One Bank to pay its own attorneys to do the necessary work, even going so far as to decline One Bank's offers to Chicago's attorneys to pursue resolution [of] the covered issues based on the contention that the underlying facts and filings were too complicated for a new set of attorneys to take over.  Comp. ¶ 138.

From these facts, One Bank concludes Chicago engaged in unconscionable, false or deceptive acts.  But these allegations do not assert that Chicago misrepresented to One Bank anything about its instructions to counsel. (Though this allegation is disputed for purposes of this motion, it must be construed in favor of Plaintiff.)   If anything, Chicago is disclosing its position on case management.  So, One Bank's characterization is off the mark.

For these reasons, Plaintiff has failed to state a claim against Defendant for violation of the Arkansas' Deceptive Trade Practices Act and this action must be dismissed.  *Jarrett v. Panasonic Corp. of No. America,* 8 F.Supp 3d 1074 (U.S.D.C. E.D. Ark. West. Div. (2013).

Respectfully submitted,

McMULLAN & BROWN
PO Box 2839
Little Rock, AR  72203-2839
(501) 376-9119
(501) 376-8437 (fax)

_____
Marian M. McMullan, Bar No. 86123
mmcmullan@m-b.law
*Counsel for Chicago Title Ins. Co.*

## CERTIFICATE OF SERVICE

I, Marian M. McMullan, do hereby certify that I have sent via:

- ☐    Hand-delivery
- ☐ /  Facsimile
- ☑    Electronic Mail
- ☐    U.S. Mail, postage pre-paid
- ☐    Court ECF System
- ☐    Federal Express

this **23** day of _**February**_, 2017, a true and complete copy of the foregoing as follows:

Wm. David Duke, Esq.
Kelly W. McNulty, Esq.
Aaron M. Heffington, Esq.
Gill Ragon Owen P.A.
425 W. Capitol, Ste. 3800
Little Rock,  AR 72201
        *Attorneys for Plaintiff*

_____
Marian M. McMullan